THE HONORABLE JOHN H. CHUN

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

| | |
|---|---|
| CHARLES GARBACCIO, Individually and on Behalf of All Others Similarly Situated, | No. 2:24-cv-01362-JHC |
| Plaintiff, | <u>CLASS ACTION</u> |
| vs. | **CONSOLIDATED COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS** |
| STARBUCKS CORPORATION, et al., | |
| Defendants. | <u>DEMAND FOR JURY TRIAL</u> |

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400, Seattle, WA 98101-3268
Telephone: 206/623-1900

# TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| I. | INTRODUCTION | 1 |
| II. | JURISDICTION AND VENUE | 3 |
| III. | PARTIES | 4 |
| | A. Lead Plaintiffs | 4 |
| | B. Defendants | 4 |
| IV. | FACTUAL BACKGROUND | 6 |
| | A. Starbucks Expands to the Largest Coffee House Chain in the World | 6 |
| | B. Amid Growing in-Store Inefficiencies, Struggling Sales in China, and Falling Profit Margins, in September 2022 Starbucks Introduces an Aggressive Three-Year "Reinvention Plan" and Incoming CEO Narasimhan | 7 |
| | C. In March 2023, Narasimhan Takes over and Introduces His Own Spin on the Reinvention Plan Dubbed the "Triple Shot Reinvention with Two Pumps" Plan | 8 |
| | D. Starbucks Implements an Algorithm, the SPA Tool, but It Suffers from Severe Deficiencies that Lead to Store Understaffing, Rapidly Increasing Wait Times, and Declining Store Traffic | 9 |
| | E. Defendants Concealed that Starbucks Sales in China Were Being Impacted by Fierce Competition | 11 |
| V. | DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS | 12 |
| | A. Q4 2023 and FY 2023 Earnings Report | 12 |
| | B. Q1 2024 Earnings Report | 16 |
| VI. | ADDITIONAL SCIENTER ALLEGATIONS | 21 |
| | A. The Alleged Misrepresentations and Omissions Concerned Starbucks' Core Operations | 21 |
| | B. Defendants' Knowledge Through Access to Information | 23 |
| | C. Narasimhan's Abrupt Termination Supports Scienter | 24 |
| | D. Corporate Scienter | 25 |

CONSOLIDATED COMPLAINT FOR
VIOLATION OF FEDERAL SECURITIES LAWS
(2:24-cv-01362-JHC)
4919-1893-9924.v1

- i -

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400, Seattle, WA 98101-3268
Telephone: 206/623-1900

1
2                                                                                              **Page**
3
4   VII.    LOSS CAUSATION ......................................................................................25

    VIII.   POST-CLASS PERIOD DEVELOPMENTS ..............................................28

    IX.     APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND THE
            FRAUD-ON-THE-MARKET DOCTRINE ...............................................29

    X.      CLASS ACTION ALLEGATIONS ............................................................30

    XI.     CAUSES OF ACTION ...............................................................................31

            COUNT I .....................................................................................................31

            COUNT II ....................................................................................................33

    PRAYER FOR RELIEF ............................................................................................34

    JURY DEMAND .......................................................................................................35
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

CONSOLIDATED COMPLAINT FOR
VIOLATION OF FEDERAL SECURITIES LAWS
(2:24-cv-01362-JHC)                                         - ii -

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400, Seattle, WA  98101-3268
Telephone: 206/623-1900

Lead Plaintiffs Pavers & Road Builders District Council Pension Fund, Teamsters Local 237 Additional Security Benefit Fund, and Teamsters Local 237 Supplemental Fund for Housing Authority Employees (collectively, "Lead Plaintiffs"), by and through their counsel Robbins Geller Rudman & Dowd LLP, allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters.[1]

## I.    INTRODUCTION

1.    This securities class action is brought on behalf of Lead Plaintiffs and all other persons that purchased or otherwise acquired Starbucks common stock between November 2, 2023 and April 30, 2024, inclusive (the "Class Period"), and were damaged thereby (the "Class"), seeking to pursue remedies under §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act").

2.    Starbucks is an iconic brand and the largest coffee chain in the world.  The majority of Starbucks' revenue comes from selling handcrafted beverages (coffee and tea) in its company-operated stores located in the United States and China, its largest and second largest markets, respectively.  This case centers on Defendants' concerted effort to hide from investors that store traffic (or transactions) – a Starbucks financial metric that reports the number of sales at existing company-operated stores – in these two important markets was declining.  During the Class Period, Defendants knew but failed to disclose that systemic understaffing at U.S. company-operated stores was causing frustratingly long wait times and driving customers away, while aggressive price wars by Starbucks' competitors were causing store traffic to decline in China.

---

[1]    Lead Plaintiffs' information and belief is based on, among other things, the independent investigation of counsel, which includes, but is not limited to, a review and analysis of: (a) Starbucks Corporation's ("Starbucks" or the "Company") public filings with the U.S. Securities and Exchange Commission ("SEC"); (b) transcripts of Starbucks' senior management's conference calls with investors and analysts; (c) releases and media reports issued about and disseminated by the Company; (d) analyst reports issued about Starbucks; (e) interviews of former Starbucks employees; (f) other public information and data regarding the Company; and (g) documents cited herein.  Lead Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

CONSOLIDATED COMPLAINT FOR
VIOLATION OF FEDERAL SECURITIES LAWS
(2:24-cv-01362-JHC)                                                                    - 1 -

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400, Seattle, WA  98101-3268
Telephone: 206/623-1900

3.      Leading into the Class Period, the Starbucks brand, built on the customer's in-store experience, was facing headwinds as in-store operations were being overloaded by customized beverage options and mobile orders.  To turn this around, Starbucks and its executives publicly introduced reinvention plans that were designed to make Starbucks' store operations more efficient and boost sales growth both in the United States and China.  During the Class Period, Defendants told investors that the reinvention plans were "fueling revenue growth" and delivering "improved partner and customer experiences," store "traffic continues to be strong and it's growing," and the reinvention plans were creating "exciting momentum in China."

4.      In truth, Defendants were aware or recklessly disregarded that the reinvention plans were not delivering the results Defendants claimed.  Rather, the reinvention plans were causing U.S. store traffic to decline.  Unbeknownst to investors, in implementing the reinvention plans, Starbucks slashed staff in order to cut costs and employed a proprietary algorithm (the SPA tool) to allocate the remaining employees – whom Starbucks calls "partners."  But the algorithm fatally underestimated the number of partner hours needed in-store by failing to account for the extra time required to accommodate increasingly popular beverage customizations, such as cold foam or extra espresso shots.  This was leading to understaffing in nearly one-third of Starbucks' U.S. stores.  The understaffing problems were compounded by a Company roll out of numerous new menu offerings, spikes in store traffic from increased promotions, and increasing and conflicting demands placed on partners due to surging mobile orders.  As a result of these problems, the Company was experiencing widespread longer wait times at U.S. stores, which were driving customers away and decreasing store traffic.

5.      In China, the reinvention plans were likewise failing, and Starbucks was facing mounting competition from specialty coffee chains, local cafés, and premium brands, leading to a sharp store traffic decline.  Rivals aggressively cut prices, expanded faster, and dominated the takeout market, leaving the Company unable to compete.

CONSOLIDATED COMPLAINT FOR
VIOLATION OF FEDERAL SECURITIES LAWS
(2:24-cv-01362-JHC)                                    - 2 -

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400, Seattle, WA  98101-3268
Telephone: 206/623-1900

6.      Defendants knew or were reckless in not knowing that their Class Period statements were misleading when made.  The fraud involved Starbucks' two largest markets, the United States and China.  Further, the Individual Defendants were Starbucks' top two executives – the Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO") – who repeatedly professed on conference calls with investors their knowledge of: (a) progress on the reinvention plans and their impact on the Company's financial performance; (b) efforts to improve partner scheduling and staffing; and (c) consumer demand through Defendants' close tracking of over 75 million customers using the Starbucks mobile app.

7.      The relevant truth concealed by Defendants' fraud was revealed to investors on April 30, 2024, when Starbucks released its Q2 2024 earnings results.[2]  The Company shocked investors, reporting that North America and U.S. comparable store sales declined 3%, driven by a 7% decline in store traffic, and China comparable store sales declined 11%, driven by a 4% decline in store traffic.  Defendants also admitted that longer wait times contributed to the miss and "intense price competition" contributed to the decline in China.  Several analysts noted that Starbucks Q2 2024 performance was the weakest store traffic performance outside of the pandemic and the global financial crisis.  In response to the Q2 2024 earnings results, the price of Starbucks common stock plummeted nearly 15%, causing Lead Plaintiffs and other investors to suffer significant losses.

## II.      JURISDICTION AND VENUE

8.      The claims alleged herein arise under §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b), 78t(a)), and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

9.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act (15 U.S.C. §78aa).

---

[2]    The letter "Q" stands for the Company's fiscal quarter of its fiscal year ("FY"); thus Q2 2024 is Starbuck's second fiscal quarter for FY 2024.

CONSOLIDATED COMPLAINT FOR
VIOLATION OF FEDERAL SECURITIES LAWS
(2:24-cv-01362-JHC)
- 3 -

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400, Seattle, WA  98101-3268
Telephone: 206/623-1900

10.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §§1391(b)-(c) because at all relevant times Starbucks maintained its corporate headquarters in this District.

11.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce of the United States, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.    PARTIES

### A.    Lead Plaintiffs

12.     Lead Plaintiff Pavers & Road Builders District Council Pension Fund is a multi-employer defined benefit fund with more than $300 million in assets under management operated for the benefit of thousands of participants, pensioners, and beneficiaries.  As set forth in its previously filed certification, Pavers & Road Builders District Council Pension Fund acquired Starbucks common stock at artificially inflated prices during the Class Period and was damaged thereby.  ECF 15-2, 15-3.

13.     Lead Plaintiffs Teamsters Local 237 Additional Security Benefit Fund and Teamsters Local 237 Supplemental Fund for Housing Authority Employees (collectively, the "Teamsters Local 237 Funds") are multi-employer defined benefit plans with more than $400 million in assets under management operated for the benefit of thousands of participants, pensioners, and beneficiaries.  As set forth in their previously filed certification, the Teamsters Local 237 Funds acquired Starbucks common stock at artificially inflated prices during the Class Period and were damaged thereby.  *Id.*

### B.    Defendants

14.     Defendant Starbucks Corporation is a global premier roaster, marketer, and retailer of specialty coffee incorporated under the laws of the state of Washington and headquartered in

CONSOLIDATED COMPLAINT FOR
VIOLATION OF FEDERAL SECURITIES LAWS
(2:24-cv-01362-JHC)                                    - 4 -

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400, Seattle, WA  98101-3268
Telephone: 206/623-1900

Seattle, Washington.  Starbucks common stock trades in an efficient market on the Nasdaq Global Select Market (the "Nasdaq") under the ticker symbol "SBUX."

15.     Defendant Laxman Narasimhan was, at all relevant times, Starbucks' CEO and a member of Starbucks' Board of Directors ("Board").  Narasimhan joined Starbucks as CEO-elect on October 1, 2022 and assumed the role of CEO and joined the Board on March 20, 2023.  On August 13, 2024, Narasimhan was abruptly removed as Starbucks' CEO and Board member.

16.     Defendant Rachel Ruggeri was the Executive Vice President and CFO of Starbucks at all relevant times, and currently holds this position.  Ruggeri joined Starbucks in 2001 as a member of the accounting team and held various leadership positions at the Company before being named CFO in 2021.  After Narasimhan's departure from the Company in August 2024, Ruggeri served as interim CEO before Brian Niccol began his tenure as the new CEO of Starbucks.

17.     Defendants Narasimhan and Ruggeri are collectively referred to herein as the "Individual Defendants."  The Individual Defendants and Starbucks are collectively referred to herein as "Defendants."

18.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Starbucks' quarterly reports, shareholder letters, press releases and other public statements, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.  The Individual Defendants were provided with copies of Starbucks' reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions with the Company and their access to material, non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and knew that the positive representations being made were then materially false.

CONSOLIDATED COMPLAINT FOR
VIOLATION OF FEDERAL SECURITIES LAWS
(2:24-cv-01362-JHC)                                      - 5 -

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400, Seattle, WA  98101-3268
Telephone: 206/623-1900

1  **IV.    FACTUAL BACKGROUND**

2      **A.    Starbucks Expands to the Largest Coffee House Chain in the World**

3       19.    Starbucks is the world's largest coffee chain and is one of the most recognized

4  brands in the world.  The Company first opened its doors on March 30, 1971 in Seattle's historic

5  Pike Place Market.  Early on, the Company focused on traditional whole bean coffee and leaf teas.

6  That changed under the leadership of Howard Schultz, Starbucks' long-time Chairman and CEO.

7  Schultz joined the Company in 1982 as Director of Operations and Marketing.  In 1983, he traveled

8  to Italy where he became enthralled with Italian coffee bars and the coffee experience.  Schultz

9  envisioned introducing the concept of the Italian coffeehouse to the American market.  He left

10  Starbucks to open his own coffeehouses, Il Giornale, only to return to Starbucks in August 1987

11  as CEO to purchase the Company.

12       20.    Schultz transformed Starbucks into the global coffeehouse behemoth that it is

13  today.  Starbucks describes itself as the "premier roaster, marketer and retailer of specialty coffee

14  in the world."  Starbucks sells its roasted coffee, handcrafted beverages and food items through its

15  company-operated stores worldwide, which are the mainstay of its business.  At the end of FY

16  2023, Starbucks had over 19,000 company-operated stores globally.  Starbucks' largest and most

17  important market is the United States.  At the end of FY 2023, Starbucks had 9,654 U.S. company-

18  operated stores that accounted for over 70% of the Company's net revenues.  China – the

19  Company's largest market outside the United States – accounted for another 6,804 company-

20  operated stores by the end of FY 2023.

21       21.    Starbucks' brand identity, and the core component of its business strategy, is what

22  the Company calls the "Starbucks Experience."  The Starbucks Experience prioritizes product

23  quality and a personalized and consistent customer experience between Starbucks customers and

24  the Company's employees – called "partners" – who make the drinks and work in-store.  The

25  Starbucks Experience was the foundation of the Company's decades-long track record of success,

26  fueling both strong customer loyalty and robust financial performance.

CONSOLIDATED COMPLAINT FOR
VIOLATION OF FEDERAL SECURITIES LAWS
(2:24-cv-01362-JHC)
- 6 -

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400, Seattle, WA  98101-3268
Telephone: 206/623-1900

**B.** **Amid Growing in-Store Inefficiencies, Struggling Sales in China, and Falling Profit Margins, in September 2022 Starbucks Introduces an Aggressive Three-Year "Reinvention Plan" and Incoming CEO Narasimhan**

22.     By 2022, Starbucks was facing business challenges on multiple fronts.  Customer preferences and buying habits were changing from a simple cup of brewed coffee.  Starbucks had pioneered the highly customized coffee drink, allowing customers to add extra espresso shots, additional pumps of syrup or a cold foam topping, which took longer for partners to execute.  By Q4 2022, there were over 170,000 ways to customize a Starbucks drink and 383 billion different possibilities for a latte.  Also, surging mobile app orders were significantly impacting in-store operations by overwhelming partners with a high volume of pre-ordered drinks that partners had to juggle with in-store and drive-thru orders.  As a result, the in-store operations were becoming increasingly inefficient with congestion at the drink pick-up areas and a less personalized customer experience as partners were forced to prioritize order fulfillment.  Partners were likewise frustrated about changing customer preferences and the increase in mobile orders, as these changes were adding complexity and time for the partners to execute orders.  At the same time, Starbucks was also facing struggling sales and losing market share in China – its largest market outside of the United States.

23.     To address these issues and the market's concerns about them, in September 2022, Schultz unveiled a three-year Reinvention Plan designed to fix the in-store inefficiencies that were impacting both Starbucks customers and partners, and grow sales outside of the United States, including in China.  Starbucks executives announced that with a renewed focus on the partner and customer experience and global growth, the Reinvention Plan would deliver a significant increase in comparable store sales growth, a Starbucks financial metric that reports the revenue generated by company-operated stores that have been open for at least 13 months.[3]  The Reinvention Plan promised a sharp increase in comparable store sales growth to a range of 7% to 9% annually from

---

[3]     Comparable store sales is also known as "same store sales."

CONSOLIDATED COMPLAINT FOR
VIOLATION OF FEDERAL SECURITIES LAWS
(2:24-cv-01362-JHC)                                   - 7 -

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400, Seattle, WA  98101-3268
Telephone: 206/623-1900

FY 2023 to FY 2025, both globally and in the United States, up from a more modest range of 4% to 5%. In China, Company executives told investors that Starbucks expected outsized comparable store sales performance in FY 2023 and FY 2024, as the most severe impact of pandemic related lockdowns were over, with growth normalizing in the new range of 4% to 6% in FY 2025, an increase from the prior range of 2% to 4%. Defendants told investors that the first phase of the plan would target Starbucks' largest market, company-operated stores in the United States.

24.     In conjunction with the announcement of the Reinvention Plan, Starbucks also announced a change in leadership, introducing Narasimhan as Starbucks' next CEO following a six-month immersion program. During his immersion, Narasimhan spent time with Schultz and the management team, visited stores, and trained and worked as a barista and engaged with partners and customers alike. Through his immersion, Narasimhan held himself out as gaining in-depth exposure to the brand, Starbucks culture, and the Reinvention Plan. Starbucks pointed to Narasimhan's "'intensive immersion'" as one of many reasons why he would "'lead Starbucks into its next phase of growth.'" According to Mellody Hobson, the Company's Independent Board Chair, Narasimhan's "'immersion has deepened Laxman's understanding of Starbucks culture and values.'" Schultz also expressed his confidence in Narasimhan, describing his successor as "'the right leader to take Starbucks into its next chapter'" and stating that Narasimhan "'is uniquely positioned to shape this work and lead the company forward with his partner-centered approach and demonstrated track record of building capabilities and driving growth in both mature and emerging markets.'"

**C.     In March 2023, Narasimhan Takes over and Introduces His Own Spin on the Reinvention Plan Dubbed the "Triple Shot Reinvention with Two Pumps" Plan**

25.     Following his immersion, Narasimhan took over the CEO position in March 2023. To make his mark, Narasimhan immediately went to work on his own spin on the Reinvention Plan, which was called the Triple Shot Reinvention with Two Pumps (the "Triple Shot" plan). Narasimhan's plan built on Schultz's Reinvention Plan, with added focus on improving in-store

CONSOLIDATED COMPLAINT FOR
VIOLATION OF FEDERAL SECURITIES LAWS
(2:24-cv-01362-JHC)                                          - 8 -

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400, Seattle, WA  98101-3268
Telephone: 206/623-1900

1  efficiencies and partner culture to grow store sales and improve the Starbucks customer
2  experience, while also expanding the Company's global store footprint, particularly in Starbucks'
3  important China market.  The stakes were high when Narasimhan took over as CEO: he brought
4  little CEO experience running a global restaurant chain and Schultz's Reinvention Plan called for
5  almost doubling both global and U.S. comparable store sales growth over a three-year period.

6      26.    Narasimhan formally announced his Triple Shot plan to investors on November 2,
7  2023.  The Triple Shot concerned the core idea of Schultz's Reinvention Plan: elevating the
8  Starbucks brand through better-run stores; strengthening and scaling the Company's digital
9  capabilities; and expanding globally, particularly in China.  The "Two Pumps" component
10 centered on growth through operation efficiency and cutting costs.  Defendants told investors that
11 they expected savings of $3 billion over the next three years, with $1 billion coming from increased
12 store efficiency.  These savings would be both reinvested in the business and delivered to
13 shareholders through margin expansion and earnings growth.  Starbucks was also continuing to
14 reinvigorate partner culture.  This "pump" centered on investing in all aspects of the partner
15 experience while benefiting from lower attrition and higher tenure in U.S. stores.

16     **D.    Starbucks Implements an Algorithm, the SPA Tool, but It Suffers**
17     **from Severe Deficiencies that Lead to Store Understaffing, Rapidly**
       **Increasing Wait Times, and Declining Store Traffic**

18     27.    Shortly after Narasimhan took over as CEO in March 2023, in conjunction with
19 implementing the Reinvention Plan and Narasimhan's own Triple Shot plan, the Company began
20 working on a new labor algorithm for partner scheduling and staffing.  Internally called the SPA
21 tool, the algorithm utilizes a set of data such as historical trends, current trends, and product
22 availability to forecast the number of hours needed for each store throughout the day.

23     28.    Unbeknown to investors, however, by the start of the Class Period, the new
24 algorithm was causing significant operational issues within company-operated stores in the United
25 States.  Specifically, despite knowing that customer demand for more complex and customized
26 drinks was increasing, Defendants failed to adjust the algorithm to incorporate the time needed for

CONSOLIDATED COMPLAINT FOR
VIOLATION OF FEDERAL SECURITIES LAWS
(2:24-cv-01362-JHC)                    - 9 -

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400, Seattle, WA  98101-3268
Telephone: 206/623-1900

increasingly complex and time-consuming drink customizations customers were ordering. As a result, the algorithm was not accurately projecting the number of partner hours needed to staff stores to meet customer demand. The understaffing problems were compounded by a roll out of numerous new menu offerings, which partners had to learn to prepare on the job. Starbucks was also rolling out promotional events, which often spiked orders beyond regular projections but which the algorithm did not factor in when determining how much manpower was needed. The understaffing problem was also exacerbated by the fact that in the year before the Class Period, Starbucks had laid off a staggering 29,000 in-store workers in the United States (reducing the number of partners from approximately 248,000 to 219,000) while at the same time ambitiously expanding its U.S. footprint by opening 380 stores.

29. As a result, during the Class Period, the Company's U.S. stores were consistently understaffed as partners had to increasingly juggle in-person, drive-thru, mobile, and delivery orders, which registered in Starbucks' system at the same time. Before and during the Class Period, internal employee surveys showed that staffing shortages and scheduling were the top complaints for Starbucks employees and were causing employee attrition. Many partners internally reported working short-staffed and getting scheduled for fewer hours than they wanted or needed. Additionally, Starbucks had implemented new policies mandating partners work a minimum of 12 hours per week, which was reducing the number of employees available at certain locations.

30. Due to the severe, systemic understaffing, during the Class Period, the customer experience Starbucks prided itself on was rapidly degrading, and drink and food order wait times were ballooning, which were negatively impacting store traffic. By November 2023, U.S. store traffic was declining as wait times increased, and by January 2024, 8% of Starbucks customers were waiting between at least 15 and 30 minutes for a drink, compared to no one waiting that long during the same period in 2019. By the start of the Class Period, customers using the Starbucks mobile app to order ahead were abandoning their orders due to long wait times. And by January

CONSOLIDATED COMPLAINT FOR
VIOLATION OF FEDERAL SECURITIES LAWS
(2:24-cv-01362-JHC)

- 10 -

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400, Seattle, WA 98101-3268
Telephone: 206/623-1900

2024, the percentage of abandoned mobile orders was rising to the mid-teens.  Starbucks' customer contact center was flooded with calls from dissatisfied customers that orders were taking too long.

31.    Defendants were well aware of lengthening wait times and the resulting erosion of U.S. traffic.  As CFO, Ruggeri led Starbucks' Audit and Compliance Committee, which was tasked with "monitor[ing] and mitigat[ing] current and emerging labor and human capital management risks."  Moreover, Starbucks prided itself on "regularly conduct[ing] anonymous surveys to seek feedback from our partners on a variety of topics," the results of which were "reviewed by senior leadership, who analyze areas of progress or deterioration and prioritize actions and activities in response to this feedback to drive meaningful improvements in partner engagement."  In addition, Defendants admittedly tracked orders placed by Starbucks Rewards members through the Starbucks app's Mobile Order & Pay ("MOP").[4]  By doing so, Defendants could assess the rate at which orders were not completed and the reasons why.

### E.    Defendants Concealed that Starbucks Sales in China Were Being Impacted by Fierce Competition

32.    At the same time that the new labor algorithm was backfiring and causing understaffing and long customer wait times at U.S. company-operated stores, Starbucks' China business was facing increased competition from a growing number of specialty coffee chains, local cafés, and premium coffee brands that was causing the Company's sales in China to sharply decline.  Starbucks' biggest competitors, Cotti and Luckin, were aggressively lowering prices to gain market share and outpacing Starbucks in store openings, and were focused on a take-out centric model with which Starbucks could not compete.  During the Class Period, Defendants knew but failed to disclose that their reinvention plans to grow sales outside of the United States, including China, were being thwarted by competition.

---

[4]    Starbucks Rewards members are customers who are enrolled in the Starbucks Rewards loyalty program, a spend-based program through which customers can earn loyalty points that can be redeemed for free product at company-operated stores.

CONSOLIDATED COMPLAINT FOR
VIOLATION OF FEDERAL SECURITIES LAWS
(2:24-cv-01362-JHC)                                          - 11 -

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400, Seattle, WA  98101-3268
Telephone: 206/623-1900

33.     Ultimately, the truth about declining store traffic and sales in both the United States and China was revealed on April 30, 2024, when Starbucks was forced to report that U.S., China, and global comparable store sales and traffic had significantly declined.  Narasimhan admitted that "challenge[s] meeting our peak morning demand in the U.S." and "long wait times" contributed to the decline in U.S. store traffic while "intense price competition" contributed to the decline in comparable store sales in China.  In the wake of the disappointing announcement, Schultz took to social media, stating that "the company's fix needs to begin at home" because "U.S. operations are the primary reason for the company's fall from grace."  According to Schultz, "[t]he answer does not lie in data, but in the stores."

## V.     DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS

### A.     Q4 2023 and FY 2023 Earnings Report

34.     The Class Period begins on November 2, 2023, when Starbucks reported Q4 2023 and FY 2023 earnings results.[5]  In the earnings release, Narasimhan touted the reinvention plan and its purported "positive impact" on "partner and customer experiences":

> "*Our Reinvention is moving ahead of schedule, fueling revenue growth, efficiency and margin expansion.  Notably, we continue to see the positive impact of our Reinvention on our partner and customer experiences*, proof points that we can continue to create, grow and strengthen our business while creating value for all.  As we enter the current year, in the face of macro uncertainty, we remain confident in the momentum throughout our business and headroom globally.  We expect sustained momentum throughout the company for years to come."

35.     Also on November 2, 2023, Narasimhan and Ruggeri convened a conference call with investors and analysts to discuss Starbucks' Q4 2023 and FY 2023 financial results and to give investors a Reinvention Plan update.  During the conference call, Narasimhan reiterated his "confidence in the company's long-term opportunity with guidance for fiscal year 2024" derived from the Company's "great momentum, fueled largely by our reinvention plan":

---

[5]     Starbucks' fiscal year ends on the Sunday closest to September 30.

CONSOLIDATED COMPLAINT FOR
VIOLATION OF FEDERAL SECURITIES LAWS
(2:24-cv-01362-JHC)                                          - 12 -

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400, Seattle, WA  98101-3268
Telephone: 206/623-1900

[W]e will also share our confidence in the company's long-term opportunity with guidance for fiscal year 2024. What you will take away from this call today is that *we have great momentum, fueled largely by our reinvention plan. We are seeing the work pay off through improved partner and customer experiences*, as well as captured improvements in efficiency and margin. We believe this bodes well for this next year and for years beyond.

36.    Narasimhan pointed to improved partner experience and stable store environments as proof that the Reinvention Plan was working:

> *We have created a more stable environment in our stores*. Hours per partner increased in the quarter by 5% as we continue finding schedules that fit our partners' and customers' needs. Turnover was down in the fourth quarter by 10%, while Barista tenure increased by 16% for the quarter. Customer connection scores also improved in the quarter relative to this time last year. We did all of this by investing over 20% of this year's profits back into our partners and stores through wages, training, equipment and new store growth. *All this is further evidence that our strategy is working*.

37.    During the November 2, 2023 conference call, both Narasimhan and Ruggeri discussed strong demand for Starbucks in the United States. Narasimhan stated: "Here in the U.S., our largest market, *we saw momentum sustain throughout the quarter*. Revenue for the quarter was up a record 12%, underpinned by 8% comps." Ruggeri underscored this growth, highlighting both transaction comparable sales growth and growth among Starbucks' "occasional" customer:

> Our U.S. business delivered 8% comparable store sales growth in Q4.
>
> *        *        *
>
> *Transaction comparable sales growth in the quarter was 2%*, which, combined with another quarter of a record ticket, drove multiple record average weekly sales, including delivering our sixth highest sales weeks ever, driven by our successful fall launch. Demand continued outside of our promotion windows, which translates to future opportunity as we leverage targeted offers to our most loyal customers, increasing efficiency as we create a more personalized experience.

38.    During the Q&A portion of the call, an analyst asked Defendants to "help unpack where the growth is coming from" for "U.S. comps and traffic":

> [Analyst:] [O]n the U.S. comps and traffic, can you help unpack where the growth is coming from? Is it new customers, existing customers, rewards members or more occasional customers? . . .

CONSOLIDATED COMPLAINT FOR
VIOLATION OF FEDERAL SECURITIES LAWS
(2:24-cv-01362-JHC)                    - 13 -

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400, Seattle, WA  98101-3268
Telephone: 206/623-1900

[Ruggeri:] Lauren, I'll start by just saying, ***overall, our traffic continues to be strong and it's growing***. So when you look at the success of our performance in the quarter, particularly in the U.S., our highest-ever average weekly sales were driven by a combination of strength in traffic but also strength in overall ticket. And we saw a record number of customers coming into our stores and spending a record amount. Now those customers are both our rewards customers as well as our non-Starbucks Rewards customers. So we're seeing growth in our customer base across the segments. And that's driving strong performance as each customer is spending more.

39.     Another analyst questioned Defendants about China and the "competitive intensity" Starbucks faced in its most important market outside of the United States, in response to which Narasimhan assured that "our business is strong" and the "business is coming together despite all the headwinds":

[Analyst:] I had a question about China, please, which I think we've heard the competitive environment there is very intense. . . . But just trying to get a read on competitive intensity, and maybe implications for new unit economics and the margin structure for the business going forward[?]

. . . [Narasimhan:] [A]s Rachel said, [in China,] ***our business is also strong***, 5% comp in Q4. If you look at the first half of the year versus the second half of the year, the growth difference in the second half was 20% higher than the first. One thing you should know is that if you just look at the morning daypart, the morning daypart for our business in China now is higher than it was pre-COVID.

We have very strong local innovation and to answer your question, if you look at the transactions that Rachel mentioned, we're very comfortable with the food and beverage transactions and what we see there, including the price realization that we have . . . . But ***we feel very good about the competitive position of beverages, the competitive position of food. We feel very good about the cash returns of the stores that we are opening. They're very strong***. The team has done a wonderful job in ensuring that the cost of builds are low, with the productivity that we have been able to accomplish in our stores. ***We feel good about the overall returns that we are getting there. And I'm heartened by . . . how the business is coming together despite all the headwinds that have been there for the last couple of years***.

40.     Defendants' statements, as alleged above in ¶¶34-39, were false and misleading when made. The true facts, which Defendants knew or recklessly disregarded, were that:

(a)     The Reinvention Plan was not fueling "revenue growth" and "working," or "improv[ing] partner and customer experiences" and "creat[ing] a more stable environment in our

CONSOLIDATED COMPLAINT FOR
VIOLATION OF FEDERAL SECURITIES LAWS
(2:24-cv-01362-JHC)                                   - 14 -

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400, Seattle, WA  98101-3268
Telephone: 206/623-1900

stores" as Defendants stated in ¶¶34-36 above, but rather the SPA tool was causing store understaffing in nearly one-third of the Company's U.S. stores. As a result, customer wait times were skyrocketing, driving customers away, and significantly degrading store experiences for partners and customers alike. The SPA tool failed to accurately account for the number of partners required to efficiently staff stores because it did not take into account the time needed to fulfill the increasing demand for highly customized drinks, surging mobile orders, the effects of customer promotions on store traffic, and the roll out of numerous new menu offerings (which partners had to learn to prepare on the job). Partners were being overwhelmed as they were forced to increasingly juggle in-person, drive-thru, mobile, and delivery orders, and there were not enough partners behind the counter to prepare drinks. As a result, customer wait times were increasing and causing mobile app orders to be abandoned, which began to negatively impact store traffic beginning in November 2023. Also, Starbucks' customer contact center was being flooded with calls from dissatisfied customers that orders were taking too long, which undermined Starbucks' image as a premium brand and ultimately hurt store traffic and sales;

(b)    Starbucks' "competitive position" in China was not "strong," as stated in ¶39 above, because Starbucks' biggest competitors were aggressively lowering prices to gain market share and outpacing Starbucks in store openings, and were focused on a take-out centric model with which Starbucks could not compete. Defendants knew but failed to disclose that their reinvention plans to grow sales outside of the United States, including China, were being thwarted by competition; and

(c)    Momentum in the U.S. market was not "sustain[ed] throughout the quarter," and "traffic" was not "strong and . . . growing," as Defendants represented in ¶¶37-38 above. Rather, at the time they spoke, they were aware of the issues described in ¶40(a) above and, as they would later admit during Starbucks' January 30, 2024 conference call, traffic was actually "***pressured to negative single digits in November*** before it started to rebound in December," which was particularly true with respect to occasional customers.

CONSOLIDATED COMPLAINT FOR
VIOLATION OF FEDERAL SECURITIES LAWS
(2:24-cv-01362-JHC)

- 15 -

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400, Seattle, WA  98101-3268
Telephone: 206/623-1900

**B.     Q1 2024 Earnings Report**

41.     On January 30, 2024, Narasimhan and Ruggeri convened a conference call with investors and analysts to discuss Starbucks' Q1 2024 financial results.  During his opening remarks, Narasimhan claimed Defendants saw "***exciting momentum in China with our focus on premium and progress on the execution of our Triple Shot strategy***."  He further stated that "***[w]e also saw great momentum in China***," and, "***[o]verall, our business and brand in China remains strong***."

42.     Narasimhan claimed that Starbucks' financial performance had been "fundamentally strong" and a testament to the Triple Shot's successful execution:

> ***Our performance in the quarter was fundamentally strong***.  Our Q1 total company revenue was a record $9.4 billion, up 8% year-over-year.  Our global comparable store sales grew 5% year-over-year, supported by ***a 5% comp growth in North America***, driven by 4% ticket growth ***and 10% comp growth in China***.  Our global operating margins expanded by 130 basis points to 15.8% and our overall earnings per share grew 20% to $0.90.  ***This speaks to the continued successful execution of our reinvention plan and the durable business we are building***.

43.     Narasimhan touted the strength of Starbucks' most loyal customers.  According to Narasimhan, "we saw our most loyal customers around the world coming into our stores more often.  Specifically, in the U.S., we set new records with our 90-day active Rewards members growing 13% year-over-year to a record 34.3 million . . . ."  Narasimhan summed up: "In short, ***our growing Starbucks Rewards members are visiting our stores more frequently*** and increasing their spend each time that they come."

44.     During the Q&A portion of the call, Narasimhan reiterated that "***our loyalty program is already performing exceptionally well***."  He confirmed that "***we are seeing no slowdown in our loyal SR customers***.  In fact, we're seeing an increase in frequency.  They're buying more, they're customizing more.  That part of the business is extremely strong."

CONSOLIDATED COMPLAINT FOR
VIOLATION OF FEDERAL SECURITIES LAWS
(2:24-cv-01362-JHC)                                    - 16 -

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400, Seattle, WA  98101-3268
Telephone: 206/623-1900

45.    With respect to occasional customers, Narasimhan acknowledged a "softening," though he assured investors that such softening was transitory, as initiatives that had been instituted were already having a "*positive impact*" on customer traffic:

> We had great momentum in August and September, and that continued into October, which exceeded our expectations across every measure. ***Beginning in mid-November, while our business continued to grow, the growth rate was impacted by 3 unexpected factors***.
>
> First, we saw a negative impact to our business in the Middle East.  Second, events in the Middle East also had an impact in the U.S., driven by misperceptions about our position.  Our most loyal customers remain loyal and in fact, increased their frequency and spend in the quarter.  ***But we did see a softening of U.S. traffic***. Specifically, our occasional U.S. customers, who tend to visit the afternoon, came in less frequently.  I will speak in a moment as to how we quickly responded with an effective action plan. . . .
>
> We responded quickly to these headwinds.  In the U.S., we implemented targeted offers aimed at bringing our occasional customers into our loyalty program.  As we've seen over time, Starbucks Rewards members develop a routinized long-term relationship with our brand that increases both ticket and transactions.  Additionally, we activated new capabilities within our proprietary Deep Brew data analytics and AI tool to identify and incentivize specific rewards members cohorts.  Finally, we are leaning further into our brand, marketing and factual narrative and social media to engage these audiences where they are.
>
> ***We've already seen the positive impact of these new initiatives with our more occasional customers beginning to rebound in December.***  However, we continue to see further opportunity to welcome back our very occasional customers. We feel good about the trajectory over the course of the quarter, but it will take time for our plans to be fully realized.

46.    Ruggeri affirmed this "rebound," stating:

> ***Our U.S. company-operated business delivered 5% comparable store sales growth in Q1*** driven by 4% ticket growing from pricing, mix and customization. . . .  Comparable transactions for the quarter increased 1% as traffic was pressured to negative single digits in November ***before it started to rebound in December***.

47.    Narasimhan stated that "***we remain confident in our Triple Shot strategy and our long-term growth***."  According to Narasimhan, the first priority of the Triple Shot Reinvention "***is to elevate our brand by operating great stores*** and driving product innovation.  ***The best lever for***

CONSOLIDATED COMPLAINT FOR
VIOLATION OF FEDERAL SECURITIES LAWS
(2:24-cv-01362-JHC)                                          - 17 -

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400, Seattle, WA  98101-3268
Telephone: 206/623-1900

*elevating our brand is our store experience.  We continue to raise the bar on running great stores with a focus on enhancing both our partner and customer experience*."

48.     Narasimhan underscored the importance of the store experience for both the customer and partner, calling the former "the key to our success" and highlighting investments in the latter via the reinvention strategy in order to "unlock efficiency" and create "a more stable environment for our partners":

> As you heard me say often, the key to our success is the experience that our partners create for our customers.  *We're investing in a better experience for our partners to advance our business to a more balanced growth model as we unlock efficiency.  In the quarter, we have seen the effectiveness of the Reinvention driven investments we have made in in-store operational efficiencies such as* standards, equipment innovation and *scheduling improvements, leading to a more stable environment for our partners*.
>
> Turnover has decreased by 5% year-over-year and is now well below pre-COVID levels.  *Average partner hours increased 10% leading to a 14 percentage point increase in partner sentiment related to scheduling*, specifically preferred hours, which we know is important to partners.  *We are listening to our partners and investing to make their experience better*.

49.     Ruggeri supported this point, falsely asserting that Starbucks "improv[ed] our overall scheduling" such that the Company was able "to create a better efficiency in serving our customers":

> [M]ore recently, we focused on improving our overall scheduling.  So providing more hours for our partners per store.  We have a ways to go, but we know that that's a high driver of engagement.  All of those efforts together have led to lower turnover in a more stable environment.  And *it's that stability that really allows us to create a better efficiency in serving our customers.  So as an example, I already spoke about our morning daypart this quarter in the U.S. was the strongest that we've seen.  And that's a function of all of those efforts and activities that I just spoke about being realized in supporting our demand*.  So creating a better experience for our partners leads to the better experience for our customers.

50.     Ruggeri also attributed the "substantial margin expansion in the quarter" to "*the meaningful labor staffing and scheduling improvements we made as part of our reinvention*." According to Ruggeri: "*We unlocked significant stability by focusing on staffing and scheduling*

CONSOLIDATED COMPLAINT FOR
VIOLATION OF FEDERAL SECURITIES LAWS
(2:24-cv-01362-JHC)                                    - 18 -

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400, Seattle, WA  98101-3268
Telephone: 206/623-1900

1    *hours based on partners' preferred shifts, which enhanced both our partners' experience and*

2    *subsequent store performance*."

3        51.    On January 30, 2024, Starbucks filed with the SEC a quarterly report on Form 10-Q

4    (the "Q1 2024 Form 10-Q").  The Q1 2024 Form 10-Q was signed by Ruggeri and the attached

5    SOX certifications signed by Narasimhan and Ruggeri.  The Q1 2024 Form 10-Q stated: "*There*

6    *have been no material changes to the risk factors disclosed in our 10-K*."  The risk factors

7    contained in Starbucks' Form 10-K for the fiscal year ended October 1, 2023, filed with the SEC

8    on November 17, 2023 (the "FY 2023 Form 10-K"), stated:

9            Erosion of trust in our brand value can be caused by isolated or recurring
         incidents originating both from us or our business partners, or from external events.
10         Such incidents can potentially trigger boycotts of our stores or result in civil or
         criminal liability and can have a negative impact on our financial results. . . .  *[I]f*
11         *we are not effective in* making sufficient progress toward our social and
         environmental program goals or in *executing on our Reinvention Plan, consumer*
12         *trust in our brand may suffer, and this perception could result in negative*
         *publicity or litigation*. . . .
13

14           The ongoing relevance of our brand may depend on making sufficient
         progress toward our social and environmental program goals as well as the
15         successful execution of the Reinvention Plan, each of which requires company-
         wide coordination and alignment.
16

17       52.    Defendants' statements, as alleged above in ¶¶41-51, were false and misleading

18    when made.  The true facts, which Defendants knew or recklessly disregarded, were that:

19           (a)    Defendants were not "successful[ly] execut[ing] [on] our Reinvention Plan"

20    or "investing in a better experience for our partners," as they stated in ¶¶41-42, 47-48, and 50-51

21    above, but rather, the SPA tool was causing store understaffing in nearly one-third of the

22    Company's U.S. stores.  As a result, customer wait times were skyrocketing, driving customers

23    away and significantly degrading store experiences for partners and customers alike.  The SPA

24    tool failed to accurately account for the number of partners required to efficiently staff stores

25    because it did not take into account the time needed to fulfill the increasing demand for highly

26    customized drinks, surging mobile orders, the effects of customer promotions on store traffic, and

CONSOLIDATED COMPLAINT FOR
VIOLATION OF FEDERAL SECURITIES LAWS
(2:24-cv-01362-JHC)                                    - 19 -

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400, Seattle, WA  98101-3268
Telephone: 206/623-1900

1  the roll out of numerous new menu offerings (which partners had to learn to prepare on the job).

2  Partners were being overwhelmed as they were forced to increasingly juggle in-person, drive-thru,

3  mobile, and delivery orders, and there were not enough partners behind the counter to prepare

4  drinks;

5  (b)    As a result of ¶52(a) above, Starbucks was not "creat[ing] a better efficiency

6  in serving our customers" as Defendants represented in ¶¶47-50 above.  Instead, by the beginning

7  of January 2024, 8% of Starbucks customers were waiting between at least 15 and 30 minutes for

8  a drink, compared to no one waiting that long during the same period in 2019.  By the start of the

9  Class Period, customers using the Starbucks mobile app to order ahead were abandoning their

10  orders due to long wait times, and by January 2024, the percentage of abandoned mobile orders

11  rose to the mid-teens.  Also, Starbucks' customer contact center was being flooded with calls from

12  dissatisfied customers that orders were taking too long, which undermined Starbucks' image as a

13  premium brand and ultimately hurt store sales;

14  (c)    As a result of the facts stated in ¶52(a)-(b) above, Defendants' statement

15  that "[t]here have been no material changes to the risk factors disclosed in our 10-K" in ¶51 above

16  was misleading because it omitted that the material risks previously warned of – "if we are not

17  effective in . . . executing on our Reinvention Plan, consumer trust in our brand may suffer" – had

18  already come to fruition and materially changed since November 17, 2023;

19  (d)    Contrary to Defendants' statements in ¶¶42 and 46 above, at the time

20  Defendants spoke on January 30, 2024, Starbucks' U.S. business was experiencing sharply

21  declining comparable store sales driven by significant decrease in store traffic, due to long wait

22  times;

23  (e)    It was misleading to state that Starbucks Rewards members were "visiting

24  our stores more frequently" and the Company was "seeing no slowdown in our loyal SR

25  customers," as stated in ¶¶43-44 above, when Defendants were aware that customers were

26  increasing their frequency of use but not completing orders.  In particular, Defendants tracked the

CONSOLIDATED COMPLAINT FOR
VIOLATION OF FEDERAL SECURITIES LAWS
(2:24-cv-01362-JHC)
- 20 -
KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400, Seattle, WA  98101-3268
Telephone: 206/623-1900

percentage of customers using Mobile Order Pay and were aware that 50% of MOP orders during the daypart were not being completed. Moreover, Defendants acknowledged just three months later that Starbucks Rewards members had in fact declined during Q2 2024, with analysts reporting that "[e]ven active domestic Starbucks Rewards members took a rare dip, declining 4$ on a sequential basis" which was "partly chalked up to weather disruption";

(f) Customers did not "begin[] to rebound in December" as Defendants misrepresented in ¶¶45-46 above. Instead, as Ruggeri would later admit on June 5, 2024, occasional customers' visits to Starbucks did not rebound in December, but rather persisted into Q2 2024 and "even further"; and

(g) Contrary to Defendants' statements in ¶¶41-42 above, there was no "exciting momentum in China." In truth, Defendants knew but failed to disclose that Starbucks' business in China was being negatively impacted by the aggressive expansion efforts and price cutting of its competitors. As Defendants would be forced to admit just one quarter later, at the time Defendants spoke at the end of January and in the midst of Q2 2024, the Company's performance in China was on the decline, suffering from a 3% decline in revenue and an 11% decrease in comparable store sales.

## VI.    ADDITIONAL SCIENTER ALLEGATIONS

53.    Each defendant knew or acted with deliberate recklessness that material facts were being concealed from investors during the Class Period and the statements set forth in ¶¶34-39 and 41-51 above would be misleading to investors when made. Defendants' misconduct was knowing or deliberately reckless based on the factual allegations above and the following:

### A.    The Alleged Misrepresentations and Omissions Concerned Starbucks' Core Operations

54.    The misrepresentations and omissions alleged herein involve the core of the Company's business: comparable store sales in the Company's two largest markets, the United States and China, partner staffing and scheduling, and customer demand. Narasimhan and Ruggeri were the two top executives – CEO and CFO – at Starbucks and led its day-to-day operations. As

CONSOLIDATED COMPLAINT FOR
VIOLATION OF FEDERAL SECURITIES LAWS
(2:24-cv-01362-JHC)

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400, Seattle, WA 98101-3268
Telephone: 206/623-1900

- 21 -

reported in the Company's FY 2023 Form 10-K, comparable store sales were one of the key operating metrics Defendants used to assess growth of the Company's business and the effectiveness of its operations.  Defendants reported on this key metric and its major component, comparable store transactions (store traffic), during each Class Period conference call with investors.

55.    Narasimhan and Ruggeri also oversaw and monitored the progress of the Reinvention Plan and Narasimhan's Triple Shot plan, which targeted store sales growth in the United States and China through improved in-store operations and cost control. Narasimhan and Ruggeri's monitoring and overseeing of these plans included knowing the effectiveness of the partner staffing and scheduling algorithm (the SPA tool), which was implemented as part of the plans, and customer demand.

56.    During the Class Period, Narasimhan repeatedly touted his knowledge of the progress the Reinvention Plan and his Triple Shot with Two Pumps plan and their impact on the partner and customer experience:

- "Our Reinvention is moving ahead of schedule, fueling revenue growth, efficiency and margin expansion.  Notably, we continue to see the positive impact of our Reinvention on our partner and customer experiences." (November 2, 2023 conference call for Q4 2023);

- "What you will take away from this call today is that we have great momentum, fueled largely by our reinvention plan.  We are seeing the work pay off through improved partner and customer experiences."  (November 2, 2023 conference call for Q4 2023);

- "We have created a more stable environment in our stores. . . . All this is further evidence that our strategy is working."  (November 2, 2023 conference call for Q4 2023);

- "In the quarter, we have seen the effectiveness of the Reinvention driven investments we have made in in-store operational efficiencies such as standards, equipment innovation and scheduling improvements, leading to a more stable environment for our partners."  (January 30, 2024 conference call for Q1 2024).

57.    Defendants also highlighted the risk Starbucks would face if they did not effectively execute the Reinvention Plan.  In the Company's FY 2023 Form 10-K, Defendants stated: "[I]f we

CONSOLIDATED COMPLAINT FOR
VIOLATION OF FEDERAL SECURITIES LAWS
(2:24-cv-01362-JHC)                                      - 22 -

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400, Seattle, WA  98101-3268
Telephone: 206/623-1900

are not effective . . . in executing on our Reinvention Plan, consumer trust in our brand may suffer, and this perception could result in negative publicity or litigation."

58.    Narasimhan also acknowledged that the Company "extremely carefully" tracked customer demand during the Class Period.  During the November 2, 2023 conference call for Q4 2023, Narasimhan acknowledged that Defendants watched customer demand "extremely carefully," with Defendants digitally tracking "over 75 million customers in terms of their last 90-day activity."  During the April 30, 2024 conference call for Q2 2024, Narasimhan also confirmed that, during the Class Period, Defendants tracked the order incompletion rate on the Starbucks mobile order and pay app, and the reasons why customers were not completing their orders.

**B.    Defendants' Knowledge Through Access to Information**

59.    Because partner staffing and scheduling were critical to store operations and, in turn, sales, the Company internally tracked partner feedback and used analytical tools to monitor and track performance and progress of the Company's staffing and scheduling algorithm.  The Company's U.S. Leadership Team kept Narasimhan and Ruggeri informed during the Class Period about key data points from the algorithm, including decision-making points regarding labor and store scheduling issues.  Defendants also regularly received feedback on staffing and scheduling issues from the Company's Scheduling Excellence Advisory committee that was made up of U.S. store managers, who provided input on partner staffing and scheduling.

60.    Narasimhan also publicly, and repeatedly, acknowledged that Defendants closely monitored and tracked partner staffing and scheduling:

- "If you look at staffing and scheduling and how we are working on that, I think we've made material progress in that area."  (November 2, 2023 conference call for Q4 2023 earnings);

- "Operationally, we are seeing evidence that we are executing better. . . .  Through scheduling and staffing improvements, we are beginning to increase the number of hours per partner in store, critical to running great stores and improving partner engagement while also improving productivity."  (August 1, 2023 conference call for Q3 2023 earnings);

CONSOLIDATED COMPLAINT FOR
VIOLATION OF FEDERAL SECURITIES LAWS
(2:24-cv-01362-JHC)                    - 23 -

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400, Seattle, WA  98101-3268
Telephone: 206/623-1900

- "There's a lot more stability, operational stability, in stores. You see tenure year go up. It's almost up by a year, which is a lot for us. And so staffing and scheduling has been a big area of work." (December 5, 2023 Morgan Stanley Global Consumer & Retail conference);

- "[W]e are listening to our partners and investing to make their experience better." (January 30, 2024 conference call for Q1 2024).

61.    Additionally, after he was hired in September 2022 and before his appointment as CEO, Narasimhan participated in a six-month immersion program where he trained as a barista and worked side-by-side with partners in company-operated stores. Then, after becoming CEO, to keep himself "'close to [Starbucks'] culture and our customers, as well as to our challenges and opportunities,'" Narasimhan committed to work a half day shift each month in a Starbucks café.

62.    Narasimhan also held himself out as having a unique perspective on China markets. During the November 2, 2023 Reinvention Update, Narasimhan told analysts, "I have studied advised-led businesses with a China footprint for the last 20 years. And it's a remarkable country. And I have deep exposure to that country over the years that I've been a professional." He further underscored his knowledge of Starbucks' operations in China during the January 30, 2024 Q1 2024 conference call, telling investors that "***I've been to China 3 times in the last 9 months***. And one of the things that's fundamentally impressed me with the business is really how we've used COVID and the time that the business has actually taken to reset the business."

**C.    Narasimhan's Abrupt Termination Supports Scienter**

63.    Narasimhan's abrupt termination on August 13, 2024 further supports a strong inference of scienter. The termination occurred within four months of the Company reporting its weakest U.S. store traffic performance outside of the COVID pandemic and the 2007 global financial crisis and a major performance decline in the Company's China market. Narasimhan served less than 17 months after assuming the CEO position – representing the shortest CEO tenure in Starbucks' history. Narasimhan's short tenure stands in stark contrast to his predecessor's long, multi-decade tenure as CEO. In announcing Narasimhan's termination, Starbucks stated, without explanation, that he would step down as CEO and member of the Board with "immediate effect."

CONSOLIDATED COMPLAINT FOR
VIOLATION OF FEDERAL SECURITIES LAWS
(2:24-cv-01362-JHC)                                           - 24 -

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400, Seattle, WA 98101-3268
Telephone: 206/623-1900

### D.      Corporate Scienter

64.      The allegations above also establish a strong inference that Starbucks as an entity acted with corporate scienter throughout the Class Period, as the Individual Defendants, Starbucks' officers, management, and agents, had actual knowledge of the misrepresentations and omissions of material facts set forth herein (for which they had a duty to disclose), or acted with reckless disregard for the truth because they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such material misrepresentations and/or omissions were made knowingly or recklessly, and without a reasonable basis, for the purpose and effect of concealing the fraudulent scheme from the investing public.  By concealing these material facts from investors, Starbucks maintained and/or increased its artificially inflated common stock prices throughout the Class Period.

## VII.    LOSS CAUSATION

65.      The market for Starbucks common stock was open, well-developed, and efficient during the Class Period.  Throughout the Class Period, Starbucks common stock traded at artificially inflated prices as a direct result of Defendants' materially misleading statements and omissions as alleged above in ¶¶34-39 and 41-51, which were widely disseminated to the securities market, investment analysts, and the investing public.  Lead Plaintiffs and other Class members purchased or otherwise acquired Starbucks common stock relying upon the integrity of the market price of Starbucks common stock and market information relating to Starbucks.

66.      When the relevant truth and its impact on Starbucks' financial results and prospects entered the market, the price of Starbucks common stock significantly dropped as the artificial inflation came out of the stock price.  As a result of their purchases of Starbucks common stock during the Class Period, Lead Plaintiffs and other Class members suffered economic loss (*i.e.*, damages) under the federal securities laws.

67.      On April 30, 2024, after the market closed, the relevant truth concealed by Defendants' materially misleading statements and omissions was revealed when Starbucks issued

CONSOLIDATED COMPLAINT FOR
VIOLATION OF FEDERAL SECURITIES LAWS
(2:24-cv-01362-JHC)                                      - 25 -

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400, Seattle, WA  98101-3268
Telephone: 206/623-1900

1   a press release reporting its Q2 2024 financial results and hosted an earnings conference call for

2   investors.  The Company press release reported that global comparable store sales *declined* 4%,

3   driven by a 6% decline in store traffic.  The Company press release also reported that North

4   America and U.S. comparable store sales *declined* 3%, driven by a 7% decline in store traffic, and

5   China comparable store sales *declined* 11%, driven by a 4% decline in store traffic.  This was the

6   first time since 2020 that the Company reported a decline in comparable store sales.  The Company

7   also reported a 2% decline in net revenues over the prior year, and a 14% decline in GAAP earnings

8   per share for Q2 2024, due to a decline in comparable store sales and store traffic.

9          68.     On the conference call, Narasimhan told investors that "challenge[s] meeting our

10  peak morning demand in the U.S." and "long wait times" contributed to the decline in U.S. store

11  traffic while "intense price competition" contributed to the decline in comparable store sales in

12  China.  During the conference call, Ruggeri also informed investors that the Company was slashing

13  its full-year 2024 guidance due to Q2 2024's disappointing comparable store sales performance.

14  The revised FY 2024 outlook projected weaker revenue growth, with global and U.S. comparable

15  store sales now expected to range from a low-single-digit decline to flat, a sharp downgrade from

16  the earlier forecast of 4% to 6% growth.  Similarly, expectations for comparable store sales in

17  China were reduced to a single-digit decline, a significant setback from the previously anticipated

18  low-single-digit growth.

19         69.     In response to this news, the price of Starbucks common stock declined over 15%,

20  from a closing price of $88.49 per share on April 30, 2024 to a closing price of $74.44 per share

21  on May 1, 2024, on abnormally high volume of close to 67 million shares traded, over 7 times the

22  Class Period average trading volume.  In stark contrast, on the same date the S&P 500 Consumer

23  Discretionary Sector, a peer group that includes Starbucks, remained flat at -0.0175%.

24         70.     The drop in the price of Starbucks common stock following the April 30, 2024

25  disclosure was the biggest single-day price decline since the stock was first publicly listed in 1992.

26

CONSOLIDATED COMPLAINT FOR
VIOLATION OF FEDERAL SECURITIES LAWS
(2:24-cv-01362-JHC)                              - 26 -

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400, Seattle, WA  98101-3268
Telephone: 206/623-1900

This stock price decline was due to firm-specific, fraud-related disclosures and not the result of market, industry, or firm-specific, non-fraud factors.

71.    Following the April 30, 2024 disclosure, analysts expressed surprise as to the magnitude of the comparable store sales decline and made material downward revisions to their 2024, 2025, and 2026 estimates and stock price targets for Starbucks.  For example, in a May 1, 2024 report, Piper Sandler made downward revisions to its 2024 to 2026 estimates and lowered its price target from $100 per share to $88 per share following Defendants' report of declining comparable store sales, and stated "the magnitude of the misses that was quite surprising," and "we think management credibility remains a big issue from here."  Similarly, on May 1, 2024, Morningstar issued a report stating "the degree of comparable store sales pressure that [Starbucks] saw in its most recent quarter was shocking."

72.    Several analysts also noted that Q2 2024's results were the Company's worst financial performance in recent history.  For example, in an April 30, 2024 analyst report, William Blair downgraded Starbucks' stock rating to market perform, noting that Q2 2024 marked the Company's "weakest traffic performance . . . outside of the [COVID] pandemic or the Great Recession."  Similarly, in a May 1, 2024 analyst report, Morgan Stanley lowered its revenue estimates and Company price target, stating, "this appears to be the worst quarter in our model . . . outside of the [Global Financial Crisis] and Covid, and -7% [North America] traffic was worse than during the [Global Financial Crisis]."  Also on April 30, 2024, Jefferies issued a report stating that Q2 2024 was "the worst result for the [North America] segment in the past 20 years [excluding] the pandemic periods."

73.    On May 1, 2024, Narasimhan went on CNBC and spoke to Jim Cramer about the Company's surprisingly poor Q2 2024 financial results.  Cramer quickly pointed out that Narasimhan failed to adequately explain the results and noted that shareholders were "distressed" and viewed the problem as "one of trust" with Company management.

CONSOLIDATED COMPLAINT FOR
VIOLATION OF FEDERAL SECURITIES LAWS
(2:24-cv-01362-JHC)                                              - 27 -

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400, Seattle, WA  98101-3268
Telephone: 206/623-1900

1  **VIII.   POST-CLASS PERIOD DEVELOPMENTS**

2      74.    On May 5, 2024, Starbucks' former CEO Howard Schultz took the unusual step of

3  publicly criticizing Narasimhan's performance as the CEO in a LinkedIn post.  Schultz noted that

4  Starbucks' U.S. operations were the primary reason for the Company's stock price decline and

5  criticized the Company's top executives for failing to focus on the customer experience and store

6  operations.

7      75.    On May 29, 2024, *Bloomberg* published a report based on the accounts of current

8  Starbucks employees confirming that Starbucks' implementation of a new scheduling algorithm

9  was causing stores to be understaffed, which significantly increased food and drink wait times.

10  According to the Starbucks employees, the new algorithm did not "adequately account for the time

11  it t[ook] to fulfill a ballooning number of special customer requests like extra espresso shots or

12  cold foam, as well as the effect of more corporate promotions."  The *Bloomberg* report cited

13  employees confirming that because of the understaffing, workers were "struggling to

14  simultaneously juggle in-person, drive-thru, mobile and delivery orders and customers were

15  waiting longer."

16      76.    On July 30, 2024, Defendants reported Q3 2024 financial results and more bad

17  news regarding declining comparable store sales and store traffic.  Defendants reported that U.S.

18  comparable store sales fell 2%, driven by a 6% decline in store traffic, China comparable store

19  sales fell 14%, driven by a 7% decline in store traffic and profits dropped more than 7%.

20  Narasimhan told investors that the Company was working to speed up service on digital orders,

21  and that Starbucks was exploring strategic partnerships for its China business.  Q2 and Q3 2024

22  were some of the Company's "worst quarters outside of the pandemic or Great Recession."

23      77.    On August 13, 2024, amidst activist investor pressure, Starbucks abruptly

24  announced that Narasimhan was immediately stepping down as the Company's CEO and a

25  member of its Board.  Narasimhan served only 17 months as Starbucks CEO, the shortest CEO

26

CONSOLIDATED COMPLAINT FOR
VIOLATION OF FEDERAL SECURITIES LAWS
(2:24-cv-01362-JHC)                                    - 28 -

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400, Seattle, WA  98101-3268
Telephone: 206/623-1900

1    tenure in Company history.  Brian Niccol, the former CEO of Chipotle, took over as CEO in

2    September 2024.

3        78.    On January 28, 2025, Starbucks held an earnings conference call with investors.

4    During the call, Niccol admitted that in Q1 2025 (September 30, 2024 to December 29, 2024), the

5    Company added more partner hours to over 3,000 U.S. stores to reduce wait times and ensure

6    enough store staffing to meet demand.  During the Q&A portion of the call, an analyst from

7    Deutsche Bank followed up on a question about the additional partner hours Starbucks added.  In

8    response, Niccol stated:

9        [W]e put in the labor into those 3,000 stores from a precision standpoint, which was
         really just going back and looking at the labor tables to find out where potentially
10       we've just gotten too thin in certain areas.  And so, we've implemented that. The
         good news is we've seen a positive response on that front.
11

12   **IX.    APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND THE
             FRAUD-ON-THE-MARKET DOCTRINE**

13       79.    Lead Plaintiffs will rely, in part, upon the presumption of reliance established by

14   the fraud-on-the-market doctrine in that:

15       •    Defendants made public misrepresentations or failed to disclose material facts
16            during the Class Period;

17       •    the omissions and misrepresentations were material;

18       •    Starbucks' common stock traded in an efficient market, was liquid and traded with
19            moderate to heavy volume during the Class Period;

20       •    the Company's common stock was traded on the Nasdaq and was covered by
              multiple analysts;
21

22       •    the misrepresentations and omissions alleged would tend to induce a reasonable
              investor to misjudge the value of the Company's stock; and
23

24       •    Lead Plaintiffs and members of the Class purchased, acquired, and/or sold
              Starbucks common stock between the time Defendants failed to disclose or
25            misrepresented material facts and the time the true facts were disclosed, without
              knowledge of the omitted or misrepresented facts.

26

CONSOLIDATED COMPLAINT FOR
VIOLATION OF FEDERAL SECURITIES LAWS
(2:24-cv-01362-JHC)                                - 29 -

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400, Seattle, WA  98101-3268
Telephone: 206/623-1900

1    80.    Based upon the foregoing, Lead Plaintiffs and the members of the Class are entitled

2    to a presumption of reliance upon the integrity of the market.

3    81.    Alternatively, Lead Plaintiffs and the members of the Class are entitled to the

4    presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens v. United*

5    *States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period

6    statements in violation of a duty to disclose such information, as detailed above.

7    **X.    CLASS ACTION ALLEGATIONS**

8    82.    Lead Plaintiffs bring this action as a class action pursuant to Federal Rules of Civil

9    Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise

10    acquired Starbucks common stock during the Class Period and were damaged thereby.  Excluded

11    from the Class are Defendants, officers, and directors of the Company, at all relevant times,

12    members of their immediate families and their legal representatives, heirs, successors, or assigns,

13    and any entity in which Defendants have or had a controlling interest.

14    83.    The members of the Class are so numerous that joinder of all members is

15    impracticable.  Throughout the Class Period, Starbucks common stock was actively traded on the

16    Nasdaq.  While the exact number of Class members is unknown to Lead Plaintiffs at this time and

17    can be ascertained only through appropriate discovery, Lead Plaintiffs believe there are hundreds

18    or thousands of members in the proposed Class.  Record owners and other members of the Class

19    may be identified from records maintained by Starbucks or its transfer agent and may be notified

20    of the pendency of this action by mail, using the form of notice similar to that customarily used in

21    securities class actions.

22    84.    Lead Plaintiffs' claims are typical of the claims of the members of the Class as all

23    members of the Class are similarly affected by Defendants' wrongful conduct in violation of

24    federal law that is complained of herein.

25

26

CONSOLIDATED COMPLAINT FOR
VIOLATION OF FEDERAL SECURITIES LAWS
(2:24-cv-01362-JHC)                                    - 30 -

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400, Seattle, WA  98101-3268
Telephone: 206/623-1900

85.     Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation.  Lead Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

86.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations, prospects, and/or management of Starbucks;

- whether statements made by Defendants to the investing public during the Class Period omitted material facts necessary to make the statements made neither false nor misleading;

- whether Defendants acted knowingly or with reckless disregard for the truth;

- whether the price of Starbucks common stock during the Class Period was artificially inflated because of Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

87.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## XI.     CAUSES OF ACTION

### COUNT I
### For Violation of Section 10(b) of the Exchange Act and Rule 10b-5
### Promulgated Thereunder Against All Defendants

88.     Lead Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

CONSOLIDATED COMPLAINT FOR
VIOLATION OF FEDERAL SECURITIES LAWS
(2:24-cv-01362-JHC)

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400, Seattle, WA  98101-3268
Telephone: 206/623-1900

89.     This Count is based upon §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and SEC Rule 10b-5 promulgated thereunder.  During the Class Period, Defendants violated §10(b) of the Exchange Act and SEC Rule 10b-5 in that: (a) Defendants employed devices, schemes, and artifices to defraud; (b) Defendants made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) Defendants engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiffs and the Class in connection with their purchase of Starbucks common stock during the Class Period.

90.     In furtherance of their scheme and wrongful course of business, Defendants, and each of them, took the actions set forth herein.

91.     During the Class Period, defendants Starbucks, Narasimhan, and Ruggeri engaged in a scheme and wrongful course of business and disseminated or approved the statements specified above, which they knew were false and misleading in that they contained misrepresentations and/or failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.  Defendants' misconduct was intended to, and did: (i) deceive the investing public, including Lead Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Starbucks common stock; and (iii) cause Lead Plaintiffs and other members of the Class to purchase or otherwise acquire Starbucks common stock at artificially inflated prices.

92.     As a direct and proximate result of the Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period in that, in reliance on the integrity of the market, they paid artificially inflated prices for Starbucks common stock.  Lead Plaintiffs and the Class would not have purchased Starbucks common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.  Upon the disclosure that the Company had been disseminating

CONSOLIDATED COMPLAINT FOR
VIOLATION OF FEDERAL SECURITIES LAWS
(2:24-cv-01362-JHC)

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400, Seattle, WA  98101-3268
Telephone: 206/623-1900

- 32 -

false and misleading statements to the investing public, Lead Plaintiffs and the other members of the Class suffered financial harm.

**COUNT II**

**For Violation of Section 20(a) of the Exchange Act**
**Against All Defendants**

93.     Lead Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

94.     During the Class Period, the Individual Defendants participated in and oversaw the operation and management of Starbucks, and conducted and participated, directly and indirectly, in the conduct of Starbucks' business affairs.  The Individual Defendants exercised control over Starbucks' operations and possessed the power to control, and did control, the specific activities which comprise the primary violations about which Lead Plaintiffs and the other members of the Class complain.

95.     The Individual Defendants acted as controlling persons of Starbucks within the meaning of §20(a) of the Exchange Act.  By virtue of their senior management positions as officers and/or directors of Starbucks, their participation in and awareness of the Company's operations, and their personal knowledge of the statements filed by the Company with the SEC and/or disseminated to the investing public, these Defendants had the power to influence and control, and did influence and control, directly or indirectly, Starbucks' decision-making, including the content and dissemination of the allegedly false and misleading statements and other acts in furtherance of a fraudulent scheme.

96.     In particular, as CEO and CFO, the Individual Defendants had direct or supervisory responsibility over the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular business and/or operating practices and expenditures and deficient control environment giving rise to the securities violations alleged in Count I, and exercised that power.

CONSOLIDATED COMPLAINT FOR
VIOLATION OF FEDERAL SECURITIES LAWS
(2:24-cv-01362-JHC)

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400, Seattle, WA  98101-3268
Telephone: 206/623-1900

- 33 -

1   97.    Starbucks had the power to control and influence the Individual Defendants and
2   other Company executives through its power to hire, fire, supervise, and otherwise control the
3   actions of its employees and their salaries, bonuses, incentive compensation, and other
4   employment considerations.  By virtue of the foregoing, Starbucks had the power to influence and
5   control, and did influence and control, directly or indirectly, the decision-making of the Individual
6   Defendants, including the content of their public statements.

7   98.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs
8   and other members of the Class suffered damages in connection with their purchases and/or
9   acquisitions of Starbucks common stock during the Class Period when the relevant truth was
10  revealed.

11  99.    By reason of the foregoing, Defendants violated §20(a) of the Exchange Act.

**PRAYER FOR RELIEF**

13  WHEREFORE, Lead Plaintiffs demand judgment against Defendants as follows:

14  A.    Declaring this action to be a class action properly maintained pursuant to Rules
15  23(a) and (b)(3) of the Federal Rules of Civil Procedure and certifying Lead Plaintiffs as Class
16  Representatives and Robbins Geller Rudman & Dowd LLP as Class Counsel;

17  B.    Awarding compensatory damages in favor of Lead Plaintiffs and the other members
18  of the Class against all Defendants, jointly and severally, for all damages sustained as a result of
19  Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

20  C.    Awarding Lead Plaintiffs and the Class their reasonable costs and expenses
21  incurred in this action, including reasonable attorneys' fees, accountants' fees, and experts' fees,
22  and other costs and disbursements; and

23  D.    Awarding Lead Plaintiffs and other members of the Class such other injunctive or
24  equitable relief, including disgorgement and/or the imposition of a constructive trust, that may be
25  deemed just and proper by the Court.

26

CONSOLIDATED COMPLAINT FOR
VIOLATION OF FEDERAL SECURITIES LAWS
(2:24-cv-01362-JHC)                                        - 34 -

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400, Seattle, WA  98101-3268
Telephone: 206/623-1900

**JURY DEMAND**

Lead Plaintiffs hereby demand a trial by jury.

DATED:  February 3, 2025

Respectfully submitted,

KELLER ROHRBACK L.L.P.
JULI E. FARRIS (WSBA #17593)


*s/ Juli E. Farris*
JULI E. FARRIS

1201 Third Avenue, Suite 3400
Seattle, WA  98101-3268
Telephone:  206/623-1900
jfarris@kellerrohrback.com

*Liaison Counsel*

ROBBINS GELLER RUDMAN
 & DOWD LLP
LAURIE L. LARGENT (admitted *pro hac vice*)
ERIKA L. OLIVER (admitted *pro hac vice*)
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
llargent@rgrdlaw.com
eoliver@rgrdlaw.com

*Lead Counsel for Lead Plaintiffs*

CONSOLIDATED COMPLAINT FOR
VIOLATION OF FEDERAL SECURITIES LAWS
(2:24-cv-01362-JHC)

KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400, Seattle, WA  98101-3268
Telephone: 206/623-1900

- 35 -