UNITED ST ATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| CHARLES GARBACCIO ET AL., | CASE NO. 2:24-cv-01362-JHC |
| Plaintiffs, | ORDER |
| v. | |
| STARBUCKS CORPORATION ET AL., | |
| Defendants. | |

**I**
**INTRODUCTION**

This matter comes before the Court on Defendants' Motion to Dismiss the Consolidated Complaint (Dkt. # 42) and Defendants' Request for Consideration Under Incorporation by Reference Doctrine and Judicial Notice in Support of Defendants' Motion to Dismiss the Consolidated Complaint (Dkt. # 44). The Court has reviewed the materials filed in support of and in opposition to the Motion and Request, pertinent portions of the record, and the applicable law. The Court finds oral argument unnecessary. For the reasons below, the Court: (1) GRANTS Defendants' Request for Incorporation by Reference and Judicial Notice (Dkt. # 44); (2) GRANTS in part and DENIES in part Defendants' Motion to Dismiss (Dkt. # 42); and (3) GRANTS Plaintiffs leave to amend as to any dismissed claims.

## II
### Background

This case is a securities class action under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 brought by Lead Plaintiffs on behalf of themselves and other similarly situated persons. Dkt. # 39 at 4. The Lead Plaintiffs[1]—Pavers & Road Builders District Council Pension Fund, Teamsters Local 237 Additional Security Benefit Fund, and Teamsters Local 237 Supplemental Fund for Housing Authority Employees—are multi-employer defined benefit plans that acquired Starbucks common stock between November 2, 2023, and April 30, 2024 (the Class Period). *Id.* at 7. Lead Plaintiffs bring this action on behalf of themselves and "all other persons that purchased or otherwise acquired Starbucks common stock" during the Class Period and "were damaged thereby." *Id.* at 4.

Plaintiffs are suing Defendant Starbucks Corporation and Individual Defendants Laxman Narasimhan and Rachel Ruggeri. *Id.* at 7-8. Starbucks Corporation is "a global premier roaster, marketer, and retailer of specialty coffee incorporated under the laws of the state of Washington and headquartered in Seattle, Washington." *Id.*; *see also* Dkt. # 42 at 12. Narasimhan is Starbucks' former Chief Executive Officer (CEO). Dkt. # 39 at 8; *see also* Dkt. # 42 at 12. According to the Complaint,[2] Narasimhan joined Starbucks' Board of Directors and assumed the role of CEO on March 20, 2023. Dkt. # 39 at 8. The company removed him from both roles on August 13, 2024. *Id.* Ruggeri was Starbucks' Executive Vice President and Chief Financial

---

[1] On August 28, 2024, Plaintiff Charles Garbaccio filed this action on behalf of himself and all other persons similarly situated. *See* Dkt. # 1. On November 19, 2024, the Court granted Lead Plaintiffs' "Motion for Appointment as Lead Plaintiff and Approval of Lead Plaintiff's Selection of Lead Counsel" (Dkt. # 14), thereby appointing Pavers & Road Builders District Council Pension Fund, Teamsters Local 237 Additional Security Benefit Fund, and Teamsters Local 237 Supplemental Fund for Housing Authority Employees as Lead Plaintiffs under 15 U.S.C. § 78u-4(a)(3)(B)(iii). *See* Dkt. # 22 at 2.

[2] As used in this Order, "Complaint" refers to Lead Plaintiffs' Consolidated Complaint (Dkt. # 39). The Complaint was filed by Lead Plaintiffs on February 3, 2025, in compliance with this Court's orders. *See* Dkt. ## 8; 22. The Consolidated Complaint replaced the original complaint (Dkt. # 1), which was filed by Plaintiff Charles Garbaccio on August 28, 2024, to commence this action.

Officer (CFO) during the Class Period. *Id.*; *see also* Dkt. # 42 at 12. According to the

Complaint, Ruggeri was named CFO in 2021 and remained in the position as of the filing of this

action. Dkt. # 39 at 8.

The Complaint alleges that Defendants violated the securities laws by engaging in a

"concerted effort to hide from investors that store traffic (or transactions) – a Starbucks financial

metric that reports the number of sales at existing company-operated stores – in [the United

States and China] was declining." *Id.* at 4. It alleges that Defendants made numerous "false and

misleading statements and omissions" during the Class Period, with actual knowledge or reckless

disregard of their falsity, in violation of §§ 10(b) and 20(a) of the Securities Exchange Act and

SEC Rule 10b-5. *Id.* at 15-28. Plaintiffs challenge the following statements:[3]

- **Statements from Q4 2023 Earnings Call, held on November 2, 2023 (Dkt. # 43-7)**

    Reinvention Plan[4] Statements:[5]

    o  "*Our Reinvention is moving ahead of schedule, fueling revenue growth, efficiency and margin expansion. Notably, we continue to see the positive impact of our Reinvention on our partner and customer experiences*, proof points that we can continue to create, grow and strengthen our business while creating value for all. As we enter the current year, in the face of macro uncertainty, we remain confident in the momentum throughout our business and

---

[3] The use of italics in the statements below mirrors the use of italics in the Complaint. *See generally* Dkt. # 39 at 15–28.

[4] According to the Complaint, the "Reinvention Plan" is a three-year plan designed by Starbucks' leadership to "fix the in-store inefficiencies" and "grow sales outside of the United States, including in China." Dkt. # 39 at 10. The Reinvention Plan, announced in September 2022 by Starbucks' then-CEO and Chairman of the Board Howard Schultz, "promised a sharp increase in comparable store sales growth to a range of 7% to 9% annually from F[iscal] Y[ear] 2023 to F[iscal] Y[ear] 2025, both globally and in the United States." *Id.* at 10–11. After assuming the role of CEO in March 2023, Narasimhan designed "his own spin on the Reinvention Plan," the "Triple Shot Reinvention with Two Pumps," which was formally announced to investors during the Q4 2023 Earnings Call on November 2, 2023. *Id.* at 11–12. "Narasimhan's [Triple Shot] plan built on Schultz's Reinvention Plan, with added focus on improving in-store efficiencies and partner culture to grow store sales and improve the Starbucks customer experience, while also expanding the Company's global store footprint, particularly in Starbucks' important China market." *Id.*

[5] As used in this Order, "Reinvention Plan Statements" refer to the challenged statements referencing Schultz's original Reinvention Plan, Narasimhan's Triple Shot update to the Reinvention Plan, or both.

headroom globally. We expect sustained momentum throughout the company for years to come." Dkt. # 39 at 15; *see also* Dkt. # 43-7 at 7.[6]

o   "We will also share our confidence in the company's long-term opportunity with guidance for fiscal year 2024. What you will take away from this call today is that *we have great momentum, fueled largely by our Reinvention Plan. We're seeing the work pay off through improved partner and customer experiences,* as well as captured improvements in efficiency and margin. We believe this bodes well for this next year and for years beyond." Dkt. # 39 at 16; *see also* Dkt. # 43-7 at 4.

o   "*We have created a more stable environment in our stores*. Hours per partner increased in the quarter by 5% as we continue finding schedules that fit our partners' and customers' needs. Turnover was down in the fourth quarter by 10%, while barista tenure increased by 16% for the quarter. Customer connection scores also improved in the quarter relative to this time last year. We did all of this by investing over 20% of this year's profits back into our partners and stores through wages, training, equipment and new store growth. *All this is further evidence that our strategy is working*." Dkt. # 39 at 16; *see also* Dkt. # 43-7 at 5–6.

o   "Here in the U.S., our largest market, *we saw momentum sustained throughout the quarter*. Revenue for the quarter was up a record 12%, underpinned by 8% comps." Dkt. # 39 at 16; *see also* Dkt. # 43-7 at 5.

o   "*Transaction comparable sales growth in the quarter was 2%*, which, combined with another quarter of a record ticket, drove multiple record average weekly sales, including delivering our sixth highest sales weeks ever, driven by our successful fall launch. Demand continued outside of our promotion windows, which translates to future opportunity as we leverage targeted offers to our most loyal customers, increasing efficiency as we create a more personalized experience." Dkt. # 39 at 16; *see also* Dkt. # 43-7 at 9.

o   "I'll start by just saying*, overall, our traffic continues to be strong and it's growing*. So when you look at the success of our performance in the quarter, particularly in the U.S., our highest-ever average weekly sales were driven by a combination of strength in traffic but also strength in overall ticket. And we saw a record number of customers coming into our stores and spending a record amount. Now those customers are both our rewards customers as well as our non-Starbucks Rewards customers. So we're seeing growth in our customer base across the segments. And that's driving strong performance as each customer is spending more." Dkt. # 39 at 17; *see also* Dkt. # 43-7 at 15.

---

[6] The final two sentences of this statement appear in the Complaint but do not appear in the transcript of the Q4 2023 Earnings Call. *Compare* Dkt. # 39 at 15 *with* Dkt. # 43-7 at 7.

China Business Statements:[7]

- ○ "[In China] *our business is also strong*, 5% comp in Q4. If you look at the first half of the year versus the second half of the year, the growth difference in the second half was 20% higher than the first. One thing you should know is that if you just look at the morning daypart, the morning daypart for our business in China now is higher than it was pre-COVID. We have very strong local innovation and to answer your question, if you look at the transactions that Rachel mentioned, we're very comfortable with the food and beverage transactions and what we see there, including the price realization that we have . . . But *we feel very good about the competitive position of beverages, the competitive position of food. We feel very good about the cash returns of the stores that we are opening. They're very strong.* The team has done a wonderful job in ensuring that the cost of bills are low, with the productivity that we have been able to accomplish in our stores. *We feel good about the overall returns that we're getting there. And I'm heartened by how the business is coming together despite all the headwinds that have been there for the last couple of years.*" Dkt. # 39 at 17; *see also* Dkt. # 43-7 at 12–13.

- **Statements from Q1 2024 Earnings Call, held on January 30, 2024 (Dkt. # 43-11)**

  Reinvention Plan Statements:

  - ○ "*Our performance in the quarter was fundamentally strong.* Our Q1 total company revenue was a record $9.4 billion, up 8% year-over-year. Our global comparable store sales grew 5% year-over-year, supported by a *5% comp growth in North America*, driven by 4% ticket growth *and 10% comp growth in China.* Our global operating margins expanded by 130 basis points to 15.8% and our overall earnings per share grew 20% to $0.90. *This speaks to the continued successful execution of our reinvention plan and the durable business we are building.*" Dkt. # 39 at 19; *see also* Dkt. # 43-11 at 5.

  - ○ "*Our U.S. company-operated business delivered 5% comparable store sales growth in Q1* driven by 4% ticket growing from pricing, mix and customization. . . . Comparable transactions for the quarter increased 1% as traffic was pressured to negative single digits in November *before it started to rebound in December.*" Dkt. # 39 at 20; *see also* Dkt. # 43-11 at 11.

  - ○ "*[W]e remain confident in our Triple Shot strategy and our long-term growth.*" Dkt. # 39 at 20; *see also* Dkt. # 43-11 at 7.

  - ○ "Our first Triple Shot Reinvention priority *is to elevate our brand by operating great stores* and driving product innovation. *The best lever for elevating our brand is our store experience. We continue to raise the bar on running great*

---

[7] As used in this Order, "China Business Statements" refer to the challenged statements referencing Starbucks' business in China.

ORDER - 5

*stores with a focus on enhancing both our partner and customer experience.*" Dkt. # 39 at 20-21; *see also* Dkt. # 43-11 at 7.

o   "As you heard me say often, the key to our success is the experience that our partners create for our customers. *We're investing in a better experience for our partners to advance our business to a more balanced growth model as we unlock efficiency. In the quarter, we have seen the effectiveness of the Reinvention driven investments we have made in in-store operational efficiencies such as standards, equipment innovation and scheduling improvements, leading to a more stable environment for our partners.* Turnover has decreased by 5% year-over-year and is now well below pre-COVID levels. *Average partner hours increased 10% leading to a 14 percentage point increase in partner sentiment related to scheduling*, specifically preferred hours, which we know is important to partners. *We are listening to our partners and investing to make their experience better.*" Dkt. # 39 at 21; *see also* Dkt. # 43-11 at 9.

o   "[M]ore recently, we focused on improving our overall scheduling. So providing more hours for our partners per store. We have a ways to go, but we know that that's a high driver of engagement. All of those efforts together have led to lower turnover in a more stable environment. And *it's that stability that really allows us to create a better efficiency in serving our customers. So as an example, I already spoke about our morning daypart this quarter in the U.S. was the strongest that we've seen. And that's a function of all of those efforts and activities that I just spoke about being realized in supporting our demand.* So creating a better experience for our partners leads to the better experience for our customers." Dkt. # 39 at 21; *see also* Dkt. # 43-11 at 18.

o   "This substantial margin expansion in the quarter reflected *the meaningful labor staffing and scheduling improvements we made as part of our Reinvention. We unlocked significant stability by focusing on staffing and scheduling hours based on partners' preferred shifts, which enhanced both our partners' experience and subsequent store performance.*" Dkt. # 39 at 21–22; *see also* Dkt. # 43-11 at 11.

Loyalty Program Statements:[8]

o   "Throughout the quarter, we saw our most loyal customers around the world coming into our stores more often. Specifically, in the US, we set new records with our 90-day active Rewards members growing 13% year-over-year to a record 34.3 million, with tender reaching an all-time high of 59% demonstrating increased engagement. . . *In short, our growing Starbucks Rewards members are visiting our stores more frequently and increasing their spend each time that they come.*" Dkt. # 39 at 19; *see also* Dkt. # 43-11 at 5.

---

[8] As used in this Order, "Loyalty Program Statements" refer to the challenged statements referencing Starbucks' Loyalty Program, also known as "Starbucks Rewards."

o  "*[O]ur loyalty program is already performing exceptionally* well." Dkt. # 39 at 19; *see also* Dkt. # 43-11 at 15.

o  "*[W]e are seeing no slowdown in our loyal SR customers.* In fact, we're seeing an increase in frequency, they're buying more, they're customizing more. That part of the business is extremely strong." Dkt. # 39 at 19; *see also* Dkt. # 43-11 at 17.

o  "We had great momentum in August and September, and that continued into October, which exceeded our expectations across every measure. *Beginning in mid-November, while our business continued to grow, the growth rate was impacted by 3 unexpected factors.* First, we saw a negative impact to our business in the Middle East. Second, events in the Middle East also had an impact in the U.S., driven by misperceptions about our position. Our most loyal customers remain loyal and in fact, increased their frequency and spend in the quarter. *But we did see a softening of U.S. traffic.* Specifically, our occasional U.S. customers, who tend to visit the afternoon, came in less frequently. I will speak in a moment as to how we quickly responded with an effective action plan. . . . We responded quickly to these headwinds. In the U.S., we implemented targeted offers aimed at bringing our occasional customers into our loyalty program. As we've seen over time, Starbucks Rewards members develop a routinized long-term relationship with our brand that increases both ticket and transactions. Additionally, we activated new capabilities within our proprietary Deep Brew data analytics and AI tool to identify and incentivize specific rewards members cohorts. Finally, we are leaning further into our brand, marketing and factual narrative and social media to engage these audiences where they are. *We've already seen the positive impact of these new initiatives with our more occasional customers beginning to rebound in December.* However, we continue to see further opportunity to welcome back our very occasional customers. We feel good about the trajectory over the course of the quarter, but it will take time for our plans to be fully realized." Dkt. # 39 at 20; *see also* Dkt. # 43-11 at 6.

China Business Statements:

o  "We saw . . . *exciting momentum in China with our focus on premium, and progress on the execution of our Triple Shot strategy*." Dkt. # 39 at 19; *see also* Dkt. # 43-11 at 5.

o  "*We also saw great momentum in China.* We aim to be the best in the premium market in China." Dkt. # 39 at 19; *see also* Dkt. # 43-11 at 5.

o  "*Overall, our business and brand in China remains strong.*" Dkt. # 39 at 19; *see also* Dkt. # 43-11 at 8.

1

- **Statement from Q1 2024 Form 10-Q, filed on January 30, 2024 (Dkt. # 43-10)**

2

Risk-Disclosure Statement:

3

- o "*There have been no material changes to the risk factors disclosed in our 10-*
4   *K.*"  Dkt. # 39 at 22; *see also* Dkt. # 43-10 at 46.

5        Plaintiffs allege that the above statements were knowingly false statements that caused

6   Starbucks common stock to be traded at artificially inflated prices during the Class Period,

7   leading Plaintiffs and other class members to suffer economic losses after "the relevant truth

8   concealed by Defendants' materially misleading statements and omissions was revealed [on

9   April 30, 2024] when Starbucks issued a press release reporting its Q2 2024 financial results and

10  hosted an earnings conference call for investors."  Dkt. # 39 at 28–29.  Plaintiffs seek

11  compensatory damages, reasonable costs and expenses incurred, and any injunctive relief

12  deemed just and proper by the Court.  *Id*. at 37.

13        Defendants now move to dismiss the Complaint in its entirety for failure to state a claim

14  upon which relief may be granted.  *See* Dkt. # 42.  They argue that the Complaint "does not

15  come close to meeting the exacting requirements" for pleading a claim of securities fraud.  *See*

16  *id*. at 18.  In connection with their Motion, under the doctrines of incorporation by reference and

17  judicial notice, Defendants also ask this Court to consider 14 documents attached to the

18  Declaration of Whitney B. Weber (Dkt. # 43).  *See* Dkt. # 44.

19

20

21

22

23

24

1

2

## III
### DISCUSSION

A.    Defendants' Request for Incorporation by Reference and Judicial Notice (Dkt. # 44)

Defendants request that the Court consider 14 exhibits in connection with their Motion to

Dismiss.[9]  *See* Dkt. # 44.  Defendants contend that these documents may be properly considered

in connection with their Motion to Dismiss because the documents are incorporated by reference

into the Complaint, subject to judicial notice under Rule 201 of the Federal Rules of Evidence, or

both.  *See* Dkt. # 44 at 4.  Plaintiffs do not object to the Court incorporating any of the 14

documents or taking judicial notice of the facts therein.  *See generally* Dkt.  Instead, Plaintiffs

only "object to Defendants' request that the Court consider extraneous materials to the extent

they are used to dispute the Complaint."  Dkt. # 45 at 11 n.2.

For the reasons below, the Court GRANTS Defendants' Request.

1.    Legal Standards for Judicial Notice and Incorporation by Reference

In ruling on a motion to dismiss, a court "must consider the complaint in its entirety, as

well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss,

in particular, documents incorporated into the complaint by reference, and matters of which a

---

[9] The 14 exhibits consist of "true and correct" copies of: (1) the transcript from Starbucks
Investor Day – Morning Session, dated September 13, 2022; (2) the transcript from Starbucks Investor
Day – Afternoon Session, dated September 13, 2022; (3) a press release titled, "Starbucks Enters New Era
of Growth Driven by an Unparalleled Reinvention Plan," dated September 13, 2022; (4) the transcript
from the Company's 2Q23 earnings call, held on May 2, 2023; (5) the transcript from the Company's
3Q23 earnings call, held on August 1, 2023; (6) the transcript from the Company's 2023 Reinvention
Update, held on November 2, 2023; (7) the transcript from the Company's 4Q23 earnings call, held on
November 2, 2023; (8) a press release titled, "Starbucks Reports Q4 and Full Year Fiscal 2023 Results,"
dated November 2, 2023; (9) the Company's Fiscal Year 2023 Form 10-K, filed with the SEC on
November 17, 2023; (10) the Company's 1Q24 Form 10-Q, filed with the SEC on January 30, 2024; (11)
the transcript from the Company's 1Q24 earnings call, held on January 30, 2024; (12) the transcript from
the Company's 2Q24 earnings call, held on April 30, 2024; (13) a *Bloomberg* article titled, "Starbucks
Wait Times Jump After Changing Work Algorithm, Staffers Say," published May 29, 2024; (14) the
transcript from the Company's presentation at the Deutsche Bank dbAccess Global Consumer Conference
– Fireside Chat, dated June 5, 2024.  *See generally* Dkt. # 43; *see also* Dkt. # 44 at 2–3.  The documents
are attached to the Declaration of Whitney B. Weber.  *See* Dkt. # 43.

court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007).

Federal Rule of Evidence 201 governs judicial notice. Under the rule, a court is permitted "to notice an adjudicative fact if it is 'not subject to reasonable dispute.'" *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 999 (9th Cir. 2018) (quoting Fed. R. Evid. 201(b)). "A fact is 'not subject to reasonable dispute' if it is 'generally known,' or 'can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'" *Id.* (quoting Fed. R. Evid. 201(b)(1)–(2)). Rule 201 thus permits district courts to take notice of undisputed facts from documents in the public record, such as SEC filings and publicly available news articles. *See Joyce v. Amazon.com, Inc.*, 2023 WL 8370101, at *3 (W.D. Wash. Dec. 4, 2023) (collecting cases); *see also United States v. Ritchie*, 342 F.3d 903, 909 (9th Cir. 2003) ("Courts may take judicial notice of some public records[.]"). "But a court cannot take judicial notice of disputed facts contained in such public records[,]" especially if doing so would "defeat what would otherwise constitute adequately stated claims at the pleading stage." *Khoja*, 899 F.3d at 998–99.

Under the incorporation-by-reference doctrine, a court may treat "certain documents as though they are part of the complaint itself." *Id.* at 1002. A court may treat a document as incorporated by reference if the complaint "refers extensively to the document or the document forms the basis of the plaintiff's claim." *Id.* (quoting *Ritchie*, 342 F.3d at 908). Once a document is incorporated by reference into the complaint, "a court 'may assume [its] contents are true for purposes of a motion to dismiss under Rule 12(b)(6).'" *Id.* at 1003 (quoting *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006)). But "it is improper to assume the truth of an incorporated document if such assumptions only serve to dispute facts stated in a well-pleaded complaint." *Id.*

1

2.      Analysis

2       The Court finds that Defendants' 14 exhibits are subject to judicial notice, incorporation

3   by reference, or both.  All 14 exhibits are publicly available records that contain facts that are

4   "generally known" or "can be accurately and readily determined from sources whose accuracy

5   cannot reasonably be questioned."  The Court thus concludes that the adjudicative facts in these

6   documents are "not subject to reasonable dispute" and may be properly noticed.  *See Khoja*, 899

7   F.3d. at 999.  The Court also finds that exhibits 1–3[10] and 5–14 may be properly incorporated by

8   reference into the Complaint.  The Complaint "refers extensively" to exhibits 7, 9, 10, and 11, as

9   these documents contain Defendants' challenged statements and are specifically quoted and

10  referenced throughout the Complaint.  These documents also "form the basis" of Plaintiffs'

11  claims, as the allegations of securities fraud stem directly from these documents.  *Id*.  The

12  remaining documents—exhibits 1–3, 5–6, 8, and 12–14—likewise form the basis of Plaintiffs'

13  claims, as they contain the underlying subject matter for Plaintiffs' theory of falsity.  The Court

14  thus concludes that exhibits 1–3 and 5–14 are properly incorporated by reference into the

15  Complaint.  *See id*. at 1002.

16      The Court also does not believe that consideration of these "extraneous materials" would

17  improperly "dispute the Complaint."  *See* Dkt. # 45 at 11 n.2.  As these materials are not

18  "extraneous," but rather core to Plaintiffs' claims, the Court does not find that reviewing these

19  documents alongside the motion to dismiss will improperly "undermin[e] . . . the usual pleading

20  burdens" or "defeat what would otherwise constitute adequately stated claims."  *Khoja*, 899 F.3d

21  at 998–99.  The Court thus finds it proper to take judicial notice of these 14 documents and

22

23

24
_____

[10] Defendants did not request incorporation of Exhibit 4.  *See generally* Dkt. # 44 at 6.

assume the truth of the statements in the incorporated documents (exhibits 1–3 and 5–14) for the purpose of evaluating Defendants' Motion to Dismiss.

B.      Defendants' Motion to Dismiss (Dkt. # 42)

Defendants move to dismiss the Complaint under Rule 12(b)(6).  *See* Dkt. # 42.  They contend that the "Complaint comes nowhere close to satisfying the rigorous and exacting pleading standards mandated by Rule 9(b) and the Private Securities Litigation Reform Act of 1995 [(PSLRA)]."  *Id.* at 10.  Defendants argue that Plaintiffs fail to plead: (1) "facts establishing that Defendants made a materially false or misleading statement"; (2) "a strong inference of scienter"; and (3) "loss causation."  *Id.* at 10–12.[11]  They contend that Plaintiffs have thus failed to state a claim for relief under sections 10(b) and 20(a) of the Securities Exchange Act and SEC Rule 10b–5.  *See id.* at 18, 34 n.3.

Plaintiffs respond that the Complaint plausibly alleges all six elements of a claim for securities fraud under section 10(b).  *See* Dkt. # 45 at 8.  They contend that the Complaint adequately pleads falsity, scienter, and loss causation because: (1) each of Defendants' challenged statements are actionable misrepresentations; (2) Defendants had "ready access to information contradicting their misrepresentations"; and (3) there is a causal connection between Defendants' fraud and Plaintiffs' losses.  *Id.* at 10–11.  Accordingly, Plaintiffs ask the Court to deny Defendants' Motion to Dismiss or, in the alternative, grant Plaintiffs leave to amend.  *Id.* at 30.

For the reasons below, the Court GRANTS in part and DENIES in part Defendants' Motion.

---

[11] As Defendants do not challenge the Complaint as to the remaining elements of a section 10(b) claim, *see generally* Dkt. # 42, the Court does not address them below.

1.      Legal Standards for Reviewing a Motion to Dismiss a Securities Fraud Complaint

"When evaluating a Rule 12(b)(6) motion [to dismiss], the district court must accept all material allegations in the complaint as true, and construe them in the light most favorable to the non-moving party." *Chubb Custom Ins. Co. v. Space Sys./Loral*, Inc., 710 F.3d 946, 956 (9th Cir. 2013).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556).  If there "is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal theory[,] the court must dismiss the claim. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).

Claims of securities fraud are governed by the Securities Exchange Act of 1934 and the SEC rules promulgated thereunder.  Section 10(b) of the Securities Exchange Act and SEC Rule 10b–5 prohibit fraud connected with the purchase or sale of a security.  *See* 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5.  "To plead a claim under section 10(b) and Rule 10b–5, [a plaintiff] must allege: (1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation." *Or. Pub. Emps. Ret. Fund v. Apollo Grp.*, 774 F.3d 598, 603 (9th Cir. 2014).  If a plaintiff fails to plead one or more of these elements, the court must dismiss the complaint for failure to state a claim. *See id.* at 610.

Section 20(a) of the Securities Exchange Act imposes liability on every person who directly or indirectly controls any person found liable for violating any provision of the Act or any rule or regulation promulgated thereunder.  *See* 15 U.S.C. § 78t(a).  To plead a section 20(a)

claim based on a violation of section 10(b) or Rule 10b–5, a plaintiff "must first allege a violation of § 10(b) or Rule 10b–5." *See Lipton v. Pathogenesis Corp*., 284 F.3d 1027, 1035 n.15 (9th Cir. 2002).  If a plaintiff fails to allege such a violation, the court must dismiss both the section 10(b) and 20(a) claims.  *See id.*; *see also In re VeriFone Sec. Litig*., 11 F.3d 865, 872 (9th Cir. 1993).

A securities fraud complaint must also "meet the higher, exacting pleading standards of Federal Rule of Civil Procedure 9(b) and the [PSLRA]."  *Or. Pub. Emps.*, 774 F.3d at 604.  Rule 9(b) requires the complaint to "state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  In other words, "the 'who, what, when, where, and how' of the fraud."  *Khoja*, 899 F.3d at 1008 (quoting *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003)).  The PSLRA likewise demands particularity, with a plaintiff required to "specify each statement alleged to have been misleading" and "the reason or reasons why the statement is misleading[.]"  15 U.S.C. § 78u–4(b)(1)(B).  The PSLRA further provides that "if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  *Id.*  "These 'heightened pleading requirements . . . present no small hurdle for the securities fraud plaintiff.'"  *Macomb Cnty. Emps.' Ret. Sys. v. Align Tech., Inc*., 39 F.4th 1092, 1096 (9th Cir. 2022) (quoting *Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 705 (9th Cir. 2016)).  Accordingly, the Ninth Circuit repeatedly affirms district court dismissals of section 10(b) claims under Rule 12(b)(6). [12]

---

[12] *See, e.g.*, *Macomb Cnty.*, 39 F.4th at 1101 (affirming district court's dismissal of a securities fraud complaint); *Or. Pub. Emps.*, 774 F.3d at 610 (same); *In re VeriFone*, 11 F.3d at 872 (same).

1    2.    Plaintiffs' Section 10(b) Claims

2        a.    Element One: Material Misrepresentation or Omission

3    The Complaint alleges that Defendants made over 20 materially false and misleading

4    statements and omissions on Starbucks' Q4 2023 Earnings Call, Q1 2024 Earnings Call, and Q1

5    2024 Form 10-Q.  *See* Dkt. # 39 at 15–28.  Plaintiffs contend that they have adequately alleged

6    "falsity," i.e., a material misrepresentation or omission, because the Complaint specifies each

7    challenged statement and why it is misleading.  *See* Dkt. # 45 at 11.  Defendants reject this

8    argument, contending that "all of the [c]hallenged [s]tatements are accurate reports about the

9    Company's historical results—which Plaintiffs do not dispute—or are nonactionable opinions,

10    expressions of corporate optimism, or forward-looking statements protected by the PSLRA safe

11    harbor."  Dkt. # 42 at 10.  Accordingly, Defendants argue that Plaintiffs "have not alleged facts

12    establishing that Defendants made a materially false or misleading statement" and thus all their

13    claims fail as a matter of law.  *Id.*

14    For the reasons below, the Court concludes that Plaintiffs have adequately pleaded a

15    material misrepresentation or omission with respect to the Q1 2024 Form 10-Q statement and

16    certain Q1 2024 Earnings Call statements.  It thus declines Defendants' request to dismiss these

17    claims for failure to plead falsity.  As for the Q4 2023 Earnings Call statements and the

18    remaining Q1 2024 Earnings Call statements, the Court determines that Plaintiffs have failed to

19    plead falsity with sufficient particularity.  It thus dismisses these claims without prejudice.

20            (1)    Legal Standards for Pleading a Material Misrepresentation or
                    Omission

21    A "material misrepresentation or omission" is a statement that is "*misleading* as to a

22    *material* fact."  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011) (quoting *Basic*

23    *Inc. v. Levinson*, 485 U.S. 224, 238 (1988)) (emphasis in original).  "[A] statement is misleading

if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1109 (9th Cir. 2010) (quoting *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008)) (internal quotation marks and citations omitted). But plaintiffs, and thus district courts, cannot "cherry-pick[ ] portions of [the d]efendants' statements and ignor[e] other portions." *Xiaojiao Lu v. Align Tech., Inc.*, 417 F. Supp. 3d 1266, 1276 (N.D. Cal. 2019). Rather, a defendant's statements must be read in context and considered as a whole. *Id.*; *see also Weston Fam. P'ship v. Twitter*, 29 F.4th 611, 621–22 (9th Cir. 2022) (considering the context of the statements); *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1143–44 (9th Cir. 2017) (same).

The Ninth Circuit, as well as district courts within the Circuit, have held that certain statements are not "misleading" and are therefore not actionable under section 10(b). These nonactionable statements include "accurate statements of historical fact" and "disclosures of accurate historical data,"[13] even if they are "accompanied by general statements of optimism" or constitute "[h]yperbolic statements" that "assign[ ] reasons for and plac[e] adjectives on past results."[14] They also include "puffery," "mildly optimistic, subjective assessment[s]," "generalized, vague and unspecific assertions," and other "expressions of opinion" not "capable of objective verification." *See Or. Pub. Emps.*, 774 F.3d at 606; *Glen Holly Entm't v. Tektronix*, 352 F.3d 367, 379 (9th Cir. 2003). Courts have cautioned that statements with "feel good monikers," such as "we feel good" and "we are excited," are often nonactionable opinions.[15]

---

[13] *See In re Dropbox Sec. Litig.*, 2020 WL 6161502, at *7 (N.D. Cal. Oct. 21, 2020) (collecting cases).

[14] *Monachelli v. Hortonworks, Inc.*, 225 F. Supp. 3d 1045, 1055 (N.D. Cal. 2016); *In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1076 (N.D. Cal. 2001).

[15] *See Or. Pub. Emps.*, 774 F.3d at 606; *see also Studen v. Funko*, 2024 WL 2209686, at *15 (W.D. Wash. May 16, 2024) (concluding "we feel good we made the right decision" is a pure opinion statement and nonactionable); *In re Terravia Holdings Sec. Litig.*, 2020 WL 553939, at *6–7 (N.D. Cal. Feb. 4, 2020) (concluding "[w]e're excited about the momentum we're building" and "[w]e are excited about the opportunities we see" are nonactionable opinion statements).

Although opinion statements are actionable in some circumstances, these are limited to situations in which: "(1) the speaker did not actually hold the stated belief, (2) the opinion contains an embedded statement of untrue fact, or (3) a reasonable investor would understand an opinion statement to convey facts . . . about the speaker's basis for holding that view, but those facts are untrue." *Studen*, 2024 WL 2209686, at *8 (citing *Omnicare v. Labs. Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 188 (2015)) (internal quotation marks and citations omitted).

Meanwhile, other statements cannot give rise to section 10(b) liability because they are protected by the PSLRA's safe harbor. These statements include "any forward-looking statement that is 'identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement,' or that the plaintiff fails to prove was made 'with actual knowledge . . . that the statement was false or misleading.'" *In re Quality*, 865 F.3d at 1141 (quoting 15 U.S.C. § 78u-5(c)(1)). To be meaningful, the cautionary language must be precise: "cautionary language is not 'meaningful' if it discusses as a mere possibility a risk that has already materialized[,]" *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 781 (9th Cir. 2023) (emphasis omitted), or merely consists of "blanket warnings that securities involve a high degree of risk." *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1414 (9th Cir. 1994). Similarly, if a defendant combines "non-forward-looking statements about past or current facts with forward-looking statements about projected revenues and earnings," the non-forward-looking statements are not protected by the PSLRA safe harbor. *In re Quality*, 865 F.3d at 1141.

To survive a motion to dismiss, plaintiffs must also satisfy the "heightened pleading requirements" of Rule 9(b) and the PSLRA for this element. *See Macomb Cnty.*, 39 F.4th at 1096. This requires plaintiffs to "clearly allege with particularity *why* [each challenged] statement was false or misleading *at the time it was made*." *Norfolk Cnty. Ret. Sys. v. Solazyme,*

*Inc.*, 2016 WL 7475555, at *3 (N.D. Cal. Dec. 29, 2016) (citing *In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 876 (9th Cir. 2012)); *see also* 15 U.S.C. § 78u–4(b)(1)(B). "[U]ncredited and speculative conclusions do not provide an adequate basis for believing that the defendants' statements were false." *Applestein v. Medivation, Inc.*, 561 F. App'x 598, 600 (9th Cir. 2014) (quoting *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir .2009), *as amended* (Feb. 10, 2009)) (internal quotation marks and citations omitted). Likewise, "[f]raud by hindsight is not actionable." *Cai v. Eargo,* 2025 WL 66041, at *1 (9th Cir. 2025). Accordingly, a statement cannot be considered "false" under section 10(b) if it is: (1) entirely consistent with the facts alleged by plaintiffs that purport to make the statement false, *see Lomingkit v. Apollo Educ. Grp. Inc.*, 2017 WL 633148, at *14 (D. Ariz. Feb. 16, 2017); (2) not accompanied by any "contemporaneous facts" that would establish a contradiction between the statement and reality, *In re Cloudera Sec. Litig.*, 2021 WL 2115303, at *11 (N.D. Cal. May 25, 2021); or (3) rendered false only by hindsight or a change in circumstances that occurred after the statement was made.[16]

"[W]hether a public statement is misleading, or whether adverse facts were adequately disclosed is a mixed question to be decided by the trier of fact." *Fecht v. Price Co.*, 70 F.3d 1078, 1081 (9th Cir. 1995). As a district court does not sit as a trier of fact when it rules on a motion to dismiss, it must accept the plaintiff's allegations of falsity "so long as the plaintiff alleges facts to support a theory that is not facially implausible." *In re Gilead Scis. Sec. Litig.*,

---

[16] *See, e.g.*, *In re VeriFone*, 11 F.3d at 871 ("The fact that the prediction proves to be wrong in hindsight does not render the statement untrue when made."); *Fialkov v. Microsoft Corp.*, 72 F. Supp. 3d 1220, 1230 (W.D. Wash. 2014), *aff'd*, 692 F. App'x 491 (9th Cir. 2017) ("[T]he fact that a company's 'forecast turned out to be incorrect does not retroactively make it a misrepresentation.'" (quoting *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 389 (9th Cir. 2010))); *In re ECOtality Sec. Litig.*, 2014 WL 4634280, at *10 (N.D. Cal. Sept. 16, 2024) (concluding that a report that came out *after* the challenged statements were made could not establish that defendants' statements were false when made); *In re Enovix Sec. Litig.*, 2024 WL 349269, at *13 (N.D. Cal. Jan. 30, 2024) (concluding that plaintiffs' allegations of falsity suffer from a "timing problem").

536 F.3d 1049, 1057 (9th Cir. 2008). Falsity is thus appropriately resolved at the motion-to-dismiss stage "only if the adequacy of the disclosure or the materiality of the statement is 'so obvious that reasonable minds [could] not differ[.]'" *Fecht*, 70 F.3d at 1081 (quoting *Durning v. First Bos. Corp*., 815 F.2d 1265, 1268 (9th Cir. 1987)).

(2)    The *Bloomberg* Article

Defendants contend, and Plaintiffs concede, that many of the Complaint's allegations are premised exclusively on reports of confidential witnesses and other facts contained in a May 29, 2024 *Bloomberg* article titled "Starbucks Wait Times Jump After Changing Work Algorithm, Staffers Say" (the Article, Dkt. # 43-13). *See* Dkt. ## 42 at 10–11, 19–20; 45 at 13–15; 47 at 6–7. Thus, prior to assessing the adequacy of the Complaint, the Court must first determine whether, and to what extent, the Article's factual allegations should be credited.

Defendants argue that the Article is not credible and should be wholly rejected by the Court. They contend that the Article's allegations of staffing problems and declining store traffic are "uncorroborated" and not "sufficiently reliable," and thus all of Plaintiffs' claims that hinge on the Article should be dismissed. *See* Dkt. ## 42 at 10–11, 19–20; 47 at 6–7. Plaintiffs respond that the Article is "[a] detailed, multi-sourced news article" based on reliable information and corroborated by Defendants' disclosures. *Id*. at 13. Plaintiffs thus contend that the Article is "properly considered" at the motion-to-dismiss stage, and the Court should accept all claims that rely on the Article's factual allegations. *See* Dkt. # 45 at 13–15. The Court disagrees with both parties' positions in part.

Generally, a plaintiff may rely on statements from confidential witnesses or newspaper articles to satisfy the PSLRA's pleading requirements. *See Zucco*, 552 F.3d at 995 (outlining the standard for accepting allegations from confidential witnesses); *In re Lottery.com, Inc. Sec. Litig*., 765 F. Supp. 3d 303, 328–29 (S.D.N.Y. 2025) (collecting cases and outlining the standard

for accepting statements from newspaper articles). But not all statements from confidential witnesses or newspaper articles should be accepted by a court at the motion-to-dismiss stage as sufficient to plead particularized facts of securities fraud.

As for confidential witnesses, "[n]aming sources is unnecessary so long as the sources are described 'with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged' and the complaint contains 'adequate corroborating details.'" *In re Daou Sys., Inc.*, 411 F.3d 1006, 1015 (9th Cir. 2005), *abrogated on other grounds* by *Matrixx*, 563 U.S. at 27 (quoting *Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*, 380 F.3d 1226, 1233 (9th Cir. 2004)). If the confidential witnesses are employees of the defendant company, courts often consider: (1) "the level of detail provided by the confidential sources"; (2) "the corroborative nature of the other facts alleged (including from other sources)"; (3) "the coherence and plausibility of the allegations"; (4) "the number of sources"; (5) the employees' job titles and responsibilities; (6) the basis for the employees' knowledge; and (7) other indicia of reliability.[17]

As for newspaper articles, the factual allegations in an article "should be credited only to the extent that other factual allegations would be—if they are sufficiently particular and detailed to indicate their reliability." *In re McKesson HBOC, Inc. Sec. Litig.*, 126 F. Supp. 2d 1248, 1272 (N.D. Cal. 2000). "Conclusory allegations of wrongdoing are no more sufficient if they come from a newspaper article than from plaintiff's counsel." *Id.* Accordingly, courts will accept claims based on newspaper articles if the article contains "numerous factual particulars[,]" is

---

[17] *See In re Daou*, 411 F.3d at 1015–16; *Zucco*, 552 F.3d at 995–98.

"based on [ ] independent investigative effort[s]," or is corroborated by other sources.[18]  But courts will reject claims based on articles that lack sufficient indicia of reliability.[19]

The Court finds that some, but not all, of the allegations in the Article are properly considered at this stage.  The Court finds sufficient indicia of reliability[20] for the Article's statements that as of May 2024, in some Starbucks stores: (1) there were fewer workers than before; (2) some workers were struggling to keep up with drink orders across the various ordering platforms (in-person, drive-through, mobile, and delivery); (3) customer wait times had increased, with some of the increase occurring before May 2024; and (4) some workers were frustrated by changes in store conditions, with some workers attributing the perceived problems to decisions made by Starbucks' management.  The Court also finds sufficient indicia of

---

[18] *Id.*; *see also Joyce*, 2023 WL 8370101, at *7 (accepting allegations in a *Wall Street Journal* article because the plaintiffs provided enough information to corroborate the accounts of the anonymous sources in the article); *In re McKesson*, 126 F. Supp. 2d at 1273 (accepting allegations in a *Wall Street Journal* article because the article was sufficiently detailed and based on the newspaper's independent investigation); *In re Lottery.com*, 765 F. Supp. 3d at 329 (accepting allegations in a *Bloomberg* article because the article was based on many sources and included detailed allegations).

[19] *See, e.g.*, *Chan v. New Oriental Educ. & Tech. Grp. Inc.*, 2019 WL 2865452, at *7 (D.N.J. July 3, 2019) (rejecting allegations in a *Reuters* article because the article quoted three employees but failed to establish whether the employees worked at the company during the class period, whether their reports were based on first-hand knowledge, and when and where the alleged wrongdoing took place, among other deficiencies); *In re McKesson*, 126 F. Supp. 2d at 1276 (rejecting allegations in an *Atlanta Constitution* article because it did not amount to "particularly reliable evidence"); *In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1172 (C.D. Cal. 2007) (rejecting allegations in a newspaper article because the article's allegations were not sufficiently detailed and plaintiffs provided "no specific facts to corroborate the reliability of the report").

[20] Although the Article neither names specific employees nor indicates a precise number of sources, it does indicate that multiple workers and managers across multiple stores were interviewed. Given the job titles, job responsibilities, and first-hand knowledge of the anonymous witnesses with respect to questions of staffing, drink preparation, and wait times in their stores, the Court finds the Article's descriptions to be credible.  It also finds that the anonymous employees' allegations about understaffing, difficulty fulfilling drink orders, and longer customer wait times are corroborated by other sources, such as the Technomic statistic and statements by Starbucks executives about the need to increase partner hours and decrease wait times at stores.

reliability[21] to support the Article's contention that as of May 2024, the customer experience had declined for at least some customers.

But the Court does not find sufficient indicia of reliability to support the Article's contention that Starbucks' new staffing algorithm is to blame "in part" for the issues identified above.  As the Article does not specify the names or titles of the employees it interviewed, the Court cannot determine the basis for the interviewees' knowledge regarding the staffing algorithm.  It also cannot answer basic threshold questions that speak to the credibility of the statements, such as "Did these employees work at [Starbucks] during the Class Period? [Are their accounts] based on first-hand knowledge? How widespread [were the staffing issues]? Where and when did [staffing issues occur]?"  *See Chan*, 2019 WL 2865452, at *7.  The Court also finds that the level of detail on the staffing algorithm in the Article is quite low.  For example, in the same sentence, the Article says that workers are frustrated with the labor algorithm but also notes that "some employees" say "the inner workings of [the algorithm] . . . remain a mystery."  Dkt. # 43-13 at 3.  Lastly, the Court finds that specific corroborative facts regarding the Article's staffing algorithm allegations are missing, as Plaintiffs provide no outside facts to corroborate the claim that Starbucks' in-store issues as of May 2024 were due "in part" to the staffing algorithm.[22]

---

[21] The Article provides the name, date, and details of a specific customer's negative experience, corroborated by a statement from a Starbucks executive about that experience.  *See* Dkt. # 43-13 at 3–4.  It also coherently asserts that increased wait times, overburdened employees, and other in-store problems have negatively affected customer experiences.

[22] Plaintiffs argue that the Article's staffing algorithm allegations are corroborated because "just after the Class Period and Narasimhan's unceremonious firing, the Company's new CEO Brian Niccol admitted that over 3,000 of Starbucks' 9,000-plus U.S. stores needed more partner hours to reduce wait times and ensure enough staff to meet demand."  Dkt. # 45 at 14.  But this statement fails to mention the staffing algorithm.  Although this statement can be used to corroborate the Article's allegation that at least some Starbucks stores were experiencing staffing problems just after the Class Period, the statement cannot be used to corroborate the allegation that there was understaffing during the Class Period that was due in part to the staffing algorithm.

1

2

3

4

5

6

In sum, the Court rejects Defendants' request to disregard the Article in its entirety but also rejects Plaintiffs' request to accept all allegations from the Article as true. For the purposes of the analysis below, the Court finds that Plaintiffs have pleaded particularized facts for all claims based exclusively on the Article's credible allegations but have not done so for any claims based exclusively on the Article's non-credible allegations or on unsupported expansions[23] of the Article's credible allegations.

7

8

(3)    Analysis of Reinvention Plan Statements from Q4 2023 Earnings Call

9

10

11

12

Defendants contend that Plaintiffs fail to plead securities fraud with the requisite level of particularity for the Q4 2023 Earnings Call Reinvention Plan Statements because Plaintiffs' theory of falsity is "based on uncorroborated allegations" and "Plaintiffs do not allege facts showing the [Reinvention Plan Statements] were false when made."[24] Dkt. # 42 at 19. The Court agrees.

13

14

15

16

17

To accept the truth of Plaintiffs' allegation that these statements were "false or misleading when made," the Court must first accept the truth of Plaintiffs' allegation that Starbucks began experiencing staffing problems and other in-store issues before November 2, 2023, the date of the Q4 2023 Earnings Call.[25] But Plaintiffs cite no sources nor allege any facts

18

19

20

21

22

23

24

---

[23] For example, Plaintiffs may use the article to allege that *some* stores experienced problems as of May 2024 but cannot use the article to allege that *all* stores experienced problems as of May 2024. Likewise, Plaintiffs cannot rely on the article to support a date-based allegation if the date appears nowhere in the article.

[24] Defendants also argue that Plaintiffs' theory of falsity fails because "the Company's reported, and unchallenged, same-store sales showed growing customer traffic[.]" Dkt. # 42 at 19. As the Court finds the Complaint's allegations of falsity inadequate on other grounds, it declines to address this argument below.

[25] The Complaint alleges that Defendants' statements were "false or misleading when made" because: "[t]he Reinvention Plan was not fueling 'revenue growth' and 'working,' or 'improv[ing] partner and customer experiences' and 'creat[ing] a more stable environment in [Starbucks] stores as Defendants stated [on the call], but rather the SPA tool was causing store understaffing in nearly one-third of the Company's U.S. stores. . . As a result, customer wait times were increasing and causing mobile app

that support this allegation.  Accordingly, the Court finds that Plaintiffs' falsity allegations are based on "uncredited and speculative conclusions," and thus "do not provide an adequate basis for believing that [Defendants'] statements were false."  *See Applestein*, 561 F. App'x at 600 (internal quotation marks and citations omitted).

Plaintiffs resist this conclusion, arguing that their alleged timeline is "corroborated" by other sources, namely the *Bloomberg* Article and the Q1 2024 Earnings Call.  *See* Dkt. # 45 at 13, 16–17.  But neither the Article nor the Q1 2024 Earnings Call can plausibly be said to "corroborate" Plaintiffs' timeline.  As for the Article, even if the Court were to ignore its analysis above and accept all of the Article's allegations as true, the only reasonable inference that the Court could draw is that Starbucks' new staffing algorithm caused problems that led to declining store traffic beginning in early 2024.[26]  As the Article contains no mention of poor customer experiences, understaffing, or declining store traffic in or before November 2023, *see generally* Dkt. # 43-13, the Article does not provide any "contemporaneous facts" that would establish a contradiction between the Q4 2023 Earnings Call Reinvention Plan Statements and Starbucks' reality as of November 2, 2023.  *See In re Cloudera*, 2021 WL 2115303, at *11 (requiring plaintiffs to plead "contemporaneous facts that would establish a contradiction between the alleged materially misleading statements and reality" to establish falsity).

---

orders to be abandoned, which began to negatively impact store traffic beginning in November 2023." Dkt. # 39 at 17–18.  Plaintiffs' response likewise confirms this theory of falsity, indicating that Defendants' statements were misleading because, "[b]y November 2023, stores U.S. stores were losing foot traffic as wait times climbed."  *See* Dkt. # 45 at 12.

[26] The Article discusses: increased wait times in the "last quarter," i.e., January 1, 2024 to March 31, 2024; a customer's long wait for a drink on "Mother's Day this year," i.e., May 12, 2024; the roll-out of new drinks "during the first three months of 2024," i.e., January 2024 to March 2024; and an employee's experience on a "recent Monday" (presumably a reference to a date in April or May 2024). *See* Dkt. # 43-13.  Although the Article states that the company "upgraded its labor algorithm and other staffing policies over the last 18 months" and indicates that Starbucks shed workers in U.S. stores "in the year through October [2023] even as it added 380 stores," the Article never states (nor even seems to suggest) that the in-store issues alleged in the Complaint existed before January 1, 2024.

The Reinvention Plan Statements are also "not inconsistent" with Defendants' comments on the Q1 2024 Earnings Call.  *See Lomingkit*, 2017 WL 633148, at *14 (rejecting plaintiffs' theory of falsity where the challenged statements were "not inconsistent with the alleged facts that purport to make them false").  Plaintiffs contend that their alleged November 2, 2023 date is supported by these two statements from the Q1 2024 Earnings Call: (1) "Beginning *in mid-November*, while our business continued to grow, the growth rate was impacted by three unexpected factors"; and (2) "Comparable transactions for the quarter increased 1% as traffic was pressured to negative single-digits *in November* before it started to rebound in December." *See* Dkt. # 45 at 16; *see also* Dkt. # 43-11 at 6, 11 (emphasis added).  But contrary to Plaintiffs' assertions, Defendants' references to declining growth "in November" do not support Plaintiffs' argument that the Reinvention Plan Statements were false when made.[27]  As declining growth after November 2, 2023 cannot make Defendants' statements false on November 2, 2023, the Court does not find that the Q1 2024 Earnings Call statements "corroborate" Plaintiffs' allegation that Starbucks began experiencing in-store issues before November 2, 2023.

As Plaintiffs have failed to plead particularized facts showing that the Q4 2023 Earnings Call Reinvention Plan Statements were false when made, they have failed to satisfy the "material misrepresentation or omission" element of a section 10(b) claim for these statements.  The Court

---

[27] Plaintiffs' allegations of falsity fall short even under their preferred interpretation, that "'November' means November 2, 2023."  Dkt. # 45 at 17.  Even if this Court accepts as true Plaintiffs' contention that growth began to decline on November 2, 2023, that does not make Defendants' statements false at the time they were made—the Q4 2023 Earnings Call took place *during* the day but any indication of declining store traffic beginning on November 2, 2023 would not be realized until the stores had closed, i.e., at the *end* of the day on November 2.  The Court also notes that at other points in the pleadings, Plaintiffs allege that Starbucks' in-store issues did not begin until January 2024, i.e., *after* November 2, 2023.  *See, e.g.*, Dkt. # 45 at 14 n.17 ("Defendants' preferred interpretation—that wait times increased in March 2024—disagrees with the Complaint's reasonable interpretation that the increase began in January.").

thus finds Rule 12(b)(6) dismissal appropriate, and dismisses Plaintiffs' claims as to these statements without prejudice.[28]

(4)     Analysis of China Business Statements from Q4 2023 Earnings Call

Defendants contend that Plaintiffs fail to plead securities fraud with the requisite level of particularity for the Q4 2023 Earnings Call China Business Statements because: (1) Starbucks did not fail to disclose it was facing competition in China; and (2) the challenged statements are nonactionable opinion statements. *See* Dkt. # 42 at 26. The Court agrees.

First, the Court does not find that Plaintiffs have pleaded a material omission by Defendants with sufficient particularity.[29] In their Response, Plaintiffs contend that Defendants fell short of their "heavy burden of proof" of disclosing competition in China and "any warnings of competition in China were counterbalanced by Defendants' simultaneous reassurances of the business's strength." Dkt. # 45 at 19 (citations omitted). But the Complaint does not allege that Defendants failed to disclose specific types of information about Starbucks' competition in China. Rather, it merely states: "Defendants knew but failed to disclose that their reinvention plans to grow sales outside of the United States, including China, were being thwarted by competition." Dkt. # 39 at 18. As Defendants did disclose the existence of competition in China

---

[28] Because the Court finds that Plaintiffs have failed to satisfy the "material misrepresentation or omission" element for the Reinvention Plan Statements, it declines to evaluate whether Plaintiffs have adequately pleaded "scienter" and "loss causation" for these statements.

[29] The Court notes that it is not entirely clear whether Plaintiffs are even alleging falsity on this ground. Although Plaintiffs' Response seems to argue falsity based on Defendants' failure to disclose Starbucks' competition in China, *see* Dkt. # 45 at 19, the Complaint seems to assert falsity based on Defendants materially misrepresenting the strength of Starbucks' position in China. *See* Dkt. # 39 at 18. Because the Court must construe the Complaint in the light most favorable to Plaintiffs, *see Chubb*, 710 F.3d at 956, it will assume for this Motion that Plaintiffs are claiming falsity on both omission and misrepresentation grounds.

and the effect of said competition on its reinvention plans,[30] the Court finds that "reasonable minds could not disagree as to whether" Defendants disclosed the existence of competition in China. *See Fecht*, 70 F.3d at 1082. The Court thus finds that Plaintiffs have failed to adequately plead a material omission for these statements as a matter of law.[31] *See id.* at 1081.

Second, the Court does not find that Plaintiffs have adequately pleaded that the China Business Statements were "false or misleading" under section 10(b). The Complaint alleges that these statements were "false or misleading when made" because "Starbucks' 'competitive position' in China was not 'strong,'" as "Starbucks' biggest competitors were aggressively lowering prices to gain market share and outpacing Starbucks in store openings, and were focused on a take-out centric model with which Starbucks could not compete." Dkt. # 39 at 18. But for the reasons discussed in part III(B)(2)(a)(1) above, none of these statements are actionable. For example, "[in China,] our business is also strong, 5% comp in Q4" is a nonactionable disclosure of accurate[32] historical data accompanied by a general statement of optimism. *See Monachelli*, 225 F. Supp. 3d at 1055; *see also In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 868–69 (N.D. Cal. 2004) (concluding that "run-of-the-mill" statements, such as the "business remained strong" are not actionable under § 10(b)). The other China

---

[30] The Q4 2023 Earnings Call China Business Statements were explicitly made in response to a question about the "competitive intensity" of China's market and the challenged comment itself referenced "the headwinds that have been [in China] for the last couple of years." *See* Dkt. # 43-7 at 12–13. The statements also must be read in context, which here includes Defendants' broader discussion of Starbucks' performance in China on the Q4 2023 Earnings Call as well as prior disclosures to investors about competition in China. *See generally* Dkt. ## 43-7; 43-5.

[31] The Court notes that its decision is confined to the narrow question of whether Plaintiffs have adequately pleaded particularized facts to support their allegation of a material omission. In reaching its conclusion, the Court makes no comment on the adequacy of Defendants' overall disclosures or the existence of a valid truth-on-the-market defense.

[32] As the Q4 2023 Earnings Call (Dkt. # 43-7) is incorporated into the Complaint by reference (see part III(A)(2) above), and Plaintiffs have not disputed the accuracy of this statistic, *see generally* Dkt. ## 39; 45, the Court assumes the truth of the statistic for the purposes of this Motion.

Business Statements are likewise nonactionable, as they constitute "generalized, vague and unspecific assertions" prefaced by "feel good monikers." *See Glen Holly*, 352 F.3d at 379; *Or. Pub. Emps.*, 774 F.3d at 606.

In their Response, Plaintiffs try to avoid this conclusion. Citing *Brendon v. Allegiant Travel Co.*, 412 F. Supp. 3d 1244 (D. Nev. 2019), they argue that the Q4 2023 Earnings Call China Business Statements are actionable because they "addressed specific questions on aspects of Starbucks' operation (its China market) that Narasimhan allegedly knew to be performing badly." Dkt. # 45 at 19–20 (citation modified). Alternatively, Plaintiffs argue that "[e]ven if the statements [ ] qualify as an opinion, [they are] actionable because the statements could be characterized as opinion statements with an embedded fact"—"embedded in [Narasimhan's] opinion [about the China business] is a factual denial of the analyst's series of questions on Starbucks' most important international market." *Id.* at 20 (internal quotation marks and citations omitted).

But the Court does not find that the logic of *Brendon* applies here. First, contrary to Plaintiffs' suggestion, *Brendon* does not support the proposition that all opinion statements in response to analysts' questions on investor calls are actionable. Rather, *Brendon* suggests that such statements are actionable only if they deny, or otherwise address, specific factual allegations in the analyst's question. *See Brendon*, 412 F. Supp. 3d at 1259. Second, the content of the questions and responses here are distinct from those in *Brendon*. Unlike in *Brendon*, Defendants' statements do not deny the factual premise of the analyst's question, i.e., that Starbucks was facing competition in China. Instead, Defendants explicitly acknowledged the existence of competition in China, both directly in response to the question and at other points on the investor call. *See* Dkt. # 43-7 at 7, 13. Similarly, Defendants' "we feel good" statements and disclosures of accurate historical data are not factual denials of competition in China, as

businesses can simultaneously see strong numbers and face intense competition in the same market.  Finally, while the *Brendon* statements referenced "safety" and "maintenance issues," the China Business Statements reference demand metrics and the strength of the business, which courts have routinely found to be nonactionable puffery.[33]  *Brendon* thus does not undermine the conclusion that the China Business Statements are nonactionable under section 10(b).

Because Plaintiffs have failed to plead a "material misrepresentation or omission" as to the Q4 2023 Earnings Call China Business Statements,[34] the Court dismisses these claims without prejudice under Rule 12(b)(6).

(5)    Analysis of Reinvention Plan Statements from Q1 2024 Earnings Call

Defendants contend that Plaintiffs fail to plead securities fraud with the requisite level of particularity for the Q1 2024 Earnings Call Reinvention Plan Statements because Plaintiffs' theory of falsity is: (1) based on uncorroborated allegations; (2) contradicted by "the Company's reported, and unchallenged, same-store sales"; and (3) unsupported by additional "facts showing the [Reinvention Plan Statements] were false when made."  Dkt. # 42 at 19.  The Court agrees in part, and concludes that Plaintiffs have failed to plead securities fraud with the requisite level of particularity for some, but not all, of these statements.

As with the Q1 2023 Earnings Call Reinvention Plan Statements, Plaintiffs allege that the Q1 2024 statements were "false or misleading when made" because "Defendants were not successfully executing on [the] Reinvention Plan or investing in a better experience for [their]

---

[33] *See, e.g.*, *In re Copper Mountain*, 311 F. Supp. 2d at 868–69 ("business remained strong" is not actionable); *In re SunPower Sec. Litig.*, 2018 WL 4904904, at *4 (N.D. Cal. Oct. 9, 2018) ("there is very, very strong demand" is not actionable); *City of Royal Oak Ret. Sys. v. Juniper Networks*, 880 F. Supp. 2d 1045, 1064 (N.D. Cal. 2012) ("we have strong demand metrics and good momentum" is not actionable).

[34] Because the Court finds that Plaintiffs have failed to satisfy the "material misrepresentation or omission" element for the China Business Statements, it declines to evaluate whether Plaintiffs have adequately pleaded "scienter" and "loss causation" for these statements.

ORDER - 29

partners[.]" Dkt. # 39 at 22 (citation modified). Instead, they say, the labor algorithm was "causing store understaffing in nearly one-third of the Company's U.S. stores[,]" thereby increasing customer wait times, decreasing store traffic, and "degrading store experiences for partners and customers alike." *Id.* But as explained in part III(B)(2)(a)(2) above, the Court cannot accept any allegation that exclusively relies on a noncredible allegation from the *Bloomberg* Article. Accordingly, the Court cannot accept Plaintiffs' allegations that Defendants' statements were false or misleading when made because of the Article's staffing algorithm allegations.

The Court can, however, accept Plaintiffs' allegations that customer wait times were increasing and thus at least some stores were experiencing issues as of January 30, 2024, i.e., the date of the Q1 2024 Earnings Call.[35] But even accepting this allegation as true and drawing all reasonable inferences in favor of Plaintiffs, the Court cannot find that all the challenged statements are actionable. Although the Court finds that Plaintiffs have adequately pleaded falsity for Defendants' more specific statements about in-store conditions, the Court does not find that the other Reinvention Plan Statements are actionable under section 10(b), as they are either disclosures of accurate[36] historical data accompanied by general statements of optimism[37]

---

[35] Although the Court acknowledges that the Article does not explicitly state that wait times began to increase in January, it finds that the allegation that "[a]bout 8% of Starbucks customers waited between 15 and 30 minutes in the last quarter [January 1, 2024 to March 31, 2024]" permits Plaintiffs to plausibly allege that an increase in wait times began in January 2024. As the Court must construe the Complaint in the light most favorable to Plaintiffs, *see Chubb*, 710 F.3d at 956, the Court will accept Plaintiffs' preferred interpretation of this quote—that wait times began to increase on January 1, 2024—for the purposes of this Motion.

[36] As the Earnings Call (Dkt. # 43-11) is incorporated into the Complaint by reference (see part III(A)(2) above), and Plaintiffs have not disputed the accuracy of these statistics, *see generally* Dkt. ## 39; 45, the Court assumes the truth of these statistics for this Motion.

[37] The Court considers the following statements to be disclosures of accurate historical data accompanied by general statements of optimism:

- "Our performance in the quarter was fundamentally strong. Our Q1 total company revenue was a record $9.4 billion, up 8% year-over-year. Our global comparable store sales grew 5% year-over-

or general expressions of optimism that are unspecific and not capable of objective verification.[38]  The Court thus dismisses these claims without prejudice for failure to state a claim.[39]

As for the remaining statements, the Court finds that Plaintiffs have adequately pleaded a "material misrepresentation or omission."  Viewing these allegations in the light most favorable to Plaintiffs, the Court concludes that the Complaint sufficiently pleads falsity as to the following statements:

- "We're investing in a better experience for our partners to advance our business to a more balanced growth model as we unlock efficiency. In the quarter, we have seen the effectiveness of the Reinvention driven investments we have made in in-store operational efficiencies such as standards, equipment innovation and scheduling improvements, leading to a more stable environment for our partners."  *See* Dkt. # 39 at 21; *see also* Dkt. # 43-11 at 9;

---

year, supported by a 5% comp growth in North America, driven by 4% ticket growth and 10% comp growth in China. Our global operating margins expanded by 130 basis points to 15.8% and our overall earnings per share grew 20% to $0.90. This speaks to the continued successful execution of our reinvention plan and the durable business we are building."  *See* Dkt. # 39 at 19; *see also* Dkt. # 43-11 at 5;

- "Our U.S. company-operated business delivered 5% comparable store sales growth in Q1 driven by 4% ticket growing from pricing, mix and customization. . . Comparable transactions for the quarter increased 1% as traffic was pressured to negative single digits in November before it started to rebound in December."  *See* Dkt. # 39 at 20; *see also* Dkt. # 43-11 at 11;
- "Turnover has decreased by 5% year-over-year and is now well below pre-COVID levels. Average partner hours increased 10% leading to a 14 percentage point increase in partner sentiment related to scheduling, specifically preferred hours, which we know is important to partners."  *See* Dkt. # 39 at 21; *see also* Dkt. # 43-11 at 9.

[38] The Court considers the following statements to be general expressions of optimism that are unspecific and not capable of objective verification:

- "[W]e remain confident in our Triple Shot strategy and our long-term growth."  *See* Dkt. # 39 at 20; *see also* Dkt. # 43-11 at 7;
- "Our first Triple Shot Reinvention priority is to elevate our brand by operating great stores and driving product innovation. The best lever for elevating our brand is our store experience. We continue to raise the bar on running great stores with a focus on enhancing both our partner and customer experience."  *See* Dkt. # 39 at 20–21; *see also* Dkt. # 43-11 at 7;
- "We are listening to our partners and investing to make their experience better."  *See* Dkt. # 39 at 21; *see also* Dkt. # 43-11 at 9.

[39] Because the Court finds that Plaintiffs have failed to satisfy the "material misrepresentation or omission" element for these statements, it declines to evaluate whether Plaintiffs have adequately pleaded "scienter" and "loss causation" for these statements.

- "All of those efforts together have led to lower turnover in a more stable environment. And it's that stability that really allows us to create a better efficiency in serving our customers. So as an example, I already spoke about our morning daypart this quarter in the U.S. was the strongest that we've seen. And that's a function of all of those efforts and activities that I just spoke about being realized in supporting our demand. So creating a better experience for our partners leads to the better experience for our customers." *See* Dkt. # 39 at 21; *see also* Dkt. # 43-11 at 18;

- "This substantial margin expansion in the quarter reflected the meaningful labor staffing and scheduling improvements we made as part of our Reinvention. We unlocked significant stability by focusing on staffing and scheduling hours based on partners' preferred shifts, which enhanced both our partners' experience and subsequent store performance." *See* Dkt. # 39 at 21–22; *see also* Dkt. # 43-11 at 11.

Contrary to Defendants' contention, *see* Dkt. # 42 at 28, the Court also finds that Plaintiffs have plausibly alleged that the statement, "We're investing in a better experience … to advance our business[,]" *see* Dkt. # 39 at 21; *see also* Dkt. # 43-11 at 9, did not accompany meaningful cautionary language and therefore does not fall within the PSLRA's safe harbor. The Court thus declines Defendants' request to dismiss Plaintiffs' claims as to these statements for failure to plead falsity.

(6) Analysis of Loyalty Program Statements from Q1 2024 Earnings Call

Defendants contend that Plaintiffs "fail to plead particularized facts that any [Q1 2024 Earnings Call Loyalty Program Statement] was false when made." Dkt. # 47 at 10; *see also* Dkt. # 42 at 24. The Court agrees in part, concluding that Plaintiffs have failed to plead securities fraud with the requisite level of particularity for some, but not all, of these statements.

Plaintiffs allege that "[i]t was misleading to state that Starbucks Rewards members were 'visiting our stores more frequently' and the Company was 'seeing no slowdown in our loyal SR customers,' . . . when Defendants were aware that customers were increasing their frequency of use but not completing orders." Dkt. # 39 at 23. They also allege that Defendants engaged in

misrepresentation because "[c]ustomers did not 'begin[ ] to rebound in December." *Id*. at 24.
Viewing these allegations in the light most favorable to Plaintiffs, the Court finds that the
Complaint sufficiently pleads falsity as to the following statements:

- "In short, our growing Starbucks Rewards members are visiting our stores more frequently and increasing their spend each time that they come." *See* Dkt. # 39 at 19; *see also* Dkt. # 43-11 at 5;

- "[W]e are seeing no slowdown in our loyal SR customers. In fact, we're seeing an increase in frequency, they're buying more, they're customizing more. That part of the business is extremely strong." *See* Dkt. # 39 at 19; *see also* Dkt. # 43-11 at 17;

- "Our most loyal customers remain loyal and in fact, increased their frequency and spend in the quarter." *See* Dkt. # 39 at 20; *see also* Dkt. # 43-11 at 6.

Unlike the statements discussed below, these statements are specific comments by
Defendants that explicitly refer to the engagement levels of Starbucks Rewards customers and
are not clothed by puffery or general expressions of opinion. These statements are also plausibly
contradicted by other facts alleged by Plaintiffs, namely a decrease in mobile-order completion
rates and Ruggeri's concession on April 30, 2024 that "Rewards-member declined quarter-over-
quarter." *See* Dkt. # 43-12 at 21. Although Defendants are correct that "none of [these
statements say] anything about mobile-order or completion rates," *see* Dkt. # 42 at 24, Plaintiffs'
theory of falsity is still plausible, as a reasonable trier of fact could find that it is misleading to
disclose an increased frequency in orders without also disclosing an increased rate of
abandonment. The Court thus declines Defendants' request to dismiss Plaintiffs' claims as to
these statements.

As for the other Loyalty Program Statements, the Court finds that Plaintiffs have failed to
adequately plead a "material misrepresentation or omission." The remaining statements

constitute nonactionable disclosures of accurate [40] historical data accompanied by general statements of optimism [41] or expressions of "'puffery' upon which a reasonable consumer could not rely." [42]  *See Glen Holly*, 352 F.3d at 379.  The Court thus finds Plaintiffs have failed to state a claim as to these statements and dismisses them without prejudice. [43]

> (7)  Analysis of China Business Statements from Q1 2024 Earnings Call

Defendants contend that Plaintiffs fail to plead securities fraud with the requisite level of particularity for the Q1 2024 Earnings Call China Business Statements because: (1) Starbucks did not fail to disclose it was facing competition in China; and (2) the challenged statements are nonactionable opinion statements.  *See* Dkt. # 42 at 26.  The Court agrees.

As with the Q4 2023 Earnings Call China Business Statements, the Court does not find that Plaintiffs have adequately pleaded a material omission here.  Plaintiffs argue that Defendants' statements were misleading because they did not disclose the existence of competition in China.  But Plaintiffs cannot establish fraud by "cherry-picking portions of

---

[40] As the Earnings Call (Dkt. # 43-11) is incorporated into the Complaint by reference (see part III(A)(2) above), and Plaintiffs have not disputed the accuracy of these statistics, *see generally* Dkt. ## 39; 45, the Court assumes the truth of these statistics for this Motion.

[41] The Court considers the following statements to be disclosures of accurate historical data accompanied by general statements of optimism:
- "We saw strong growth in our loyalty programs, sequentially increased in frequency and record spend among our loyal customers, positive traction from new product innovations."  *See* Dkt. # 39 at 19; *see also* Dkt. # 43-11 at 5;
- "Throughout the quarter, we saw our most loyal customers around the world coming into our stores more often. Specifically, in the US, we set new records with our 90-day active Rewards members growing 13% year-over-year to a record 34.3 million, with tender reaching an all-time high of 59% demonstrating increased engagement."  *See* Dkt. # 39 at 19; *see also* Dkt. # 43-11 at 5;
- "We've already seen the positive impact of these new initiatives with our more occasional customers beginning to rebound in December."  *See* Dkt. # 39 at 20; *see also* Dkt. # 43-11 at 6.

[42] The Court considers the following statement to be a nonactionable expression of puffery: "[O]ur loyalty program is already performing exceptionally well."  *See* Dkt. # 39 at 19; *see also* Dkt. # 43-11 at 15.

[43] Because the Court finds that Plaintiffs have failed to satisfy the "material misrepresentation or omission" element for these statements, it declines to evaluate whether Plaintiffs have adequately pleaded "scienter" and "loss causation" for these statements.

Defendants' statements and ignoring other portions."  *See Xiaojiao*, 417 F. Supp. 3d at 1276.

Although Plaintiffs' cited statements do not discuss competition, Defendants' broader discussion

of China on the Q1 2024 Earnings Call does.[44]  Plaintiffs have thus failed to allege that

Defendants did not disclose the existence of competition in China.

The Court also does not find that Plaintiffs have adequately pleaded a material

misrepresentation.  Plaintiffs claim that the Q1 2024 Earnings Call China Business Statements

"were false or misleading when made" because "there was no exciting momentum in China."

Dkt. # 39 at 24 (citation modified).  But for the reasons discussed in part III(B)(2)(a)(1) and part

III(B)(2)(a)(4) above, the Court finds that these statements are nonactionable opinion statements.

Contrary to Plaintiffs' suggestion, *see* Dkt. # 45 at 20, these statements are also not actionable as

"opinion statements with an embedded statement of untrue fact."  Because Defendants'

comments were made amid disclosures of certain business metrics regarding the company's

performance in China, *see generally* Dkt. # 43-11 at 5, 8, and Plaintiffs do not challenge any of

these metrics as "untrue," *see generally* Dkt. ## 39; 45, there is no basis to find an "embedded

statement of untrue fact" within Defendants' opinion statements.  Plaintiffs have thus failed to

plead a "material misrepresentation or omission,"[45] and the Court dismisses Plaintiffs' claims as

to these statements without prejudice for failure to state a claim.

---

[44] On the Q1 2024 Earnings Call, Defendants mentioned the "headwind" of declining growth in China.  *See* Dkt. # 43-11 at 6.  They also: (1) stated that the company "experienced a slower-than-expected recovery in China"; (2) stated that "the overall market weakness [in China] led to significantly increased pricing competition"; (3) cited "an increase in mass market competitors" as a "near-term" obstacle for the China business; and (4) caveated their discussion of the past quarter's accomplishments in China, the "strength" of the China business, and the "momentum" in China with disclosures about the near-term challenges and potential strategies to increase Starbucks' market position in China.  *See id.* at 6, 8.

[45] Because the Court finds that Plaintiffs have failed to satisfy the "material misrepresentation or omission" element for the China Business Statements, it declines to evaluate whether Plaintiffs have adequately pleaded "scienter" and "loss causation" for these statements.

1

2

(8)    Analysis of Risk-Disclosure Statement from Q1 2024 Form 10-Q

3        Defendants contend that Plaintiffs fail to plead securities fraud with the requisite level of

4    particularity because the Q1 2024 Form 10-Q Risk-Disclosure Statement was not "false or

5    misleading when made." Dkt. # 42 at 25. They argue that it was not false because: (1)

6    Starbucks' "same-store sales growth [numbers] showed increased same-store sales [and]

7    customer traffic at the time of the [disclosure]"; and (2) "Defendants repeatedly said the strategy

8    would unfold over several years, and that Starbucks had 'a ways to go' to improve staffing." *Id*.

9    The Court disagrees and concludes that Plaintiffs have adequately alleged a material

10   misrepresentation as to this statement.

11        Plaintiffs allege that the Risk-Disclosure Statement violated section 10(b) because

12   Defendants stated, "There have been no material changes to the risk factors disclosed in our [FY

13   2023] 10-K," thereby omitting "that the material risks previously warned of [in the FY 2023 10-

14   K] – 'if we are not effective in . . . executing on our Reinvention Plan, consumer trust in our

15   brand may suffer' – had already come to fruition and materially changed since November 17,

16   2023." Dkt. # 39 at 23. Because the Court finds that Plaintiffs have plausibly alleged that

17   Defendants were not "executing on [the] Reinvention Plan" as of January 30, 2024 (see part

18   III(B)(2)(a)(5) and part III(B)(2)(a)(6) above), it finds that Plaintiffs have plausibly alleged that

19   the Q1 2024 Form 10-Q Risk-Disclosure Statement was misleading. *See In re Alphabet, Inc.*

20   *Sec. Litig.*, 1 F.4th 687, 703 (9th Cir. 2021) ("Risk disclosures that 'speak[ ] entirely of as-yet-

21   unrealized risks and contingencies' and do not 'alert[ ] the reader that some of these risks may

22   already have come to fruition' can mislead reasonable investors." (quoting *Berson*, 527 F.3d at

23   985–87)). Contrary to Defendants' contention, *see* Dkt. # 42 at 28, the Court also does not find

24

that the PSLRA's safe harbor applies, as Plaintiffs have plausibly alleged that the statement did not accompany meaningful cautionary language.

The Court thus declines Defendants' request to dismiss Plaintiffs' claims as to this statement for failure to plead falsity.

b.    Element Two: Scienter

The Complaint alleges that "[e]ach defendant knew or acted with deliberate recklessness that material facts were being concealed from investors during the Class Period and the [challenged statements] would be misleading to investors when made."  Dkt. # 39 at 24. Defendants reject this claim, asserting that Plaintiffs do not "plead in great detail any particularized facts suggesting that Defendants acted with deliberate recklessness or an intent to defraud" nor do they offer "any plausible motive for why Defendants would lie."  Dkt. # 42 at 11, 30 (internal quotation marks and citations omitted).  Defendants thus argue that Plaintiffs have failed to plead a strong inference of scienter and thus their section 10(b) claims must be dismissed.  *Id*. at 18.

The Court finds that Plaintiffs have adequately pleaded scienter with respect to Individual Defendant Narasimhan and Defendant Starbucks Corporation.  It thus declines Defendants' request to dismiss the remaining claims against these defendants for failure to plead scienter.  As for Defendant Ruggeri, the Court finds that Plaintiffs have failed to plead facts that raise a strong inference of scienter.  It thus dismisses all claims against Defendant Ruggeri without prejudice.

(1)    Legal Standard for Pleading Scienter

"Scienter" is "a mental state that not only covers intent to deceive, manipulate, or defraud, but also deliberate recklessness." [46] *Schueneman*, 840 F.3d at 705 (internal quotation marks and citations omitted). To plead scienter, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2)(A). When a plaintiff "seek[s] to hold individuals and a company liable on a securities fraud theory," they must "allege scienter with respect to each of the individual defendants." *Or. Pub. Emps.*, 774 F.3d at 607. As the Ninth Circuit has not adopted the corporate scienter doctrine, in most cases, a failure to plead scienter as to a specific individual will also result in a failure to plead scienter as to the defendant corporation. *See In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1063 (9th Cir. 2014).

In evaluating a claim of scienter, Ninth Circuit courts "conduct a two-part inquiry to determine whether scienter has been adequately pled[.]" *Or. Pub. Emps.*, 774 F.3d at 607 (quoting *N.M. State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1095 (9th Cir. 2011)). First, the court must "determine whether any of the allegations, standing alone, are sufficient to create a strong inference of scienter[.]" *Id.* If the allegations, standing alone, do not establish a strong inference of scienter, the court must proceed to step two: a "holistic review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness." *Id.*

In applying these principles, Ninth Circuit courts have found scienter where corporate executives: (1) "touched on the specific issue" at the core of the falsity allegations in their public

---

[46] For the purposes of § 10(b), "deliberate recklessness" is defined as "an extreme departure from the standards of ordinary care, which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Nguyen v. Endologix*, 962 F.3d 405, 414 (9th Cir. 2020) (internal quotation marks and citations omitted).

statements, *Roberti v. OSI Sys., Inc.*, 2015 WL 1985562, at *12 (C.D. Cal. 2015); (2) "touted intimate knowledge" of pricing and other key market conditions to investors, *Evanston Police Pension Fund v. McKesson Corp.*, 411 F. Supp. 3d 580, 602 (N.D. Cal. 2019); *see also In re Daou*, 411 F.3d at 1022 ("[S]pecific admissions from top executives that they are involved in every detail of the company and that they monitored portions of the company's database are factors in favor of inferring scienter[.]"); or (3) made statements that, although technically true, were worded in such a way to suggest that defendants "understood what was going on and were careful to be technically correct" so as to mislead investors. *Washtenaw Cnty. Emps. Ret. Sys. v. Celera Corp.*, 2012 WL 3835078, at *3 (N.D. Cal. Sept. 4, 2012). Courts will also sometimes infer scienter based on a "core-operations inference," i.e., a situation where it would be "absurd" to suggest that a defendant did not know of a matter given their role in the company and the importance of the information. *See In re Alphabet*, 1 F.4th at 706; *see also S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 786 (9th Cir. 2008). But "proof under [the core operations] theory is not easy." *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1062 (9th Cir. 2014). To plead scienter under the core operations theory, "[a] plaintiff must produce either specific admissions by one or more corporate executives of detailed involvement in the minutia of a company's operations . . . or witness accounts demonstrating that executives had actual involvement in creating false reports." *Id.* (internal citations omitted).

In contrast, Ninth Circuit courts have declined to find scienter where: (1) the defendants' statements "bear no connection to the allegedly false or misleading nature of [the] statements," *Xiaojiao*, 417 F. Supp. 3d at 1280; (2) the scienter allegations depend solely on "corporate management's general awareness of the day-to-day workings of the company's business[,]" *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1068 (9th Cir. 2008); or (3) the scienter allegations are based on an executive's resignation or termination, not accompanied by

any other evidence of the their wrongdoing.  *In re Downey Sec. Litig.*, 2009 WL 736802, at *10–11 (C.D. Cal. Mar. 18, 2009).  Additionally, although failure to allege a motive is not necessarily fatal to the Complaint, a lack of a plausible motive allegation "certainly makes it much less likely that a plaintiff can show a strong inference of scienter." *Prodanova v. H.C. Wainwright & Co., LLC*, 993 F.3d 1097, 1108 (9th Cir. 2021); *see also Joyce*, 2023 WL 8370101, at *11 (declining to find scienter in part because plaintiffs did "not offer any plausible motive for why [d]efendants would lie").

At the motion-to-dismiss stage, "[t]he inference that the defendant acted with scienter need not be irrefutable, i.e., of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Tellabs*, 551 U.S. at 324.  But it "must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations." *Id*.  A complaint will survive a motion to dismiss "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id*.

(2)    Analysis of Scienter as to Defendant Narasimhan

Defendants contend that Plaintiffs fail to plead particularized facts supporting a strong inference of scienter as to Defendant Narasimhan.  *See* Dkt. # 42 at 29–32.  They say that Plaintiffs' theory of scienter rests on conclusory assertions and an improper application of the "core operations" doctrine, rather than particularized facts that Defendant "had any involvement with or knowledge of the staffing algorithm." *Id*. at 31–32.  The Court disagrees and concludes that Plaintiffs have adequately alleged scienter as to Defendant Narasimhan.

In conducting a "holistic review," the Court finds that Plaintiffs' allegations, when combined and viewed in the light most favorable to Plaintiffs, suffice to raise a strong inference of scienter.  Plaintiffs allege that: (1) the alleged misrepresentations and omissions "involve the

core of the Company's business: comparable store sales in the Company's two largest markets, the United States and China, partner staffing and scheduling, and customer demand"; (2) Narasimhan was the CEO during the Class Period and thus was involved in the company's day-to-day operations and had access to key information related to staffing and comparable store sales; (3) Narasimhan was partially responsible for overseeing and monitoring the progress of the Reinvention and Triple Shot plans and he "repeatedly touted his knowledge" of these plans and "their impact on the partner and customer experience" during the Class Period; (4) Narasimhan "publicly, and repeatedly acknowledged that Defendants closely monitored and tracked partner staffing and scheduling"; and (5) "Narasimhan's abrupt termination on August 13, 2024 further supports a strong inference of scienter." *See* Dkt. # 39 at 24–27.  These allegations suffice to permit "a reasonable person" to "deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *See Tellabs*, 551 U.S. at 324. Accordingly, the Court finds dismissal of these claims inappropriate at this stage.

The Court thus denies Defendants' request to dismiss Plaintiffs' remaining claims against Defendant Narasimhan for failure to raise a strong inference of scienter.

(3)    Analysis of Scienter as to Defendant Ruggeri

Defendants contend that Plaintiffs fail to plead particularized facts supporting a strong inference of scienter as to Defendant Ruggeri.  *See* Dkt. # 42 at 29–32.  Like with Defendant Narasimhan, Defendants contend that at most, Plaintiffs have alleged that Defendant Ruggeri was a "top executive" with "access to information," which falls short of the PSLRA's high pleading standards.  *Id.* at 11.  The Court agrees, concluding that Plaintiffs have failed to allege scienter as to Defendant Ruggeri.

Even if the Court views Plaintiffs' allegations holistically, it does not find that Plaintiffs have alleged sufficient facts to raise a strong in inference of scienter as to Defendant Ruggeri.

Plaintiffs allege that: (1) the alleged misrepresentations and omissions "involve the core of the Company's business: comparable store sales in the Company's two largest markets, the United States and China, partner staffing and scheduling, and customer demand"; (2) Ruggeri was the CFO during the Class Period and thus was involved in the company's day-to-day operations and had access to key information related to staffing and comparable store sales; and (3) Ruggeri was partially responsible for overseeing and monitoring the progress of the Reinvention and Triple Shot plans. *See* Dkt. # 39 at 24–25. But unlike with Defendant Narasimhan, Plaintiffs do not allege that Ruggeri "touted intimate knowledge" of the Reinvention and Triple Shot plans nor do they cite specific statements by Ruggeri suggesting that she possessed scienter. They also do not allege facts suggesting that Ruggeri was directly involved in monitoring or tracking the success of these plans or that it would be "absurd" for Ruggeri to be unaware of staffing problems and other in-store issues given her position as Starbucks' CFO. Plaintiffs also do not allege any plausible motive for why Ruggeri would lie, a termination or change in Ruggeri's job position, or any other particularized facts that would support an inference of scienter. *See generally* Dkt. ## 39, 45.

  As a result, Plaintiffs have failed to establish a "cogent" inference of scienter as to Defendant Ruggeri that is "at least as compelling as any opposing inference one could draw from the facts alleged." *See Tellabs*, 551 U.S. at 324. The Court thus dismisses all claims against Defendant Ruggeri without prejudice for failure to plead scienter.

      (4)  Analysis of Scienter as to Defendant Starbucks Corporation

  Defendants argue that Plaintiffs have failed to establish scienter as to Defendant Starbucks Corporation "[b]ecause Plaintiffs have not alleged any facts to show that either [Individual] Defendant acted with scienter." Dkt. #42 at 33. The Court disagrees.

Because the Court finds that Plaintiffs have adequately pleaded scienter as to Defendant Narasimhan for the reasons discussed in part III(B)(2)(b)(2) above, it declines Defendants' request to dismiss Plaintiffs' remaining claims against Defendant Starbucks Corporation for failure to plead scienter.

c.        Element Six: Loss Causation

The Complaint alleges that loss causation is present because: (1) "[t]hroughout the Class Period, Starbucks common stock traded at artificially inflated prices as a direct result of Defendants' materially misleading statements and omissions . . . which were widely disseminated to the securities market, investment analysts, and the investing public"; (2) "Lead Plaintiffs and other Class members purchased or otherwise acquired Starbucks common stock relying upon the integrity of the market price of Starbucks common stock and market information relating to Starbucks"; and (3) "[w]hen the relevant truth and its impact on Starbucks' financial results and prospects entered the market [on April 30, 2024], the price of Starbucks common stock significantly dropped as the artificial inflation came out of the stock price[,]" thereby causing Lead Plaintiffs and other Class members to suffer economic losses. Dkt. # 39 at 28.  Defendants reject this claim, arguing that Plaintiffs "incorrectly claim" that Starbucks' April 30, 2024 disclosures were "corrective disclosures," rather than timely disclosures that Starbucks failed to hit its prior earnings estimates coupled with "revised forward-looking projections" based on new facts.  *See* Dkt. ## 42 at 33–34; Dkt. # 47 at 17.

For the reasons below, the Court finds that Plaintiffs have adequately pleaded loss causation with respect to the remaining statements.  It thus denies Defendants' Motion to Dismiss Plaintiffs' remaining section 10(b) claims.

(1)      Legal Standards for Pleading Loss Causation

"Loss causation" is the plaintiff's "burden of proving that the act or omission of the defendant alleged to violate [the Securities Exchange Act] caused the loss for which the plaintiff seeks to recover damages." *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018) (quoting 15 U.S.C. § 78u-4(b)(4)). To show "loss causation" a plaintiff must "demonstrate a causal connection between the deceptive acts that form the basis for the claim of securities fraud and the injury suffered by the [plaintiffs]." *Or. Pub. Emps.*, 774 F.3d at 608 (quoting *Ambassador Hotel Co., Ltd. v. Wei–Chuan Inv.*, 189 F.3d 1017, 1027 (9th Cir. 1999)). "This inquiry requires no more than the familiar test for proximate cause": "plaintiffs need only show a causal connection between the fraud and the loss by tracing the loss back to the very facts about which the defendant lied." *First Solar Inc.*, 881 F.3d at 753 (quoting *Nuveen Mun. High Income Opportunity Fund v. City of Alameda*, 730 F.3d 1111, 1120 (9th Cir. 2013)) (internal quotation marks and citations omitted).

The Ninth Circuit has clarified that "[d]isclosure of the fraud is not a sine qua non of loss causation, which may be shown even where the alleged fraud is not necessarily revealed prior to the economic loss." *Id.* Rather, "the ultimate issue is whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss." *Id.* (quoting *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016). So there are many ways for a plaintiff to satisfy the loss causation element, including by "showing that the stock price fell upon the revelation of an earnings miss, even if the market was unaware at the time that fraud had concealed the miss." *Id.* at 754. In considering this element on a Rule 12(b)(6) motion, dismissal is inappropriate "[s]o long as the complaint alleges facts that, if taken as true, plausibly establish loss causation." *In re Gilead*, 536 F.3d at 1057.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

(2)    Analysis of Loss Causation

Defendants argue that Plaintiffs have failed to plead loss causation because: (1) Starbucks' announcement that it "'failed to hit prior 2Q24 earnings estimates' is a proper, timely disclosure—not a revelation of fraud"; and (2) Starbucks' revision guidance for Fiscal Year 2024 was a "forward-looking forecast" not a "corrective disclosure." Dkt. # 42 at 34 (citations modified). The Court disagrees.

The Court finds that Plaintiffs have sufficiently alleged loss causation. The Complaint plausibly alleges that Starbucks' "stock price fell upon the revelation of an earnings miss[,]" *see First Solar Inc*., 881 F.3d at 754, thereby causing economic harm to Lead Plaintiffs and other class members. Plaintiffs have thus alleged a causal connection between Defendants' allegedly misleading statements and Plaintiffs' economic losses. Although the Court acknowledges that Plaintiffs have not conclusively alleged that Starbucks' April 30, 2024 disclosures were "corrective disclosures" rather than proper, timely disclosures based on new facts, it also notes that loss causation may be shown even without a showing of a corrective disclosure. *See id*. The Court thus finds that the Complaint "alleges facts that, if taken as true, plausibly establish loss causation." *In re Gilead*, 536 F.3d at 1057. Accordingly, the Court declines Defendants' request to dismiss Plaintiffs' remaining claims for failure to plead loss causation.

3.    Plaintiffs' Section 20(a) Claims

The Complaint alleges that Individual Defendants Narasimhan and Ruggeri violated section 20(a) of the Securities Exchange Act because they "had direct or supervisory responsibility over the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular business and/or operating practices and expenditures and deficient control environment giving rise to the [alleged section 10(b) violations], and exercised that power." Dkt. # 39 at 36. Defendants argue that Plaintiffs' section

20(a) claims should be dismissed because "Plaintiffs do not plead a Section 10(b) claim, so their Section 20(a) claim fails."  Dkt. # 42 at 34 n.3 (citing *Lipton*, 284 F.3d at 1035 n.15).

For the reasons discussed in part III(B)(2) above, the Court finds that Plaintiffs have adequately pleaded some, but not all, of their section 10(b) claims.  It thus declines Defendants' request to dismiss any of Plaintiffs' section 20(a) claims that hinge on Plaintiffs' validly pleaded section 10(b) claims as discussed above.  As for all other 20(a) claims, the Court dismisses them without prejudice for failure to state a claim.

**V**
**CONCLUSION**

For all these reasons, the Court:

(1)    GRANTS Defendants' Request for Incorporation by Reference and Judicial Notice (Dkt. # 44);

(2)    GRANTS in part and DENIES in part Defendants' Motion to Dismiss (Dkt. # 42). The following claims are dismissed without prejudice:

    a.    All claims related to the challenged statements from the Q4 2023 Earnings Call;

    b.    All claims related to the Reinvention Plan Statements listed in footnotes 37 and 38, the Loyalty Program Statements listed in footnotes 43 and 44, and the China Business Statements from the Q1 2024 Earnings Call;

    c.    All claims against Defendant Ruggeri; and

(3)    GRANTS Plaintiffs leave to amend the Complaint with respect to any dismissed claims.  Plaintiffs must file any such amended pleading on or before December 10, 2025.  In amending the complaint, Plaintiffs should consider other strong

arguments raised by Defendants' Motion to Dismiss and not explicitly addressed in this Order.

Dated this 19th day of November, 2025.

John H. Chun
United States District Judge