THE HONORABLE JOHN H. CHUN

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| CHARLES GARBACCIO, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>STARBUCKS CORPORATION, et al.,<br><br>Defendants. | No. 2:24-cv-01362-JHC<br><br>CLASS ACTION<br><br>AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS<br><br>DEMAND FOR JURY TRIAL |

**[REDACTED]**



KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400, Seattle, WA 98101-3268
Telephone: 206/623-1900

## TABLE OF CONTENTS


**Page**

I. INTRODUCTION .......... 2

II. JURISDICTION AND VENUE .......... 6

III. PARTIES .......... 6

A. Lead Plaintiffs .......... 6

B. Defendants .......... 7

IV. FACTUAL ALLEGATIONS .......... 8

A. Starbucks Expands to the Largest Coffee House Chain in the World .......... 8

B. Amid Growing in-Store Inefficiencies and Falling Profit Margins, in September 2022 Starbucks Introduces an Aggressive Three-Year "Reinvention Plan" and Incoming CEO Narasimhan .......... 9

C. In March 2023, Narasimhan Takes Over and Introduces His Own Spin on the Reinvention Plan Dubbed the "Triple Shot Reinvention with Two Pumps" Plan .......... 11

D. Unbeknownst to Investors, Starbucks' Implementation of the Reinvention Plans Leads to Store Understaffing and [redacted], Resulting in Rapidly Increasing Customer Wait Times and Declining Store Traffic .......... 11

V. DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS .......... 21

VI. ADDITIONAL SCIENTER ALLEGATIONS .......... 45

A. The Alleged Misrepresentations and Omissions Concerned Starbucks' Core Operations .......... 45

B. Narasimhan and Ruggeri were Responsible for the Reinvention Plans and Held Themselves out to Investors as the People Most Knowledgeable .......... 45

C. Defendants' Knowledge Through Access to Information .......... 47

D. Narasimhan's Abrupt Termination Supports Scienter .......... 49

E. Corporate Scienter .......... 50

VII. LOSS CAUSATION .......... 50

VIII. POST-CLASS PERIOD DEVELOPMENTS .......... 54




KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400, Seattle, WA 98101-3268
Telephone: 206/623-1900

**Page**

IX. APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND THE FRAUD-ON-THE-MARKET DOCTRINE ..... 56

X. CLASS ACTION ALLEGATIONS ..... 56

XI. CAUSES OF ACTION ..... 58

COUNT I ..... 58

For Violation of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against Starbucks and Laxman Narasimhan ..... 58

COUNT II ..... 59

For Violation of §20(a) of the Exchange Act Against All Defendants ..... 59

PRAYER FOR RELIEF ..... 61

JURY DEMAND ..... 61



KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400, Seattle, WA 98101-3268
Telephone: 206/623-1900

This is a class action brought on behalf of persons and entities that purchased or otherwise acquired Starbucks Corporation ("Starbucks" or the "Company") common stock between January 31, 2024 and April 30, 2024, inclusive (the "Class Period"), and were damaged thereby (the "Class"), seeking to pursue remedies under §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"). This action is brought against (i) Starbucks, (ii) former Chief Executive Officer ("CEO") Laxman Narasimhan, and (iii) former Chief Financial Officer ("CFO") Rachel Ruggeri (collectively, "Defendants").

Lead Plaintiffs Pavers & Road Builders District Council Pension Fund, Teamsters Local 237 Additional Security Benefit Fund, and Teamsters Local 237 Supplemental Fund for Housing Authority Employees (collectively, "Lead Plaintiffs"), by and through their counsel Robbins Geller Rudman & Dowd LLP, allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Lead Plaintiffs' information and belief is based on, among other things, the independent investigation of counsel, which includes, but is not limited to, a review and analysis of (a) Starbucks' public filings with the U.S. Securities and Exchange Commission ("SEC"); (b) transcripts of Starbucks' senior management's conference calls with investors and analysts; (c) releases and media reports issued about and disseminated by the Company; (d) analyst reports issued about Starbucks; (e) interviews of former Starbucks employees; (f) other public information and data regarding the Company; (g) documents produced in discovery by Defendants and third parties and Defendants' discovery responses; and (h) documents cited or referenced herein. Lead Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

On November 19, 2025, the Court issued an Order (ECF 49) that granted in part and denied in part Defendants' Motion to Dismiss the Consolidated Complaint (ECF 42), which Order the Court clarified in its December 12, 2025 Order (ECF 58). On July 15, 2026, the Court granted Defendants' Motion for Judgment on the Pleadings under Federal Rule of Civil Procedure 12(c). ECF 96. In the July 15, 2026 Order, the Court granted Lead Plaintiffs leave to amend their complaint (ECF 39) with



KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400, Seattle, WA 98101-3268
Telephone: 206/623-1900

respect to the claims dismissed in the July 15, 2026 Order and instructed Lead Plaintiffs to "omit the claims and arguments that were already dismissed by the Court" in its December 12, 2025 Order. ECF 96 at 12. Consistent with this instruction, this Amended Complaint for Violations of the Federal Securities Laws ("Complaint") only amends the claims dismissed by the July 15, 2026 Order. This Complaint does not amend the allegations that the Court dismissed in its December 12, 2025 Order. All of the allegations as to those dismissed claims remain in the prior complaint and are expressly reserved for appeal.[1]

This Amended Complaint (the "Complaint") bolsters Lead Plaintiffs' claims concerning Defendants' false and misleading statements made during Starbucks' January 30, 2024 earnings call. Specifically, the Complaint provides additional details that further bolster the strong inference of Starbucks' and Narasimhan's scienter, in particular, allegations concerning (1) [redacted] prior to the call that demonstrate Defendants' statements were false and misleading when made; (2) what Defendants knew or recklessly disregarded prior to the call; and (3) reports and reporting lines demonstrating Defendants' access to information that contradicted statements made on the call.

## I. INTRODUCTION

1. Starbucks is an iconic brand and the largest coffee chain in the world that prides itself as being "'not in the coffee business serving people, but in the people business serving coffee.'" Central to Starbucks' "people business" are its employees, who the Company refers to as "partners." Partners are the cornerstone of the "Starbucks Experience," which centers on fostering human connection with and creating meaningful moments for customers. Accordingly, the way the

[1] *See Lacey v. Maricopa Cnty.*, 693 F.3d 896, 928 (9th Cir. 2012) (en banc) ("We therefore join our sister circuits and overrule in part the rule . . . 'that a plaintiff waives all claims alleged in a dismissed complaint which are not realleged in an amended complaint.' For claims dismissed with prejudice and without leave to amend, we will not require that they be repled in a subsequent amended complaint to preserve them for appeal. But for any claims voluntarily dismissed, we will consider those claims to be waived if not repled.").


KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400, Seattle, WA 98101-3268
Telephone: 206/623-1900

Company was perceived to treat its partners was foundational to Starbucks' brand and success as a coffee chain.

2. The majority of Starbucks' revenue comes from selling handcrafted beverages (coffee and tea) in its company-operated stores located in the United States, its largest market. This Complaint centers on Defendants' concerted effort to hide from investors that U.S. store traffic—a Starbucks financial metric that reports the number of sales at existing company-operated stores—in its most important market was declining due to systemic understaffing and long wait times for customers. Throughout FY24 Q1 and persisting into FY24 Q2 and the Class Period, Defendants knew or recklessly disregarded that systemic understaffing at U.S. company-operated stores was causing [redacted], which directly impacted their ability to serve customers and resulted in frustratingly long wait times and driving customers away. Yet Defendants told investors the opposite—that employee satisfaction was at an all-time high and that they had enhanced store performance and partners' and customers' experience with their reinvention plans.

3. Leading into the Class Period, the Starbucks brand, built on the customer's in-store experience, was facing headwinds as in-store operations were being overloaded by customized beverage options and mobile orders. To turn this around, Starbucks and its executives publicly introduced reinvention plans that were designed to make Starbucks' store operations more efficient and boost sales growth in the United States. On January 30, 2024, Defendants told investors that the reinvention plans were resulting in "in-store operational efficiencies," including "labor staffing . . . improvements," which were "leading to a more stable environment for our partners" and a "better experience for our customers."

4. In truth, Defendants were aware or recklessly disregarded that the reinvention plans were not delivering the results Defendants claimed. Rather, the reinvention plans were causing U.S. store traffic to decline. Unbeknownst to investors, in implementing the reinvention plans, Starbucks slashed staff in order to cut costs and employed a proprietary algorithm to allocate the remaining

partners. But the algorithm fatally underestimated the number of partner hours needed in-store by failing to account for the extra time required to accommodate increasingly popular beverage customizations, such as cold foam or extra espresso shots. This led to understaffing in nearly one-third of Starbucks' U.S. stores. The understaffing problems were compounded by a Company roll out of numerous new menu offerings, spikes in store traffic from increased promotions, and increasing and conflicting demands placed on partners due to surging mobile orders. As a result of these problems, the Company was experiencing widespread longer wait times at U.S. stores, which were driving customers away, decreasing store traffic, and ultimately reducing revenues and earnings per share ("EPS").

5. Defendants were well aware that, throughout FY24 Q1, [redacted] as the Company's labor scheduling and staffing practices failed to keep pace with customer demand.[2] [redacted].[3] [redacted]

---

[2] "FY" refers to Starbucks' fiscal year, which ends on the Sunday closest to September 30 in the prior calendar year. "Q__" refers to Starbucks' fiscal quarters, which normally consist of 13 weeks and run Monday through Sunday. Thus, "FY24 Q1" refers to October 2, 2023 through December 31, 2023.

[3] Starbucks describes segments of its business day as "dayparts."

[redacted][4] This was important because the morning daypart accounted for about half of Starbucks' business, and Starbucks Rewards customers accounted for 57% of Starbucks' U.S. revenue as of December 31, 2023.

6. Defendants knew or were deliberately reckless in not knowing that their January 30, 2024 statements were false and misleading when made. Narasimhan's [redacted] Moreover, the fraud involved Starbucks' largest and most important market and Starbucks' top executives. Defendants repeatedly professed on conference calls with investors their knowledge of (a) progress on the reinvention plans and their impact on the Company's financial performance; (b) efforts to improve partner scheduling and staffing; and (c) consumer demand through Defendants' close tracking of over 75 million customers using the Starbucks mobile app.

7. The relevant truth concealed by Defendants' fraud was revealed to investors on April 30, 2024 when Starbucks released its FY24 Q2 earnings results. The Company shocked investors, reporting that, instead of improving, North America and U.S. comparable store sales declined 3%, driven by a 7% decline in store traffic. Defendants admitted that longer wait times contributed to the miss, and that the Q2 headwinds were a continuation of those experienced during Q1. Several analysts noted that Starbucks' FY24 Q2 performance was the weakest store traffic performance outside of the pandemic and the global financial crisis. In response to these disclosures, the price of Starbucks common stock plummeted nearly 15%, causing Lead Plaintiffs and other investors to suffer significant losses.

---

[4] Starbucks Rewards members are customers who are enrolled in the Starbucks Rewards loyalty program, a spend-based program through which customers can earn loyalty points that can be redeemed for free product at company-operated stores.

## II. JURISDICTION AND VENUE

8. The claims alleged herein arise under §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b), 78t(a)), and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

9. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act (15 U.S.C. §78aa).

10. Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §§1391(b)-(c) because at all relevant times Starbucks maintained its corporate headquarters in this District.

11. In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce of the United States, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III. PARTIES

### A. Lead Plaintiffs

12. Lead Plaintiff Pavers & Road Builders District Council Pension Fund is a multi-employer defined benefit fund with more than $300 million in assets under management operated for the benefit of thousands of participants, pensioners, and beneficiaries. As set forth in its previously filed certification, Pavers & Road Builders District Council Pension Fund acquired Starbucks common stock at artificially inflated prices during the Class Period and was damaged thereby. ECF 15-2, 15-3.

13. Lead Plaintiffs Teamsters Local 237 Additional Security Benefit Fund and Teamsters Local 237 Supplemental Fund for Housing Authority Employees (collectively, the "Teamsters Local 237 Funds") are multi-employer defined benefit plans with more than $400 million in assets under management operated for the benefit of thousands of participants, pensioners, and beneficiaries. As

set forth in their previously filed certification, the Teamsters Local 237 Funds acquired Starbucks common stock at artificially inflated prices during the Class Period and were damaged thereby. *Id.*

**B. Defendants**

14. Defendant Starbucks is a global premier roaster, marketer, and retailer of specialty coffee incorporated under the laws of the state of Washington and headquartered in Seattle, Washington. Starbucks common stock trades in an efficient market on the Nasdaq Global Select Market (the "Nasdaq") under the ticker symbol "SBUX."

15. Defendant Laxman Narasimhan was, at all relevant times, Starbucks' CEO and a member of Starbucks' Board. Narasimhan joined Starbucks as CEO-elect on October 1, 2022 and assumed the role of CEO and joined the Board on March 20, 2023. On August 13, 2024, Narasimhan was abruptly removed as Starbucks' CEO and Board member.

16. Defendant Rachel Ruggeri was the Executive Vice President ("EVP") and CFO of Starbucks at all relevant times. Ruggeri joined Starbucks in 2001 as a member of the accounting team and held various leadership positions at the Company before being named CFO in 2021. After Narasimhan's departure from the Company in August 2024, Ruggeri served as interim CEO before Brian Niccol began his tenure as the new CEO of Starbucks.

17. Narasimhan and Ruggeri, because of their positions with the Company, possessed the power and authority to control the contents of Starbucks' quarterly reports, shareholder letters, press releases and other public statements, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Narasimhan and Ruggeri were provided with copies of Starbucks' reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Moreover, [redacted] Because of their position with the Company and their access to material, non-public information available to them,

Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and knew that the positive representations being made were then materially false and misleading.

## IV. FACTUAL ALLEGATIONS

### A. Starbucks Expands to the Largest Coffee House Chain in the World

18. Starbucks is the world's largest coffee chain and is one of the most recognized brands in the world. The Company first opened its doors on March 30, 1971 in Seattle's historic Pike Place Market. Early on, the Company focused on traditional whole bean coffee and leaf teas. That changed under the leadership of Howard Schultz, Starbucks' long-time Chairman and CEO. Schultz joined the Company in 1982 as Director of Operations and Marketing. In 1983, he traveled to Italy where he became enthralled with Italian coffee bars and the coffee experience. Schultz envisioned introducing the concept of the Italian coffeehouse to the American market. He left Starbucks to open his own coffeehouses, Il Giornale, only to return to Starbucks in August 1987 as CEO to purchase the Company.

19. Schultz transformed Starbucks into the global coffeehouse behemoth that it is today. Starbucks describes itself as the "premier roaster, marketer and retailer of specialty coffee in the world." Starbucks sells its roasted coffee, handcrafted beverages, and food items through its company-operated stores worldwide, which are the mainstay of its business. At the end of FY23, Starbucks had over 19,000 company-operated stores globally. Starbucks' largest and most important market is the United States. At the end of FY23, Starbucks had 9,654 U.S. company-operated stores that accounted for over 70% of the Company's net revenues.

20. Starbucks' brand identity, and the core component of its business strategy, is what the Company calls the "Starbucks Experience." The Starbucks Experience was the foundation of the Company's decades-long track record of success, fueling both strong customer loyalty and robust financial performance.

21. The Starbucks Experience prioritizes product quality and a personalized and consistent customer experience between Starbucks customers and the Company's partners who make the drinks and work in-store. Store partners are the cornerstone of the Starbucks Experience. According to Mr. Schultz:

> Because we believed the best way to meet and exceed the expectations of customers was to hire and train great people, we invested in employees who were zealous about good coffee. . . . That's the secret of the power of the Starbucks brand: the personal attachment our partners feel and the connection they make with our customers.

This remained true under Narasimhan. As he wrote to the Board, [redacted] In short, according to the Company, "[o]ur success starts and ends with our coffeehouse partners."

### B. Amid Growing in-Store Inefficiencies and Falling Profit Margins, in September 2022 Starbucks Introduces an Aggressive Three-Year "Reinvention Plan" and Incoming CEO Narasimhan

22. By 2022, Starbucks was facing business challenges on multiple fronts. Customer preferences and buying habits were changing from a simple cup of brewed coffee. Starbucks had pioneered the highly customized coffee drink, allowing customers to add extra espresso shots, additional pumps of syrup, or a cold foam topping, which took longer for partners to execute. By FY22 Q4, there were over 170,000 ways to customize a Starbucks drink and 383 billion different possibilities for a latte. Also, surging mobile app orders were significantly impacting in-store operations by overwhelming partners with a high volume of pre-ordered drinks that partners had to juggle with in-store and drive-thru orders. As a result, the in-store operations were becoming increasingly inefficient with congestion at the drink pick-up areas and a less personalized customer experience as partners were forced to prioritize order fulfillment. Partners were likewise frustrated about changing customer preferences and the increase in mobile orders, as these changes were adding complexity and time for the partners to execute orders.


KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400, Seattle, WA 98101-3268
Telephone: 206/623-1900

23. To address these issues and the market's concerns about them, in September 2022, Schultz unveiled a three-year Reinvention Plan designed to fix the in-store inefficiencies that were impacting both Starbucks customers and partners. Starbucks executives announced that with a renewed focus on the partner and customer experience, the Reinvention Plan would deliver a significant increase in comparable store sales growth, a Starbucks financial metric that reports the revenue generated by company-operated stores that have been open for at least 13 months.[5] The Reinvention Plan promised a sharp increase in comparable store sales growth to a range of 7% to 9% annually from FY23 to FY25 in the United States, up from a more modest range of 4% to 5%. Defendants told investors that the first phase of the plan would target Starbucks' largest market, company-operated stores in the United States.

24. In conjunction with the Reinvention Plan's announcement, Starbucks also announced a change in leadership, introducing Narasimhan as Starbucks' next CEO following a six-month immersion program. During his immersion, Narasimhan spent time with Schultz and the management team, visited stores, trained and worked as a barista, and engaged with partners and customers alike. Through his immersion, Narasimhan held himself out as gaining in-depth exposure to the brand, Starbucks culture, and the Reinvention Plan. Starbucks pointed to Narasimhan's "'intensive immersion'" as one of many reasons why he would "'lead Starbucks into its next phase of growth.'" According to Mellody Hobson, the Company's Independent Board Chair, Narasimhan's "'immersion has deepened Laxman's understanding of Starbucks culture and values.'" Schultz also expressed his confidence in Narasimhan, describing his successor as "'the right leader to take Starbucks into its next chapter'" and stating that Narasimhan "'is uniquely positioned to shape this work and lead the company forward with his partner-centered approach and demonstrated track record of building capabilities and driving growth in both mature and emerging markets.'"

---

[5] Comparable store sales is also known as "same store sales."

### C. In March 2023, Narasimhan Takes Over and Introduces His Own Spin on the Reinvention Plan Dubbed the "Triple Shot Reinvention with Two Pumps" Plan

25. Following his immersion, Narasimhan took over the CEO position in March 2023. To make his mark, Narasimhan immediately went to work on his own spin on the Reinvention Plan, which was called the Triple Shot Reinvention with Two Pumps (the "Triple Shot" plan). Narasimhan's plan built on Schultz's Reinvention Plan, with added focus on improving in-store efficiencies and partner culture to grow store sales and improve the Starbucks customer experience. The stakes were high for Narasimhan as he assumed the CEO role: he brought little CEO experience running a global restaurant chain and was taking over the helm from Schultz, the architect of Starbucks' decades-long success. Moreover, the Reinvention Plan called for almost doubling U.S. comparable store sales growth over a three-year period.

26. Narasimhan did not distance himself from the promised growth, but rather adopted it as the centerpiece of his own leadership agenda. He formally announced his Triple Shot plan to investors on November 2, 2023. The Triple Shot plan concerned the core idea of Schultz's Reinvention Plan: elevating the Starbucks brand through better-run stores and strengthening and scaling the Company's digital capabilities. The "Two Pumps" component centered on growth through operational efficiency and cutting costs. Defendants told investors that they expected savings of $3 billion over the next three years, with $1 billion coming from increased store efficiency. These savings would be both reinvested in the business and delivered to shareholders through margin expansion and earnings growth. Starbucks was also continuing to reinvigorate partner culture. This "pump" centered on investing in all aspects of the partner experience while benefiting from lower attrition and higher tenure in U.S. stores.

### D. Unbeknownst to Investors, Starbucks' Implementation of the Reinvention Plans Leads to Store Understaffing and [redacted] Resulting in Rapidly Increasing Customer Wait Times and Declining Store Traffic

27. Shortly after Narasimhan took over as CEO in March 2023, in conjunction with implementing the Reinvention Plan and Narasimhan's own Triple Shot plan, the Company began

working on a new labor algorithm for partner scheduling and staffing. The labor algorithm utilizes a set of data such as historical trends, current trends, and product availability to forecast the number of hours needed for each store throughout the day.

28. Unknown to investors, however, during FY24 Q1 and continuing into Q2 and the Class Period, the algorithm was causing significant operational issues within U.S. company-operated stores. Specifically, despite knowing that customer demand for more complex and customized drinks was increasing, Defendants failed to incorporate the time and processes needed for increasingly complex and time-consuming drink customizations customers were ordering. As a result, Defendants were not accurately projecting the number of partner hours needed to staff stores to meet customer demand. The understaffing problems were compounded by a roll out of numerous new menu offerings, which partners had to learn to prepare on the job. Starbucks was also rolling out promotional events, which often spiked orders beyond regular projections. However, Defendants and their algorithm did not factor in the additional partner hours that were needed to handle the influx of customers. The understaffing problem was also exacerbated by the fact that Starbucks had reduced its store staff by 30,000 partners, while at the same time ambitiously expanding its U.S. footprint by opening approximately 380 stores.

29. As a result, during FY24 Q1, continuing into Q2, and persisting throughout the Class Period, the Company's U.S. stores were consistently understaffed as partners had to increasingly juggle in-person, drive-thru, mobile, and delivery orders, which registered in Starbucks' system at the same time. Indeed, staffing shortages and scheduling were the top complaints for Starbucks partners. [redacted] Additionally, Starbucks had implemented new policies mandating partners work a minimum of 12 hours per week, which was reducing the number of employees available at certain locations.

30. Defendants were well aware of the severe, systemic understaffing in U.S. stores. Before and during the Class Period, Ruggeri led, and Narasimhan regularly attended meetings of, Starbucks' Audit and Compliance Committee, which was tasked with "monitor[ing] and mitigat[ing] current and emerging labor and human capital management risks." Moreover, Starbucks prided itself on "regularly conduct[ing] anonymous surveys to seek feedback from our partners on a variety of topics," the results of which were "reviewed by senior leadership, who analyze areas of progress or deterioration and prioritize actions and activities in response to this feedback to drive meaningful improvements in partner engagement." Indeed, before and during the Class Period, Starbucks conducted [redacted]

31. [redacted]

32. [redacted]

[redacted]

33. [redacted]

34. [redacted]



KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400, Seattle, WA 98101-3268
Telephone: 206/623-1900

[redacted]

36. Due to the severe, systemic understaffing, during FY24 Q1, continuing into Q2, and persisting throughout the Class Period, the customer experience on which Starbucks prided itself was rapidly degrading, and drink and food order wait times were ballooning. This in turn was negatively impacting store traffic and ultimately Starbucks' revenues and EPS. For instance, [redacted]

37. [redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]



KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400, Seattle, WA 98101-3268
Telephone: 206/623-1900

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]

[redacted] [redacted]



KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400, Seattle, WA 98101-3268
Telephone: 206/623-1900

[redacted]

39. Defendants were well aware of [redacted] As discussed above, Defendants told investors that they "regularly conduct[ed]" these "anonymous surveys to seek feedback from our partners on a variety of topics," and that the results were "reviewed by senior leadership, who analyze areas of progress or deterioration and prioritize actions and activities in response to this feedback to drive meaningful improvements in partner engagement." Moreover, [redacted]

[redacted]

[redacted]

41. [redacted]

42. [redacted]

43. As a result of the foregoing, during FY24 Q1 and persisting into FY24 Q2 and the Class Period, U.S. store traffic was declining as wait times increased. [redacted]

[redacted]

44. Abandoned orders were also on the rise during FY24 Q1. [redacted]

45. Defendants were well aware that customers were abandoning orders, as they told investors that they tracked customer demand "extremely carefully" leading into and during the Class Period. They publicly acknowledged digitally tracking "over 75 million customers in terms of their last 90-day activity," as well as the rate at which MOP orders were begun but not completed, and the reasons why.

46. Starbucks' systemic understaffing, deteriorating partner and customer experience, and increasing wait times persisted into FY24 Q2, which began on January 1, 2024. By the beginning of January 2024, 8% of Starbucks customers were waiting between at least 15 and 30 minutes for a drink, compared to no one waiting that long during the same period in 2019, and the percentage of abandoned mobile orders had risen to the mid-teens. In addition, Starbucks' customer contact center was flooded with calls from dissatisfied customers that orders were taking too long.

47. Knowingly or recklessly disregarding the negative information above, on January 30, 2024, four weeks into FY24 Q2, Defendants made false and misleading statements concerning Starbucks' operations, telling investors that partner satisfaction was at an all-time high, Starbucks was successfully creating a better experience for partners and customers alike, and customers were visiting stores more frequently. Narasimhan could not publicly acknowledge the growing problems, mere months after assuming the CEO position, as that would undermine his newly announced strategic vision, call into question the aggressive growth and efficiency targets, and signal that the Company's flagship strategic initiative had failed almost immediately after he assumed leadership. Accordingly, Defendants concealed the operational problems and continued to portray Starbucks' reinvention as successful while they attempted to resolve the mounting operational deficiencies behind the scenes.

48. Ultimately, however, the relevant truth about declining store traffic and sales in the United States was revealed on April 30, 2024, when Starbucks was forced to report that U.S. comparable store sales and traffic had significantly declined. Narasimhan admitted that "challenge[s] meeting our peak morning demand in the U.S." and "long wait times" contributed to the decline in U.S. store traffic. In the wake of the disappointing announcement, Schultz took to social media, stating that "the company's fix needs to begin at home" because "U.S. operations are the primary reason for the company's fall from grace." According to Schultz, "[t]he answer does not lie in data, but in the stores."

## V. DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS

49. On January 30, 2024, after the market closed, Narasimhan and Ruggeri convened a conference call with investors and analysts to discuss Starbucks' FY24 Q1 financial results, current January trends, and FY24 Q2 expectations. [redacted]

[redacted][6]

50. In his opening remarks, Narasimhan touted the strength of Starbucks' most loyal customers, misleadingly stating that "***our growing Starbucks Rewards members are visiting our stores more frequently and increasing their spend each time that they come***."

51. Defendants' statement in ¶50 was misleading when made. The true facts, which Defendants knew or recklessly disregarded, included the following:

(a) As set out more fully above (*supra* §IV.D), nearly one-third of Starbucks' U.S. stores were understaffed. Starbucks' staffing decisions failed to accurately account for the number of partners required to efficiently staff stores because they did not take into account the time needed to fulfill the increasing demand for highly customized drinks, surging mobile orders, the effects of customer promotions on store traffic, and the roll out of numerous new menu offerings (which partners had to learn to prepare on the job). Partners were being overwhelmed as they were forced to increasingly juggle in-person, drive-thru, mobile, and delivery orders, and there were not enough partners behind the counter to prepare drinks. Defendants were aware of this. [redacted]

[6] This Complaint includes the seven statements for which the Court held falsity was sufficiently pleaded. ECF 58 at 31-33, 36-37. Both Narasimhan and Ruggeri knew of the operational problems and their impact on the partner experience, customer experience, and U.S. store traffic, as described herein. Nevertheless, Narasimhan sat idly by as Ruggeri made the false and misleading statements identified in ¶¶58 and 62. He also knowingly reinforced her false and misleading statements by issuing his own statements on the same topics, as identified in ¶¶50, 52, 54, 56, and 60. In addition, Narasimhan signed the SOX certification that accompanied the false and misleading statement identified in ¶64, in which he attested that the Form 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."



KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400, Seattle, WA 98101-3268
Telephone: 206/623-1900

(b) [redacted]

(c) As a result of ¶51(a)-(b), leading into and during the Class Period, customer wait times were skyrocketing, driving customers away and significantly degrading store experiences for partners and customers alike. [redacted]


KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400, Seattle, WA 98101-3268
Telephone: 206/623-1900

[redacted] Increasing wait times persisted into FY24 Q2. By the time Narasimhan spoke in January 2024, 8% of Starbucks customers were waiting between at least 15 and 30 minutes for a drink, compared to no one waiting that long during the same period in 2019.

(d) In addition, customers were increasingly abandoning orders. During FY24 Q1, Starbucks' [redacted] By January 2024, the percentage of abandoned mobile orders rose to the mid-teens.

(e) In sum, during FY24 Q1 and persisting through the time Narasimhan spoke on January 30, 2024, Starbucks' U.S. business was experiencing sharply declining comparable store sales driven by a significant decrease in store traffic, due to long wait times. It was thus misleading to state that Starbucks Rewards members were "visiting our stores more frequently," as stated in ¶50 above, without also disclosing an increased rate of abandonment. In particular, Defendants tracked the percentage of customers using MOP, as well as the percentage of orders that were started but not completed on MOP and the reasons why. Moreover, Defendants acknowledged just three months later that Starbucks Rewards members had in fact declined during FY24 Q2, with Ruggeri conceding that "Rewards member declined quarter-over-quarter" and analysts reporting that "[e]ven active domestic Starbucks Rewards members took a rare dip, declining 4$ on a sequential basis."

(f) In addition, throughout the January 30, 2024 conference call, Narasimhan and Ruggeri discussed both Starbucks' completed FY24 Q1 results and then-current FY24 Q2 conditions. Narasimhan's statement in ¶50 was framed in the present tense, was temporally unqualified, and was made during a call that expressly addressed current January trends and FY24 Q2 expectations. These contextual facts support the particularized inference that Narasimhan understood his statement to describe conditions as of January 30, 2024—not merely conditions

during the quarter ended December 31, 2023—and nevertheless made the statement despite contrary information known to him. That inference is at least as compelling as the alternative explanation previously raised by Defendants that Narasimhan genuinely believed he was speaking only about completed FY24 Q1 results. In any event, even under that alternative explanation, the temporal distinction does not negate scienter because the adverse staffing, capacity, wait-time, and order-abandonment conditions alleged above already existed during FY24 Q1 and had been presented to Narasimhan before the call.

52. With respect to occasional customers, Narasimhan acknowledged a "softening," but misleadingly told investors that "***[o]ur most loyal customers remain loyal and in fact, increased their frequency and spend in the quarter***," and that "***[w]e feel good about the trajectory over the course of the quarter, but it will take time for our plans to be fully realized***."

53. Defendants' statements in ¶52 were false and misleading when made. The true facts, which Defendants knew or recklessly disregarded, included the following:

(a) As set out more fully above (*supra* §IV.D), nearly one-third of Starbucks' U.S. stores were understaffed. Starbucks' staffing decisions failed to accurately account for the number of partners required to efficiently staff stores because they did not consider the time needed to fulfill the increasing demand for highly customized drinks, surging mobile orders, the effects of customer promotions on store traffic, and the roll out of numerous new menu offerings. Partners were being overwhelmed as they were forced to increasingly juggle in-person, drive-thru, mobile, and delivery orders, and there were not enough partners behind the counter to prepare drinks. Defendants were aware of this. [redacted]

(b) [redacted]

(c) As a result of ¶53(a)-(b), customer wait-time and capacity problems were already present and worsening during FY24 Q1, continued into FY24 Q2 from January 1 through the time of the January 30, 2024 earnings call, and persisted throughout the Class Period, driving customers away, causing them to abandon or forgo purchases and significantly degrading the store experience for partners and customers alike. [redacted]



KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400, Seattle, WA 98101-3268
Telephone: 206/623-1900

[redacted]

(d) In addition, customers were increasingly abandoning orders. During FY24 Q1[redacted]. Defendants were aware of this, as they admittedly tracked customer demand "extremely carefully." They also tracked the percentage of customers using MOP, as well as the percentage of orders that were started but not completed on MOP and the reasons why.

(e) In sum, during FY24 Q1, Starbucks' U.S. business was experiencing sharply declining comparable store sales driven by a significant decrease in store traffic, due to long wait times. In light of these concealed facts, it was misleading to disclose an increased frequency in orders while concealing an increased rate of abandonment.

54. Narasimhan also falsely and misleadingly portrayed partner sentiment. He claimed that "our turnover amongst full-time store partners reached a record low in the quarter, coupled with ***an all-time high partner satisfaction score***."

55. Defendants' statement in ¶54 was false and misleading when made. The true facts, which Defendants knew or recklessly disregarded, included the following:

(a) As set out more fully above (*supra* §IV.D), nearly one-third of Starbucks' U.S. stores were understaffed. Starbucks' staffing decisions failed to accurately account for the number of partners required to efficiently staff stores because they did not take into account the time needed to fulfill the increasing demand for highly customized drinks, surging mobile orders, the effects of customer promotions on store traffic (which were often announced without notice to store partners), and the roll out of numerous new menu offerings (which partners had to learn to prepare

on the job). Partners were being overwhelmed as they were forced to increasingly juggle in-person, drive-thru, mobile, and delivery orders, and there were not enough partners behind the counter to prepare drinks or to maintain the cleanliness of the store. [redacted]

(b) [redacted]

(c) [redacted]



KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400, Seattle, WA 98101-3268
Telephone: 206/623-1900

(d) [redacted]

(e) [redacted]

(f) As a result of ¶55(a)-(e), customer wait-time and capacity problems were already present and worsening during FY24 Q1, continued into FY24 Q2 from January 1 through the time of the January 30, 2024 earnings call, and persisted throughout the Class Period, driving customers away, causing them to abandon or forgo purchases, and significantly degrading the store experience for partners and customers alike. [redacted]

[redacted]

(g) [redacted] Accordingly, [redacted], ***not*** "an all-time high," as Narasimhan falsely represented in ¶54.

56. Narasimhan underscored the importance of the store experience for both the customer and partner, calling it "the key to our success," but falsely and misleadingly stated that Starbucks had unlocked efficiency and created a more stable environment for its store employees:

> As you heard me say often, the key to our success is the experience that our partners create for our customers. ***We're investing in a better experience for our partners to advance our business to a more balanced growth model as we unlock efficiency. In the quarter, we have seen the effectiveness of the Reinvention driven investments we have made in in-store operational efficiencies such as standards, equipment innovation and scheduling improvements, leading to a more stable environment for our partners.***

57. Defendants' statements in ¶56 were false and misleading when made. The true facts, which Defendants knew or recklessly disregarded, included the following:

(a) As set out more fully above (*supra* §IV.D), nearly one-third of Starbucks' U.S. stores were understaffed. Starbucks' staffing decisions failed to accurately account for the number of partners required to efficiently staff stores because they did not consider the time needed to fulfill the increasing demand for highly customized drinks, surging mobile orders, the effects of

customer promotions on store traffic, and the roll out of numerous new menu offerings. Partners were being overwhelmed as they were forced to increasingly juggle in-person, drive-thru, mobile, and delivery orders, and there were not enough partners behind the counter to prepare drinks or maintain the cleanliness of the store. [redacted]

(b) [redacted] that Starbucks was not "investing in a better experience for our partners" and had not created "a more stable environment for our partners." [redacted] as the Company's labor scheduling and staffing practices failed to keep pace with customer demand.

(c) [redacted]

(d) [redacted]



KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400, Seattle, WA 98101-3268
Telephone: 206/623-1900

[redacted]

(e) [redacted]

(f) As a result of ¶57(a)-(e), customer wait-time and capacity problems were already present and worsening during FY24 Q1, continued into FY24 Q2 from January 1 through the time of the January 30, 2024 earnings call, and persisted throughout the Class Period, driving customers away and significantly degrading store experiences for both partners and customers—not creating "a more stable environment for our partners." [redacted]

[redacted] And by the time Defendants spoke in January 2024, 8% of Starbucks customers were waiting between at least 15 and 30 minutes for a drink, compared to no one waiting that long during the same period in 2019.

(g) For the foregoing reasons, it was false and misleading to represent that Starbucks was "investing in a better experience for our partners" and had created "a more stable environment for our partners," as stated in ¶56 above. Instead, partner commentary provided in response to the October 2023 survey uniformly told the opposite story—[redacted]

(h) Moreover, throughout the January 30, 2024 conference call, Narasimhan and Ruggeri discussed both Starbucks' completed FY24 Q1 results and then-current FY24 Q2 conditions. Narasimhan's statement in ¶56 was framed in the present tense, was temporally unqualified, and was made during a call that expressly addressed current January trends and FY24 Q2 expectations. These contextual facts support the particularized inference that Narasimhan understood his statement to describe conditions as of January 30, 2024—not merely conditions present during FY24 Q1—and nevertheless made the statement despite contrary information known to him. That inference is at least as compelling as the alternative explanation that Defendants previously raised, *i.e.*, that Narasimhan genuinely believed he was speaking only about completed FY24 Q1 results. In any event, even under that alternative explanation, the temporal distinction does not negate scienter because the adverse staffing, capacity, wait-time, and order-abandonment conditions alleged above already existed during FY24 Q1 and had been presented to Narasimhan before the call.

58. Ruggeri falsely and misleadingly attributed the "substantial margin expansion in the quarter" to "meaningful labor staffing and scheduling improvements" that "enhanced both our partners' experience and subsequent store performance," but concealed that they were causing a slowdown the Company already identified internally as needing correction:

> North America's operating margin was 21.4% in Q1, expanding 280 basis points from the prior year, driven by 240 basis points from Reinvention related in-store operational efficiencies as well as sales leverage and pricing, partially offset by continued investment in our partners. ***This substantial margin expansion in the quarter reflected the meaningful labor staffing and scheduling improvements we made as part of our reinvention. We unlocked significant stability by focusing on staffing and scheduling hours based on partners' preferred shifts, which enhanced both our partners' experience and subsequent store performance***.

59. The statements in ¶58 were false and misleading when made. The true facts, which Defendants knew or recklessly disregarded, included the following:

(a) As set out more fully above (*supra* §IV.D), nearly one-third of Starbucks' U.S. stores were understaffed. Starbucks' staffing decisions failed to accurately account for the number of partners required to efficiently staff stores because they did not consider the time needed to fulfill the increasing demand for highly customized drinks, surging mobile orders, the effects of customer promotions on store traffic, and the roll out of numerous new menu offerings. Partners were being overwhelmed as they were forced to increasingly juggle in-person, drive-thru, mobile, and delivery orders, and there were not enough partners behind the counter to prepare drinks or to maintain the cleanliness of the store. Narasimhan and Ruggeri were aware of this. [redacted]

(b) [redacted] made "meaningful labor staffing . . . improvements" as "part of our reinvention," as Defendants

misrepresented. [redacted]

(c) As a result of ¶59(a)-(b), customer wait-time and capacity problems were already present and worsening during FY24 Q1, continued into FY24 Q2 from January 1 through the time of the January 30, 2024 earnings call, and persisted throughout the Class Period, driving customers away and significantly degrading store experiences for both partners and customers—not "enhanc[ing] both our partners' experience and subsequent store performance." [redacted]


KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400, Seattle, WA 98101-3268
Telephone: 206/623-1900

[redacted].

(d) Customers were also increasingly abandoning orders. During FY24 Q1, [redacted]. In short, Starbucks' U.S. business was experiencing sharply declining comparable store sales driven by significant decreases in store traffic, due to long wait times.

60. During the Q&A portion of the call, Narasimhan falsely and misleadingly confirmed that "***we are seeing no slowdown in our loyal SR [Starbucks Reward] customers. In fact, we're seeing an increase in frequency***. They're buying more, they're customizing more. That part of the business is extremely strong."

61. Defendants' statement in ¶60 was false and misleading when made. The true facts, which Defendants knew or recklessly disregarded, included the following:

(a) As set out more fully above (*supra* §IV.D), nearly one-third of Starbucks' U.S. stores were understaffed. Starbucks' staffing decisions failed to accurately account for the number of partners required to efficiently staff stores because they did not take into account the time needed to fulfill the increasing demand for highly customized drinks, surging mobile orders, the effects of customer promotions on store traffic, and the roll out of numerous new menu offerings (which partners had to learn to prepare on the job). Partners were being overwhelmed as they were forced to increasingly juggle in-person, drive-thru, mobile, and delivery orders, and there were not enough partners behind the counter to prepare drinks. Defendants were aware of this, [redacted]

(b) [redacted]

(c) As a result of ¶61(a)-(b), customer wait-time and capacity problems were already present and worsening during FY24 Q1, continued into FY24 Q2 from January 1 through the time of the January 30, 2024 earnings call, and persisted throughout the Class Period, driving customers away and significantly degrading store experiences for partners and customers. [redacted] And by the time Defendants spoke in January 2024, 8% of Starbucks customers

were waiting between at least 15 and 30 minutes for a drink, compared to no one waiting that long during the same period in 2019.

(d) In addition, customers were increasingly abandoning orders. During FY24 Q1, Starbucks' [redacted] By January 2024, the percentage of abandoned mobile orders rose to the mid-teens.

(e) In sum, during FY24 Q1, and persisting into Q2 and at the time Defendants spoke on January 30, 2024, Starbucks' U.S. business was experiencing sharply declining comparable store sales driven by significant decreases in store traffic due to long wait times. It was thus misleading to state that "we are seeing no slowdown in our loyal SR [Starbucks Reward] customers" and "[i]n fact, we're seeing an increase in frequency," as stated in ¶60 above, without also disclosing an increased rate of abandonment. In particular, Defendants tracked the percentage of customers using MOP, the percentage of orders that were started but not completed on MOP, and the reasons why. They also acknowledged just three months later that Starbucks Rewards members had in fact declined during FY24 Q2, with Ruggeri conceding that "Rewards member declined quarter-over-quarter" and analysts reporting that "[e]ven active domestic Starbucks Rewards members took a rare dip, declining 4$ on a sequential basis."

(f) In addition, throughout the January 30, 2024 conference call, Narasimhan and Ruggeri discussed both Starbucks' completed FY24 Q1 results and then-current FY24 Q2 conditions. Narasimhan's statement in ¶60 was framed in the present tense, was temporally unqualified, and was made during a call that expressly addressed current January trends and FY24 Q2 expectations. These contextual facts support the particularized inference that Narasimhan understood his statement to describe conditions as of January 30, 2024—not just conditions that

existed during FY24 Q1—and nevertheless made the statement despite contrary information known to him. That inference is at least as compelling as the alternative explanation that Defendants previously raised, *i.e.*, that Narasimhan genuinely believed he was speaking only about completed FY24 Q1 results. In any event, even under that alternative explanation, the temporal distinction does not negate scienter because the adverse staffing, capacity, wait-time, and order-abandonment conditions alleged above already existed during FY24 Q1 and had been presented to Narasimhan before the call.

62. Analysts were concerned about Starbucks' reported operating margin expansion, which included reduced expenses from store partners. In response to a question from an Oppenheimer analyst commenting on Starbucks' impressive operating margins but asking "How sustainable is this performance on the operating expense line?", Ruggeri falsely and misleadingly claimed Starbucks was in "a stable environment," the morning daypart in the United States was "the strongest that we've seen," and a "better" partner experience was leading to a "better" customer experience:

> ***All of those efforts together have led to lower turnover in a more stable environment. And it's that stability that really allows us to create a better efficiency in serving our customers. So as an example, I already spoke about our morning daypart this quarter in the U.S. was the strongest that we've seen. And that's a function of all of those efforts and activities that I just spoke about being realized in supporting our demand. So creating a better experience for our partners leads to the better experience for our customers.***

63. Defendants' statements in ¶62 were false and misleading when made. The true facts, which Defendants knew or recklessly disregarded, included the following:

(a) As set out more fully above (*supra* §IV.D), nearly one-third of Starbucks' U.S. stores were understaffed. Starbucks' staffing decisions failed to accurately account for the number of partners required to efficiently staff stores because they did not account for the time needed to fulfill the increasing demand for highly customized drinks, surging mobile orders, the effects of customer promotions on store traffic, and the roll out of numerous new menu offerings. Partners were being overwhelmed as they juggled in-person, drive-thru, mobile, and delivery orders,


KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400, Seattle, WA 98101-3268
Telephone: 206/623-1900

and there were not enough partners behind the counter to prepare drinks and to maintain the cleanliness of the store. Narasimhan and Ruggeri were aware of this. [redacted]

(b) [redacted]

(c) [redacted]



KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400, Seattle, WA 98101-3268
Telephone: 206/623-1900

(d) [redacted]

(e) [redacted]

(f) As a result of ¶63(a)-(e), customer wait-time and capacity problems were already present and worsening during FY24 Q1, continued into FY24 Q2 from January 1 through the time of the January 30, 2024 earnings call, and persisted throughout the Class Period, driving customers away and significantly degrading store experiences for both partners and customers—not creating "a more stable environment" or a "better experience" for partners or customers. [redacted]

[redacted]

(g) Customers were also increasingly abandoning orders. [redacted] As a result, Starbucks' U.S. business experiencing sharply declining comparable store sales driven by significant decreases in store traffic, due to long wait times. [redacted] It was thus misleading for Defendants to represent that "our morning daypart this quarter in the U.S. was the strongest that we've seen."

(h) In addition, throughout the January 30, 2024 conference call, Narasimhan and Ruggeri discussed both Starbucks' completed FY24 Q1 results and then-current FY24 Q2 conditions. Defendants' statement in ¶62 was framed in the present tense, was temporally unqualified, and was made during a call that expressly addressed current January trends and FY24 Q2 expectations. These contextual facts support the particularized inference that Defendants understood the statement to describe conditions as of January 30, 2024—not just conditions that were present during the quarter ended December 31, 2023—and nevertheless made the statement despite contrary information known to them. In particular, by the time Defendants spoke in January 2024, 8% of Starbucks customers were waiting between at least 15 and 30 minutes for a drink, compared to no one waiting that long during the same period in 2019. Order abandonment also persisted into and worsened during Q2, with the percentage of abandoned mobile orders rising to the

mid-teens by January 2024. This inference is at least as compelling as the alternative explanation previously raised by Defendants that they genuinely believed they were speaking only about completed FY24 Q1 results. In any event, even under that alternative explanation, the temporal distinction does not negate scienter because the adverse staffing, capacity, wait-time, and order-abandonment conditions alleged above already existed during FY24 Q1 and had been presented to Defendants before the call.

64. On January 30, 2024, Starbucks filed with the SEC a quarterly report on Form 10-Q (the "FY24 Q1 Form 10-Q"). The FY24 Q1 Form 10-Q was signed by Ruggeri and the attached SOX certifications were signed by Narasimhan and Ruggeri. The FY24 Q1 Form 10-Q stated: "***There have been no material changes to the risk factors disclosed in our 10-K***." The risk factors contained in Starbucks' Form 10-K for the fiscal year ended October 1, 2023, filed with the SEC on November 17, 2023 (the "FY23 Form 10-K"), stated:

> Erosion of trust in our brand value can be caused by isolated or recurring incidents originating both from us or our business partners, or from external events. Such incidents can potentially trigger boycotts of our stores or result in civil or criminal liability and can have a negative impact on our financial results. . . . ***[I]f we are not effective in*** making sufficient progress toward our social and environmental program goals or in ***executing on our Reinvention Plan, consumer trust in our brand may suffer, and this perception could result in negative publicity or litigation***. . . .
>
> The ongoing relevance of our brand may depend on making sufficient progress toward our social and environmental program goals as well as the successful execution of the Reinvention Plan, each of which requires company-wide coordination and alignment.

65. As detailed below, Defendants' statement, as alleged above in ¶64, were materially misleading when made because they omitted to state material facts necessary in order to make the statement not misleading.

(a) The statement that consumer trust in the Starbucks brand "***may***" suffer "[i]f we are not effective in . . . executing on our Reinvention Plan" was misleading because it omitted that the risk it was warning investors about had already come to fruition. In fact, as set out more

fully above (*supra* §IV.D), Starbucks' staffing decisions had already resulted in Starbucks stores having insufficient capacity to meet consumer demand. [redacted] and tarnished their trust in the brand.

(b) In addition, Defendants' statement that "[t]here have been no material changes to the risk factors disclosed in our 10-K" in ¶64 above was misleading because it omitted that the material risks previously warned of—"[i]f we are not effective in . . . executing on our Reinvention Plan, consumer trust in our brand may suffer"—had already come to fruition and materially changed since November 17, 2023. In particular, partner sentiment worsened throughout FY24 Q1, with 33% of store managers and 32% of hourly store partners disagreeing that they would recommend Starbucks as a great place to work, according to the October 2023 survey. That metric worsened by January 2024, with 39% of store managers and 34% of hourly partners disagreeing that Starbucks is a great place to work. This translated into a quickly deteriorating customer experience. By the beginning of January 2024, 8% of Starbucks customers were waiting between at least 15 and 30 minutes for a drink, compared to no one waiting that long during the same period in 2019, and the percentage of abandoned mobile orders had risen to the mid-teens, [redacted]


KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400, Seattle, WA 98101-3268
Telephone: 206/623-1900

## VI. ADDITIONAL SCIENTER ALLEGATIONS

66. Defendants knew or acted with deliberate recklessness that material facts were being concealed from investors during the Class Period and the statements set forth in ¶¶50-64 above would be misleading to investors when made. Defendants' misconduct was knowing or deliberately reckless based on the factual allegations above and the following:

### A. The Alleged Misrepresentations and Omissions Concerned Starbucks' Core Operations

67. The misrepresentations and omissions alleged herein involve the core of the Company's business: comparable store sales in the Company's largest market, the United States, partner staffing and scheduling, and customer demand. Narasimhan was Starbucks' top executive and led its day-to-day operations. As reported in the Company's FY23 Form 10-K, comparable store sales were one of the key operating metrics Defendants used to assess growth of the Company's business and the effectiveness of its operations. Defendants reported on this key metric and its major component, comparable store transactions (store traffic), during each Class Period conference call with investors.

### B. Narasimhan and Ruggeri were Responsible for the Reinvention Plans and Held Themselves out to Investors as the People Most Knowledgeable

68. Narasimhan and Ruggeri also oversaw and monitored the progress of the Reinvention Plan and Narasimhan's Triple Shot plan, which targeted store sales growth in the United States through improved in-store operations and cost control. Narasimhan and Ruggeri's monitoring and overseeing of these plans included knowing the effectiveness of the partner staffing and scheduling algorithm, which was implemented as part of the plans, and customer demand.

69. Leading into and during the Class Period, Narasimhan repeatedly touted his knowledge of the progress of the Reinvention Plan and his Triple Shot plan and their impact on the partner and customer experience:

- "Our Reinvention is moving ahead of schedule, fueling revenue growth, efficiency and margin expansion. Notably, we continue to see the positive impact of our



KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400, Seattle, WA 98101-3268
Telephone: 206/623-1900

Reinvention on our partner and customer experiences." (November 2, 2023 conference call for FY23 Q4);

- "What you will take away from this call today is that we have great momentum, fueled largely by our reinvention plan. We are seeing the work pay off through improved partner and customer experiences." (November 2, 2023 conference call for FY23 Q4);

- "We have created a more stable environment in our stores. . . . All this is further evidence that our strategy is working." (November 2, 2023 conference call for FY23 Q4); and

- "In the quarter, we have seen the effectiveness of the Reinvention driven investments we have made in in-store operational efficiencies such as standards, equipment innovation and scheduling improvements, leading to a more stable environment for our partners." (January 30, 2024 conference call for FY24 Q1).

70. Likewise, Rugerri also repeatedly touted her knowledge of the progress of the Reinvention Plan and its impact on Starbucks' financials, specifically providing details about U.S. store and staffing impacts:

- "Our fiscal year 2023 double-digit earnings growth was a direct result of both double-digit revenue growth and margin expansion, as our focused and disciplined execution of our reinvention delivered tangible financial results." (November 2, 2023 conference call);

- "Q4 consolidated operating margin expanded 310 basis points from the prior year to 18.2%, exceeding our expectations, primarily driven by increased efficiency throughout our U.S. stores as our strong execution on reinvention amplified results even greater than we anticipated, coupled with sales leverage and pricing." (November 2, 2023 conference call);

- "Our Reinvention has successfully driven resiliency in our business with our North America margin expanding a notable 280 basis points in the quarter, which I will discuss in further detail in a moment." (January 30, 2024 conference call); and

- "This substantial margin expansion in the quarter reflected the meaningful labor staffing and scheduling improvements we made as part of our reinvention." (January 30, 2024 conference call).

71. They also highlighted the risk Starbucks would face if it did not effectively execute the Reinvention Plan. In the Company's FY23 Form 10-K, they stated: "[I]f we are not effective . . .

in executing on our Reinvention Plan, consumer trust in our brand may suffer, and this perception could result in negative publicity or litigation."

72. Narasimhan acknowledged that the Company "extremely carefully" tracked customer demand leading into and during the Class Period. During the November 2, 2023 conference call for Q4 2023, Narasimhan acknowledged that he watched customer demand "extremely carefully," with Defendants digitally tracking "over 75 million customers in terms of their last 90-day activity." During the April 30, 2024 conference call for FY24 Q2, Narasimhan also confirmed that, during the Class Period, he tracked the MOP incompletion rate and the reasons why customers were not completing their orders. He also stated that he would "continue spending time each month working up close shoulder to shoulder with partners in stores."

**C. Defendants' Knowledge Through Access to Information**

73. Because partner staffing and scheduling were critical to store operations and, in turn, sales, the Company internally tracked partner feedback and used analytical tools to monitor and track performance and progress of the Company's staffing and scheduling algorithm. The Company's U.S. Leadership Team kept Narasimhan and Ruggeri informed during the Class Period about key data points about partner sentiment, staffing levels, and their impact on customers' experience and transactions. Defendants also regularly received feedback on staffing and scheduling issues from the Company's Scheduling Excellence Advisory ("SEA") committee that was made up of U.S. store managers, who provided input on partner staffing and scheduling. Starbucks formed the SEA in December 2023 and the SEA operated from January 2024 through June 2024.

74. Narasimhan also publicly, and repeatedly, acknowledged that Defendants closely monitored and tracked partner staffing and scheduling:

- "If you look at staffing and scheduling and how we are working on that, I think we've made material progress in that area." (November 2, 2023 conference call);
- "Operationally, we are seeing evidence that we are executing better. . . . Through scheduling and staffing improvements, we are beginning to increase the number of hours per partner in store, critical to running great stores and improving partner engagement while also improving productivity." (August 1, 2023 conference call);

- "There's a lot more stability, operational stability, in stores. You see tenure year go up. It's almost up by a year, which is a lot for us. And so staffing and scheduling has been a big area of work." (December 5, 2023 Morgan Stanley Global Consumer & Retail conference); and

- "[W]e are listening to our partners and investing to make their experience better." (January 30, 2024 conference call).

75. Additionally, after he was hired in September 2022 and before his appointment as CEO, Narasimhan participated in a six-month immersion program where he trained as a barista and worked side-by-side with partners in company-operated stores. Then, after becoming CEO, to keep himself "'close to [Starbucks'] culture and our customers, as well as to our challenges and opportunities,'" Narasimhan committed to work a half day shift each month in a Starbucks café.

76. The Company's U.S. Leadership Team kept Narasimhan and Ruggeri informed during the Class Period about key issues and data affecting the Company's reinvention plans, including the customer and partner experience, product innovation and availability, and in-store operations. Narasimhan and Ruggeri's core team consisted of senior executive leaders Frank Britt, Sara Kelly, Sara Trilling, Brady Brewer, and Michael Conway who worked with and reported directly to them on these key issues, and alongside Narasimhan and Ruggeri presented on and answered related questions to the Board during the Class Period:

- Frank Britt was the "key architect" of Starbucks' reinvention efforts and was formally appointed Chief Reinvention Officer on November 13, 2023. In this capacity, Mr. Britt oversaw the Company's reinvention plans leading into and throughout the Class Period, including efforts to increase store efficiency and productivity through investments in equipment, operational tools, staffing, and scheduling. Mr. Britt reported directly to Narasimhan;

- Sara Kelly, Starbucks' EVP and Chief Partner Officer, oversaw Starbucks' partner-related functions, including the U.S. retail partner experience, labor, staffing, scheduling, retention, training, compensation and benefits, and other initiatives affecting Starbucks' in-store partners. Ms. Kelly reported directly to Narasimhan throughout the Class Period and was part of a core group of executives that presented to the Board and investors on the status and strategy of reinvention;

- Sara Trilling, EVP and President of North America, was responsible for the Company's North American company-operated and licensed store businesses, including store operations, development and renovations, the retail partner and

customer experience, equipment deployment, throughput, and implementation of the Siren System and related reinvention initiatives. Ms. Trilling also reported directly to Narasimhan;

- Brady Brewer, Starbucks' Chief Marketing Officer, who provided updates concerning the Reinvention Plan, marketing efforts, demand, and Starbucks Reward programs; and

- Michael Conway served as Group President of International and Channel Development before assuming the newly created role of CEO of North America on April 1, 2024. In that role, Mr. Conway oversaw Starbucks' North American business and reported directly to Narasimhan, with Ms. Trilling reporting directly to Conway.

77. In assisting Narasimhan and Ruggeri with providing updates on the Company's reinvention plans, members of Narasimhan and Ruggeri's core team also demonstrated that Defendants monitored and tracked demand, including Brady Brewer:

- "We have—what we look at is latent demand and we measure that. How many people book walking in the store and walk out? How many people walk outside the store? What does that look like in a drive-thru? So we look at latent demand that we're unable to serve, but then we also look at customers and what new opportunities can we capture. So we look at the market and the demand spaces of the market. We measure where Starbucks is playing, what the headroom is, and we strategically go after those spaces. We do that with product innovation." (November 2, 2023 investor call); and

- "[W]e look at digital, Laxman referenced that 30% of U.S. transactions coming through MOP. We're seeing high demand for that service even among occasional customers . . . ." (January 30, 2024 conference call).

## D. Narasimhan's Abrupt Termination Supports Scienter

78. Narasimhan's abrupt termination on August 13, 2024 further supports a strong inference of scienter. The termination occurred within four months of the Company reporting its weakest U.S. store traffic performance outside of the COVID pandemic and the 2007 global financial crisis. Narasimhan served less than 17 months after assuming the CEO position—representing the shortest CEO tenure in Starbucks' history. Narasimhan's short tenure stands in stark contrast to his predecessor's long, multi-decade tenure as CEO. In announcing Narasimhan's

termination, Starbucks stated, without explanation, that he would step down as CEO and a member of the Board with "immediate effect."

### E. Corporate Scienter

79. The allegations above also establish a strong inference that Starbucks as an entity acted with corporate scienter throughout the Class Period, as Narasimhan, Ruggeri, Starbucks' officers, management, and agents had actual knowledge of the misrepresentations and omissions of material facts set forth herein (for which they had a duty to disclose), or acted with reckless disregard for the truth because they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and/or omissions were made knowingly or recklessly, and without a reasonable basis, for the purpose and effect of concealing the fraudulent scheme from the investing public. By concealing these material facts from investors, Starbucks maintained and/or increased its artificially inflated common stock prices throughout the Class Period.

## VII. LOSS CAUSATION

80. The market for Starbucks common stock was open, well-developed, and efficient during the Class Period. Throughout the Class Period, Starbucks common stock traded at artificially inflated prices as a direct result of Defendants' materially misleading statements and omissions as alleged above in ¶¶50-64, which were widely disseminated to the securities market, investment analysts, and the investing public. Lead Plaintiffs and other Class members purchased or otherwise acquired Starbucks common stock relying upon the integrity of the market price of Starbucks common stock and market information relating to Starbucks.

81. When the relevant truth and its impact on Starbucks' financial results and prospects entered the market, the price of Starbucks common stock significantly dropped as the artificial inflation came out of the stock price. As a result of their purchases of Starbucks common stock during the Class Period, Lead Plaintiffs and other Class members suffered economic loss (*i.e.*, damages) under the federal securities laws.

82. On April 30, 2024, after the market closed, the relevant truth concealed by Defendants' materially misleading statements and omissions was revealed when Starbucks issued a press release reporting its FY24 Q2 financial results and hosted an earnings conference call for investors. The Company press release reported that, instead of increases over the holiday season North America and U.S. comparable store sales ***declined*** 3%, driven by a 7% decline in store traffic. This was the first time since 2020 that the Company reported a decline in comparable store sales. Starbucks' rewards membership also declined to 32.8 million from 34.3 million in the prior quarter, the first decline in ten years. The Company also reported a 2% decline in net revenues over the prior year, and a 14% decline in GAAP EPS for FY24 Q2, due to a decline in comparable store sales and store traffic. Defendants also disclosed a Q2 EPS of $0.68, declining 14% over the prior year, and in North America, operating margin contracted 110 basis points year-over-year to 18.0%.

83. On the conference call, Narasimhan told investors that "challenge[s] meeting our peak morning demand in the U.S." and "long wait times" contributed to the decline in U.S. store traffic. Demonstrating that Starbucks' problems were more than single-quarter issues, Ruggeri also informed investors that the Company was slashing its full-year 2024 guidance. The revised FY24 outlook projected weaker revenue growth, with U.S. comparable store sales now expected to range from a low-single-digit decline to flat, a sharp downgrade from the earlier forecast of 4% to 6% growth. Defendants also slashed guidance for EPS and non-GAAP EPS to flat to low single digits, from the previous range of 15% to 25%.

84. On the call, Narasimhan and Ruggeri acknowledged that they had in fact been seeing both declining revenues and declining comparable store sales in Q1, which continued into and throughout Q2:

> [Narasimhan] ***Headwinds discussed last quarter have continued***. In a number of key markets, we continue to feel the impact of a more cautious consumer, particularly with our more occasional customer, and a deteriorating economic outlook has weighed on customer traffic, an impact felt broadly across the industry.

* * *

> [Ruggeri] Our U.S. company-operated business posted a 3% comparable store sales decline in Q2, driven by a 7% decrease in transactions.
>
> ***Consistent with Q1***, the traffic decline was pronounced among more occasional customers . . . .
>
> * * *
>
> Broadly, in the second quarter, our business underperformed as revenues in the U.S., China, Middle East and other markets were impacted more deeply than anticipated by the continued multifaceted headwinds. In addition to the second quarter performance, our exit rates of both revenue and comp growth across our key markets reflect ***continued headwinds***.
>
> * * *
>
> As a result of what has changed, our revenue and comp guidance as well as the related flow-through to margin and earnings is impacted.
>
> * * *
>
> First, Q2 was a challenging quarter for us as headwinds ***consistently persisted throughout the quarter*** leading us to revamp our actions and response plans to both unlock and attract demand.

85. Defendants disclosed their issues with meeting customer demand and customers abandoning MOP transactions, which Defendants knew of or recklessly disregarded during FY24 Q1 and Q2 and throughout the Class Period. Narasimhan stated:

> But we currently have ***a challenge meeting our peak morning demand in the U.S.*** For example, more than 60% of our morning business in the U.S. comes from Starbucks Rewards members who overwhelmingly order with a Starbucks app. What's interesting though, despite strong [MOP] sales, we saw a mid-teens percent order in completion rate within the order channel this past quarter. In other words, customers using MOP put items into their cart and sometimes chose not to complete their order citing ***long wait times or product unavailability***.

86. In response to this news, the price of Starbucks common stock declined 15.88%, from a closing price of $88.49 per share on April 30, 2024 to a closing price of $74.44 per share on May 1, 2024, on abnormally high volume of close to 67 million shares traded, over 7 times the Class Period average trading volume. In stark contrast, on the same date the S&P 500 Consumer Discretionary Sector, a peer group that includes Starbucks, remained flat at -0.0175%.

87. The drop in the price of Starbucks common stock following the April 30, 2024 disclosure was the biggest single-day price decline since the stock was first publicly listed in 1992. This stock price decline was due to firm-specific, fraud-related disclosures and not the result of market, industry, or firm-specific, non-fraud factors.

88. Following the April 30, 2024 disclosure, analysts expressed surprise as to the magnitude of the comparable store sales decline and made material downward revisions to their 2024, 2025, and 2026 estimates and stock price targets for Starbucks. For example, in a May 1, 2024 report, Piper Sandler made downward revisions to its 2024 to 2026 estimates and lowered its price target from $100 per share to $88 per share following Defendants' report of declining comparable store sales, and stated "the magnitude of the misses that was quite surprising," and "we think management credibility remains a big issue from here." Similarly, on May 1, 2024, Morningstar issued a report stating "the degree of comparable store sales pressure that [Starbucks] saw in its most recent quarter was shocking."

89. Several analysts also noted that FY24 Q2's results were the Company's worst financial performance in recent history. For example, in an April 30, 2024 analyst report, William Blair downgraded Starbucks' stock rating to market perform, noting that FY24 Q2 marked the Company's "weakest traffic performance . . . outside of the [COVID] pandemic or the Great Recession." Similarly, in a May 1, 2024 analyst report, Morgan Stanley lowered its revenue estimates and Company price target, stating, "this appears to be the worst quarter in our model . . . outside of the [Global Financial Crisis] and Covid, and -7% [North America] traffic was worse than during the [Global Financial Crisis]." Also on April 30, 2024, Jefferies issued a report stating that FY24 Q2 was "the worst result for the [North America] segment in the past 20 years [excluding] the pandemic periods."

90. On May 1, 2024, Narasimhan went on CNBC and spoke to Jim Cramer about the Company's surprisingly poor FY24 Q2 financial results. Cramer quickly pointed out that

Narasimhan failed to adequately explain the results and noted that shareholders were "distressed" and viewed the problem as "one of trust" with Company management.

## VIII. POST-CLASS PERIOD DEVELOPMENTS

91. Subsequent market commentary exemplifies that investors were misled. On May 2, 2024, HSBC published a report entitled "Hold: Flurry of initiatives amidst conundrum of woes." In the report, HSBC reduced its price target by 20% because of misses to "many of the most meaningful metrics," including:

> 1) a slide in traffic of a whopping 7% y-o-y, the worst in company history, excepting the peak of the pandemic and the global financial crisis; 2) a sharp decline in same-store-sales of 3% y-o-y (versus our expectation for an increase of 1%) despite the benefit of price increases of +4% . . . ; 4) a decrease in active rewards members (4% sequentially)—the first decline in over ten years; 5) order incompletion rate of mid-teens (%) among rewards members in the US (a cohort that represents c60% of the critical morning day part sales).

HSBC said that its revised outlook was based in part on "a disconnect between current go-to market strategy and evolving consumer preferences."

92. In April 2024, Starbucks had a major internal reorganization. One of the significant changes was that Mr. Conway became the North America CEO. Ms. Trilling, who was previously the head of North America reporting to CEO Narasimhan, was layered and began reporting to Mr. Conway.

93. On May 5, 2024, Starbucks' former CEO Schultz took the unusual step of publicly criticizing Narasimhan's performance as the CEO in a LinkedIn post. Schultz noted that Starbucks' U.S. operations were the primary reason for the Company's stock price decline and criticized the Company's top executives for failing to focus on the customer experience and store operations.

94. On May 29, 2024, *Bloomberg* published a report based on the accounts of current Starbucks partners confirming that Starbucks' implementation of a new scheduling algorithm was causing stores to be understaffed, which significantly increased food and drink wait times. According to the Starbucks partners, the new algorithm did not "adequately account for the time it t[ook] to fulfill a ballooning number of special customer requests like extra espresso shots or cold

foam, as well as the effect of more corporate promotions." The *Bloomberg* report cited partners confirming that because of the understaffing, workers were "struggling to simultaneously juggle in-person, drive-thru, mobile and delivery orders and customers were waiting longer."

95. June 14, 2024 was Mr. Britt's last day at Starbucks. As the "key architect" of the Reinvention Plan, *Bloomberg* reported that his departure coincided with the revamp that was "buckling under an influx of to-go orders," while the Company was "seeking to make it easier for staff to operate cafes by investing in new equipment and training, among other initiatives." Starbucks did not appoint his replacement.

96. On July 30, 2024, Defendants reported FY24 Q3 financial results and more bad news regarding declining comparable store sales and store traffic. They reported that U.S. comparable store sales fell 2%, driven by a 6% decline in store traffic, and profits dropped more than 7%. Narasimhan told investors that the Company was working to speed up service on digital orders. FY24 Q2 and Q3 were some of the Company's "worst quarters outside of the pandemic or Great Recession."

97. On August 13, 2024, amidst activist investor pressure, Starbucks abruptly announced that Narasimhan was immediately stepping down as the Company's CEO and a member of its Board. Narasimhan served only 17 months as Starbucks' CEO, the shortest CEO tenure in Company history. Brian Niccol, the former CEO of Chipotle, took over as CEO in September 2024.

98. On January 28, 2025, Starbucks held an earnings conference call with investors. During the call, Niccol admitted that in FY25 Q1 (September 30, 2024 to December 29, 2024), the Company added more partner hours to over 3,000 U.S. stores to reduce wait times and ensure enough store staffing to meet demand. During the Q&A portion of the call, an analyst from Deutsche Bank followed up on a question about the additional partner hours Starbucks added. In response, Niccol stated:

> [W]e put in the labor into those 3,000 stores from a precision standpoint, which was really just going back and looking at the labor tables to find out where potentially we've just gotten too thin in certain areas. And so, we've implemented that. The good news is we've seen a positive response on that front.

## IX. APPLICABILITY OF THE PRESUMPTION OF RELIANCE AND THE FRAUD-ON-THE-MARKET DOCTRINE

99. Lead Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;
- the omissions and misrepresentations were material;
- Starbucks' common stock traded in an efficient market, was liquid and traded with moderate to heavy volume during the Class Period;
- the Company's common stock was traded on the Nasdaq and was covered by multiple analysts;
- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and
- Lead Plaintiffs and members of the Class purchased, acquired, and/or sold Starbucks common stock between the time Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

100. Based upon the foregoing, Lead Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

101. Alternatively, Lead Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## X. CLASS ACTION ALLEGATIONS

102. Lead Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Starbucks common stock during the Class Period and were damaged thereby. Excluded from the Class are Defendants, officers, and directors of the Company, at all relevant times,

members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

103. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Starbucks common stock was actively traded on the Nasdaq. While the exact number of Class members is unknown to Lead Plaintiffs at this time and can be ascertained only through appropriate discovery, Lead Plaintiffs believe there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Starbucks or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

104. Lead Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

105. Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Lead Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

106. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations, prospects, and/or management of Starbucks;
- whether statements made by Defendants to the investing public during the Class Period omitted material facts necessary to make the statements made neither false nor misleading;
- whether Defendants acted knowingly or with reckless disregard for the truth;



KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400, Seattle, WA 98101-3268
Telephone: 206/623-1900

- whether the price of Starbucks common stock during the Class Period was artificially inflated because of Defendants' conduct complained of herein; and
- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

107. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XI. CAUSES OF ACTION

### COUNT I

### For Violation of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against Starbucks and Laxman Narasimhan

108. Lead Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

109. This Count is based upon §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and SEC Rule 10b-5 promulgated thereunder. During the Class Period, Starbucks and Narasimhan violated §10(b) of the Exchange Act and SEC Rule 10b-5 in that they (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiffs and the Class in connection with their purchase of Starbucks common stock during the Class Period.

110. In furtherance of their scheme and wrongful course of business, Starbucks and Narasimhan, and each of them, took the actions set forth herein.

111. During the Class Period, Starbucks and Narasimhan engaged in a scheme and wrongful course of business and disseminated or approved the statements specified above, which

they knew were false and misleading in that they contained misrepresentations and/or failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading. Starbucks and Narasimhan's misconduct was intended to, and did (i) deceive the investing public, including Lead Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Starbucks common stock; and (iii) cause Lead Plaintiffs and other members of the Class to purchase or otherwise acquire Starbucks common stock at artificially inflated prices.

112. As a direct and proximate result of Starbucks and Narasimhan's wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases of the Company's common stock during the Class Period in that, in reliance on the integrity of the market, they paid artificially inflated prices for Starbucks common stock. Lead Plaintiffs and the Class would not have purchased Starbucks common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated the misleading statements alleged herein. Upon the disclosure that the Company had been disseminating false and misleading statements to the investing public, Lead Plaintiffs and the other members of the Class suffered financial harm.

## COUNT II

### For Violation of §20(a) of the Exchange Act Against All Defendants

113. Lead Plaintiffs repeat and reallege each and every allegation above as if fully set forth herein.

114. During the Class Period, Narasimhan and Ruggeri participated in and oversaw the operation and management of Starbucks, and conducted and participated, directly and indirectly, in the conduct of Starbucks' business affairs. Narasimhan and Ruggeri exercised control over Starbucks' operations and possessed the power to control, and did control, the specific activities which comprise the primary violations about which Lead Plaintiffs and the other members of the Class complain. In addition, [redacted]


KELLER ROHRBACK L.L.P.
1201 Third Avenue, Suite 3400, Seattle, WA 98101-3268
Telephone: 206/623-1900

[redacted]

115. Narasimhan and Ruggeri acted as controlling persons of Starbucks within the meaning of §20(a) of the Exchange Act. By virtue of their senior management positions as officers and/or directors of Starbucks, their participation in and awareness of the Company's operations, and their personal knowledge of the statements filed by the Company with the SEC and/or disseminated to the investing public, Narasimhan and Ruggeri had the power to influence and control, and did influence and control, directly or indirectly, Starbucks' decision-making, including the content and dissemination of the allegedly false and misleading statements and other acts in furtherance of a fraudulent scheme.

116. In particular, as CEO and CFO, Narasimhan and Ruggeri had direct or supervisory responsibility over the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular business and/or operating practices and expenditures and deficient control environment giving rise to the securities violations alleged in Count I, and exercised that power.

117. Starbucks had the power to control and influence Narasimhan and Ruggeri and other Company executives through its power to hire, fire, supervise, and otherwise control the actions of its employees and their salaries, bonuses, incentive compensation, and other employment considerations. By virtue of the foregoing, Starbucks had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Narasimhan and Ruggeri, including the content of their public statements.

118. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and other members of the Class suffered damages in connection with their purchases and/or acquisitions of Starbucks common stock during the Class Period when the relevant truth was revealed.

119. By reason of the foregoing, Defendants violated §20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs demand judgment against Defendants as follows:

A. Declaring this action to be a class action properly maintained pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) and certifying Lead Plaintiffs as Class Representatives and Robbins Geller Rudman & Dowd LLP as Class Counsel;

B. Awarding compensatory damages in favor of Lead Plaintiffs and the other members of the Class against Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Lead Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including reasonable attorneys' fees, accountants' fees, and experts' fees, and other costs and disbursements; and

D. Awarding Lead Plaintiffs and other members of the Class such other injunctive or equitable relief, including disgorgement and/or the imposition of a constructive trust, that may be deemed just and proper by the Court.

## JURY DEMAND

Lead Plaintiffs hereby demand a trial by jury.

DATED: July 31, 2026

Respectfully submitted,

ROBBINS GELLER RUDMAN
& DOWD LLP
LUKE O. BROOKS (admitted *pro hac vice*)
KEVIN A. LAVELLE (admitted *pro hac vice*)
ERIKA L. OLIVER (admitted *pro hac vice*)
PATTON L. JOHNSON (admitted *pro hac vice*)
EVELYN SANCHEZ GONZALEZ
(admitted *pro hac vice*)

s/ ERIKA L. OLIVER
ERIKA L. OLIVER

655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
lukeb@rgrdlaw.com
klavelle@rgrdlaw.com
eoliver@rgrdlaw.com
pjohnson@rgrdlaw.com
egonzalez@rgrdlaw.com

*Lead Counsel for Lead Plaintiffs*

KELLER ROHRBACK L.L.P.
JULI E. FARRIS (WSBA #17593)
1201 Third Avenue, Suite 3400
Seattle, WA 98101-3268
Telephone: 206/623-1900
jfarris@kellerrohrback.com

*Liaison Counsel for Lead Plaintiffs*